FILED

OCT 2 3 2007

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          v.<br><br>ABITIBI-CONSOLIDATED INC. and<br>BOWATER INCORPORATED,<br><br>                    Defendants. | CASE NO.:<br><br>Case: 1:07-cv-01912<br>Assigned To : Collyer, Rosemary M.<br>Assign. Date : 10/23/2007<br>Description: Antitrust<br><br>DATE STAMP: |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the

Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files

this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in

this civil antitrust proceeding.

### I. NATURE AND PURPOSE OF THE PROCEEDING

Defendants Abitibi-Consolidated Inc. ("Abitibi") and Bowater Incorporated ("Bowater")

entered into a merger agreement, dated January 29, 2007, pursuant to which Defendants would

merge to create a new company, AbitibiBowater Inc. The United States filed a civil antitrust

complaint on October 23, 2007, seeking to enjoin the proposed merger. The Complaint alleges

that the likely effect of the merger would be to lessen competition substantially in the production

and distribution of newsprint in North America in violation of Section 7 of the Clayton Act, 15

U.S.C. § 18. This loss of competition likely would result in higher newsprint prices in the United

2

States. At the same time the Complaint was filed, the United States also filed an Asset

Preservation Stipulation and Order ("Stipulation") and a proposed Final Judgment, which are

designed to eliminate the anticompetitive effects of the merger.

Under the proposed Final Judgment, which is explained more fully in Section III,

Defendants are required to divest Abitibi's Snowflake, Arizona, newsprint mill, which has

approximately 375,000 metric tonnes of newsprint manufacturing capacity. Until the mill is sold

and operated under the new ownership, Defendants must take certain steps to ensure that the mill

and its accompanying assets, as defined in the proposed Final Judgment (hereafter, the

"Divestiture Assets"), are operated as ongoing, economically viable, and competitive assets.

The United States and Defendants have stipulated that the proposed Final Judgment may

be entered after compliance with the APPA. Entry of the proposed Final Judgment would

terminate this action, except that the Court would retain jurisdiction to construe, modify, or

enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II. DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A.    Defendants and the Proposed Transaction

Abitibi and Bowater both produce, distribute, and sell newsprint and other groundwood

paper throughout the world. Defendants also produce other pulp and wood-related products,

operate sawmills, and own or lease timberlands throughout the United States and Canada.

Abitibi is a Canadian company with its headquarters in Montréal, Quebec, Canada. In

2006, Abitibi reported total sales of approximately $4.85 billion. Its North American newsprint

-2-

sales were approximately $1.7 billion. Abitibi is the largest newsprint producer in North America. It owns approximately 25 percent of North American capacity.

Bowater is incorporated in Delaware, and has its headquarters in Greenville, South Carolina. In 2006, Bowater reported total sales of approximately $3.53 billion. Its North American newsprint sales were approximately $1.1 billion. Bowater is the second largest newsprint producer in North America. It owns approximately 16 percent of North American capacity.

Defendants publicly announced their proposed transaction on January 29, 2007. The new company, AbitibiBowater Inc., will be headquartered in Montréal, Quebec, Canada, but it will be incorporated in Delaware and listed on both the NYSE and Toronto stock exchanges.

**B.      The Competitive Effects of the Transaction on the Newsprint Market**

**1.      Newsprint is the Relevant Product Market**

The Complaint alleges that the production, distribution, and sale of newsprint is a relevant product market within the meaning of Section 7 of the Clayton Act. Newspapers are printed on newsprint. Newsprint is an uncoated groundwood paper made by a mechanical pulping process without the use of chemical additives, such as bleach. Newsprint can also be made, partly or entirely, from recovered fiber, such as old newsprint and old magazines. Because of the production process and lack of additives, newsprint is the lowest quality and generally least expensive grade of groundwood paper.[2]

---

[2] There are two primary newsprint basis weights, 30 pound (48.8 gsm) and 27.7 pound (45 gsm), the lighter of which has a higher yield. The differences between the two weights are not material to product market definition because prices for each basis weight track each other, newspaper publishers can use either weight in their presses, and newsprint

Newspaper publishers, who buy more than 80 percent of all newsprint sold in the United States, have no close substitutes to use for printing newspapers because of newsprint's price and physical characteristics, such as its strength and opacity. In addition, because publishers' newsprint presses are optimized to use newsprint, switching to another grade of paper would be costly.

Newsprint used for other purposes, primarily the production of direct mail and newspaper inserts, constitutes only a small share of total newsprint sales. If newsprint prices were to increase by a small but significant amount, some customers for these other uses might switch to other grades of groundwood paper or otherwise reduce their consumption of newsprint. Those losses, however, would not be sufficient to make such a price increase unprofitable.[3]   For these reasons, demand for newsprint is highly inelastic to changes in price. Accordingly, the production, distribution, and sale of newsprint is a line of commerce and a relevant product market.

**2.    Relevant Geographic Market: North America**

The Complaint alleges that the relevant geographic market is no smaller than the United States and Canada ("North America").[4]  Newsprint can be transported within the United States

---

manufacturers can produce either weight on the same newsprint machines without incurring switching costs.

[3] Defendants also produce higher-grade groundwood paper and would be able to recapture some of the revenue lost from newsprint in these other groundwood grades.

[4] The United States did not fully investigate whether Mexico should be included in the North American market because the inclusion or exclusion of Mexico does not change the analysis. Mexico is not a significant producer of newsprint, it does not export significant amounts of newsprint to the United States, and the industry does not consider Mexico to be part of the North

and Canada at a sufficiently low cost and in such a timely and reliable manner that an attempt to

increase price in any smaller region of the United States or North America would prove

unprofitable. In the event of such an attempted price increase, customers could readily and

economically shift their purchases to newsprint producers throughout North America. In

addition, national newspaper buying groups, which account for over 70 percent of all newsprint

purchases throughout the United States, create a North American pricing structure. Price

differences across regions within the United States have been small and short-lived, as supply has

shifted rapidly to restore parity marketwide.

The Complaint also alleges that the relevant geographic market is no broader than North

America. Newsprint mills located in Canada and the United States account for approximately 98

percent of North American newsprint consumption. Transportation costs of importing newsprint

are high, and customers are concerned about the reliability of foreign newsprint supply.

Consequently, a small but significant increase in the price of newsprint will not likely cause

customers to purchase sufficient volumes of additional newsprint from outside North America to

make such a price increase unprofitable. Accordingly, North America is a relevant geographic

market.

3.    **Anticompetitive Effects of the Merger**

The Complaint alleges that the proposed merger likely will substantially reduce

competition to supply newsprint in the United States. Abitibi and Bowater are the two largest

North American newsprint producers, and they directly compete against one another to produce

and sell newsprint. Abitibi and Bowater currently own approximately 25 percent and 16 percent

American market.

of North American newsprint capacity, respectively, which will result in a post-merger share of over 40 percent.[5]

North American newsprint demand has declined over the last several years at a rate of approximately 5 to 10 percent per year because of a significant decline in demand for newspapers. As a result, North American newsprint producers have closed or idled capacity and converted some of their newsprint machines to produce other grades of paper. This decline in demand for newsprint is projected to continue, and the resulting excess newsprint capacity likely will lead Defendants and their competitors to close, idle, or convert more newsprint mills.

But for the merger, neither Defendant acting alone would be of sufficient size to profitably increase the price of newsprint by reducing its own output through strategically closing, idling, or converting its capacity.

The combination enhances Defendants' incentives to exercise market power because the merged firm will control a greater base of capacity over which the merged firm would benefit from an increase in newsprint prices after strategically closing, idling, or converting some of its capacity. Without Snowflake's capacity, the merged firm would not be of sufficient size to be able to recoup the losses from such strategic closures through increases in prices on its remaining newsprint production. The divestiture of Snowflake would adequately address the likelihood that the proposed merger substantially would reduce competition for newsprint in the United States.

---

[5] The 40 percent market share represents the merged firm's newsprint capacity over which it would be able to profit from an anticompetitive price increase. This share does not include approximately nine percent of North American newsprint capacity attributable to Abitibi and Bowater through joint-venture relationships and a sales management contract. This volume is not relevant to the competitive effects analysis because, under the structure of these arrangements, Defendants would not be able to benefit from a price increase on this capacity.

**4.    Neither Supply Responses Nor Entry Will Defeat the Exercise of Market Power**

Neither the combined firm's North American producers, nor competitors from outside of the North American market, can, individually or collectively, increase their newsprint sales to North American customers to make a price increase by the merged firm unprofitable. Entry by a new competitor would not be timely, likely, or sufficient to defeat an exercise of market power by the merged firm. The merged firm will therefore have both the incentive and the ability to impose an anticompetitive price increase.

While North American newsprint competitors currently have some limited excess capacity, that capacity will be reduced by the closure or conversion of unprofitable newsprint mills or machines in response to falling demand for newsprint. Once this capacity exits the market, the merged firm then will be able profitably to exercise market power.

North American newsprint competitors would not defeat an anticompetitive price increase by restarting their closed or idled capacity. The increased revenue from restarting a closed mill or machine would not outweigh the start-up costs, particularly in a declining market.

North American producers with the capacity to make higher-grade groundwood paper are not likely to switch production from those grades into newsprint production in response to a price increase. Declining demand for newsprint has caused several producers to invest substantial capital to convert newsprint machines to produce more profitable value-added grades of paper. These producers would not find it profitable to switch from producing higher grades back to newsprint to defeat an exercise of market power by the merged firm.

Some North American producers export a portion of their newsprint capacity. Some of these newsprint exports likely would be directed back to the North American market in response to a price increase. However, this repatriation of newsprint will be insufficient, even in combination with other competitive responses, to discipline an exercise of market power by the combined firm. Abitibi and Bowater collectively produce 65 percent of North American newsprint exports, and would have no incentive to repatriate their exports to defeat a price increase. In addition, most of the remaining exports by North American producers are sold pursuant to long-term sales arrangements and relationships and, therefore, are unlikely to be repatriated in response to a price increase.

Greenfield entry is highly unlikely. A new North American newsprint mill or machine would cost in excess of a hundred million dollars. Particularly given that demand for newsprint is declining in North America, a new entrant would not find it profitable to build a new newsprint mill in response to a price increase, and could not do so within two years.

Accordingly, expansion, repatriation, and entry would not be timely, likely, or sufficient to deter an anticompetitive price increase by the merged firm.

### III. EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The proposed Final Judgment provides for the divestiture of Abitibi's Snowflake, Arizona, newsprint mill to a buyer acceptable to the United States, in its sole discretion, to preserve competition for newsprint in the United States. Snowflake is located in northeastern Arizona. In 2006, Snowflake produced over 330,000 metric tonnes of newsprint on two machines. Snowflake is one of the most efficient and profitable newsprint mills in North America. Plans to improve the

-8-

Snowflake mill's efficiency in coming years with investments in energy and machinery are already underway. Snowflake's size and cost position ensure that its divestiture to a competitor of the merged firm will preserve competition in the North American newsprint market.

As part of its investigation, the United States considered market shares, costs of production, the extent of industry excess capacity, and future reductions in newsprint demand in analyzing whether the merger would cause an anticompetitive increase in newsprint prices. As discussed in Section II.B.3, if Defendants were allowed to merge without a divestiture, the merged firm would be able to close its capacity strategically, allowing the merged firm to raise newsprint prices and recoup its lost profits on its combined output. Divesting Snowflake, however, will reduce the capacity over which the merged firm could profit to a level at which it would not have the ability to close capacity strategically.

Snowflake uses 100 percent recycled fiber and Abitibi currently supplies the Snowflake mill with approximately 25 to 30 percent of its fiber requirements. At the option of the Acquirer, the proposed Final Judgment requires Defendants to enter into a supply contract for up to 25 percent of Snowflake's old newsprint requirements at the prevailing market price for up to three years from the date of the divestiture. Similarly, at the option of the Acquirer, and upon the approval of the United States, the proposed Final Judgment also requires Defendants to provide certain transition services for up to twelve (12) months as part of the divestiture.

In merger cases where the United States seeks a divestiture remedy, it requires completion of the divestiture within the shortest time period reasonable under the circumstances. Section IV of the proposed Final Judgment requires Defendants to complete the divestiture within 120 days

-9-

after the filing of the Complaint in this matter. The assets must be divested in such a way as to satisfy the United States in its sole discretion that the operations can and will be operated by the purchaser as a viable, ongoing business that can compete effectively in the relevant market. The United States, in its sole discretion, may grant one or more extensions of time, not to exceed sixty (60) calendar days in total. Defendants must use their best efforts to accomplish the divestiture as expeditiously as possible.

If Defendants do not accomplish the divestiture within the period prescribed in the proposed Final Judgment, a trustee shall be appointed by the Court upon the application of the United States. If a trustee is appointed, the proposed Final Judgment provides that Defendants will pay all costs and expenses of the trustee. The trustee's commission will be structured so as to provide an incentive for the trustee based on the price obtained and the speed with which the divestiture is accomplished. After his or her appointment becomes effective, the trustee will file monthly reports with the Court and the United States setting forth his or her efforts to accomplish the divestiture. If the divestiture has not been accomplished at the end of the six months, the trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate in order to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

Finally, the proposed Final Judgment sets forth the process for and the circumstances when Defendants must notify the United States of the acquisition of any mill or machine or any interest in a mill or machine, if the value of such exceeds $2,000,000, that is currently jointly-owned by either Abitibi or Bowater with any third party. This notification requirement applies to

-10-

certain transactions not otherwise subject to the reporting and waiting period requirements under

the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and runs for ten years from entry of

the Final Judgment. The provision is intended to ensure that any such acquisition does not

undermine the benefits that the divestiture of the Snowflake mill will bring to the market.

### IV.  REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been

injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to

recover three times the damages the person has suffered, as well as costs and reasonable attorneys'

fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any

private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15

U.S.C. § 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent private

lawsuit that may be brought against the defendants.

### V.  PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may

be entered by the Court after compliance with the provisions of the APPA, provided that the

United States has not withdrawn its consent. The APPA conditions entry upon the Court's

determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the

proposed Final Judgment within which any person may submit to the United States written

comments regarding the proposed Final Judgment. Any person who wishes to comment should

do so within sixty days of the date of publication of this Competitive Impact Statement in the

-11-

Federal Register. All comments received during this period will be considered by the Department

of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time

prior to the Court's entry of judgment. The comments and the response of the United States will

be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> Joseph Miller
> Assistant Chief, Litigation I Section
> 1401 H St. NW, Suite 4000
> Antitrust Division
> United States Department of Justice
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the

parties may apply to the Court for any order necessary or appropriate for the modification,

interpretation, or enforcement of the Final Judgment.

## VI. **ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT**

The United States considered, as an alternative to the proposed Final Judgment, a full trial

on the merits against Defendants. The United States could have continued the investigation and

sought preliminary and permanent injunctions against Abitibi and Bowater's proposed merger.

The United States is satisfied, however, that the divestiture of assets described in the proposed

Final Judgment will preserve competition in the market identified by the United States and that

such a remedy would achieve all or substantially all of the relief the United States would have

obtained through litigation, but avoids the time, uncertainty, and expense of a trial.

In developing this relief, the United States considered a number of divestiture alternatives

and determined that the divestiture of the Snowflake mill, under the circumstances, was the best

-12-

solution given the size and efficiency of the Snowflake mill. The analysis conducted by the

United States indicates that the Snowflake mill is among the largest and most profitable mills in

the United States. The location of the mill to be divested is not competitively significant because

the evidence does not support the conclusion that the relevant geographic market is narrower than

North America.

## VII. STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in

antitrust cases brought by the United States be subject to a sixty-day comment period, after which

the Court shall determine whether entry of the proposed Final Judgment "is in the public interest."

15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as

amended in 2004, is required to consider:

> (A)    the competitive impact of such judgment, including termination of
> alleged violations, provisions for enforcement and modification, duration of
> relief sought, anticipated effects of alternative remedies actually
> considered, whether its terms are ambiguous, and any other competitive
> considerations bearing upon the adequacy of such judgment that the court
> deems necessary to a determination of whether the consent judgment is in
> the public interest; and

> (B)    the impact of entry of such judgment upon competition in the
> relevant market or markets, upon the public generally and individuals
> alleging specific injury from the violations set forth in the complaint
> including consideration of the public benefit, if any, to be derived from a
> determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A)-(B); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d

1, 11 (D.D.C. 2007) (concluding that the 2004 amendments "effected minimal changes" to scope

of review under Tunney Act, leaving review "sharply proscribed by precedent and the nature of

-13-

Tunney Act proceedings").[6]

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1458-62 (D.C. Cir. 1995). With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62. Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest.*" More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[7] In making its public interest

---

[6] The 2004 amendments substituted "shall" for "may" in directing relevant factors for court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006).

[7] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

-14-

determination, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations because this may only reflect underlying weakness in the government's case or concessions made during negotiation." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

Court approval of a consent decree requires a standard more flexible and less strict than that appropriate to court adoption of a litigated decree following a finding of liability. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id*. at 1459-60. As this Court recently confirmed in *SBC Commc'ns*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The language wrote into the statute what the Congress that enacted the Tunney Act in 1974 intended, as Senator Tunney then explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F.

-16-

Supp. 2d at 11.[8]

# VIII. DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: October 23, 2007

Respectfully submitted,

Karl D. Knutsen
Ryan Danks
Mitchell Glende
Seth A. Grossman
N. Christopher Hardee (DC Bar No. 458168)
David Kelly
Ihan Kim
Rebecca A. Perlmutter
Attorneys
U.S. Department of Justice
Antitrust Division
Litigation I Section
1401 H Street, NW, Suite 4000
Washington, DC 20530
(202) 514-0976

---

[8] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized."); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.").