UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO.:    1:07-cv-01912 |
| vs. | ) | Assigned To: Collyer, Rosemary M. |
| | ) | Assign. Date: 10/23/2007 |
| ABITIBI-CONSOLIDATED, INC. | ) | Description:   Antitrust |
| and BOWATER INCORPORATED, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

REPLY BY NEWSPAPER ASSOCIATION OF AMERICA IN SUPPORT
OF ITS MOTION FOR LEAVE TO APPEAR AS *AMICUS CURIAE*

In this Tunney Act proceeding the Antitrust Division of the Department of Justice seeks approval of a consent decree settling its challenge to the merger of North America's two largest newsprint producers.    The Antitrust Division sued the merging parties, Abitibi-Consolidated Inc. and Bowater Incorporated (now merged into a single firm, AbitibiBowater, Inc.), alleging that combining the two companies would substantially lessen competition in the market for newsprint in North America. The Antitrust Division accepted the divestiture of a single newsprint mill in Snowflake, Arizona, as adequate relief. Ultimately the question before the Court will be whether this settlement is in the public interest.

Issue Before the Court

The immediate issue is whether the Newspaper Association of America (NAA), a trade association representing the daily newspapers that purchase most of the newsprint sold by AbitibiBowater, should be allowed to participate as *amicus curiae*. The Antitrust

Division and AbitibiBowater oppose NAA's motion, arguing (1) there is already enough information in the record for the Court to make its public interest determination (2) NAA has nothing helpful to add that is not already in its formal comment and in its motion and (3) the Court can easily obtain anything more it needs without NAA's participation as *amicus curiae*. (Antitrust Division's Opposition at 4-8; AbitibiBowater's Opposition at 3-4)

Each of these arguments is wrong. (1) The record before the Court is incomplete in two respects. First, the Antitrust Division's competitive impact statement, the proposed consent decree, and the response to NAA's comment each omit or deemphasize underlying facts and assumptions that call into question the efficacy of the settlement. Second, none of these documents squarely addresses what are perhaps the most important facts of all when it comes to the Court's public interest determination -- events in the newsprint market precipitated by AbitibiBowater since the merger was consummated on October 29, 2007. (2) NAA is not a disinterested third party. NAA represents the customers of newsprint that will suffer most of the direct financial harm if the government's predictions about the adequacy of this divestiture prove wrong. Indeed, the statute expressly requires the Court to take account of the merger's effect on customers. NAA is the only potential participant with both the motivation and the knowledge base to present facts tending to prove that the proposed decree is not within the limits of the public interest. (3) Courts have typically allowed interested parties to intervene or participate as *amicus curiae* whenever the courts have perceived a need to supplement the record presented by the government in Tunney Act proceedings. This is such a case.

## The Record Before the Court is Incomplete

The competitive impact statement and the proposed consent decree were filed on October 23, 2007. The sixty day public comment period required by the Tunney Act ended on January 7, 2008. Although NAA's comment was filed within the comment period, the Antitrust Division did not file its response to NAA's comment until April 18, 2008, more than three months after the end of the comment period. The Antitrust Division permitted the merger between Abitibi and Bowater to be completed on October 29, 2007, even before the commencement of the comment period on November 8, 2007, the completion of the comment period on January 7, 2008, or the completion of the Tunney Act proceedings.

As NAA noted in its comment, neither the competitive impact statement nor the response to NAA's comment provides an explanation to the Court of how the proposed divestiture of a single newsprint mill located in Arizona will remediate the competitive harm recognized by the Antitrust Division and challenged in its complaint. The Antitrust Division asserts that it has performed an economic analysis to support its position, but the key numerical and other assumptions on which that analysis depends are missing from the information the Antitrust Division has filed with the Court. The Antitrust Division has not even provided the Court with the capacity share accounted for by the Snowflake newsprint mill (just 3 percent of North American newsprint capacity) or any explanation of why the removal of that relatively small capacity share from AbitibiBowater (a reduction of the merged firm's combined North American newsprint capacity share from 40 percent to only 37 percent) would be sufficient to bring about a correction of a merger between the first and second largest producers of newsprint, a merger that the Antitrust

Case 1:07-cv-01912-RMC    Document 15    Filed 04/28/2008    Page 4 of 13

Division has challenged as anticompetitive. The Antitrust Division has left the Court entirely in the dark as to how a divestiture of that share of productive capacity compares with other divestitures accepted by the Antitrust Division and approved by courts in other Tunney Act proceedings.

The Antitrust Division's failure to inform the Court of these and other relevant facts is particularly striking because of the sharp contrast between the proposed divestiture in the AbitibiBowater case and a very recent divestiture in the Antitrust Division's settlement for a merger in a similar paper industry case. According to the complaint in *United States v. Altivity Packaging LLC and Graphic Packaging International, Inc.*, Case 1:08-cv-00400, D.D.C., March 5, 2008, the merging parties had a combined market share of 42 percent of coated recycled boxboard (CRB) capacity in the North American geographic market. The proposed final judgment required the divestiture of two CRB mills with a combined capacity of 11 percent, which would lower the merged firm's combined capacity share to 31 percent. The theory of anticompetitive effects resulting from the merger and the justification for the proposed size of the divestiture were based on the same unilateral effects theory the Antitrust Division used in the AbitibiBowater matter. (*See Altivity* Competitive Impact Statement, pages 6 and 9)

It is also noteworthy that the Antitrust Division failed to address NAA's argument in its comment concerning the similarity of the AbitibiBowater merger with Georgia-Pacific's acquisition of Fort James Corporation, another similar paper industry merger but with a somewhat smaller combined capacity share in the relevant product market (parent tissue rolls) prior to the acquisition. The Antitrust Division applied the same unilateral effects analysis to the Georgia-Pacific matter that it used here. However, the

4

Antitrust Division required a divestiture of 11 percent of Georgia-Pacific's capacity share to preserve competition, reducing Georgia-Pacific's post-acquisition capacity share from 36 percent to 25 percent. In sharp contrast, the Division claims the divestiture of just 3 percent of AbitibiBowater's capacity share, reducing AbitibiBowater's post-merger capacity share from 40 percent to only 37 percent, is sufficient to protect newsprint consumers from anticompetitive conduct by AbitibiBowater. (See NAA's Comment at 20-21). The Division has provided no explanation why it required significantly larger divestitures in the Altivity and Georgia-Pacific paper industry mergers compared to the much smaller divestiture it agreed to in the AbitibiBowater merger.

Because the Antitrust Division allowed the AbitibiBowater merger to occur before the completion of the Tunney Act proceedings, the merger's competitive impact – the *sine qua non* of a case under Section 7 of the Clayton Act – is no longer a matter of conjecture. As *amicus* NAA would place before the Court facts showing the major changes precipitated by AbitibiBowater that have occurred in the market for newsprint during the months following the merger. NAA would also provide the Court with economic analysis that calls into question the efficacy of the settlement. Unlike a merger that has not occurred at the time of a Tunney Act proceeding, where future events can be predicted with varying degrees of uncertainty, this completed merger affords the Court the opportunity to review the most important, relevant facts needed by the Court to make its public interest determination – events that have already occurred in the newsprint market within the six months since the merger was consummated.

In short, there is now an answer to the key question about the efficacy of the Snowflake divestiture, an answer that could only be predicted when the proposed consent

decree was filed. That question is, simply: has the proposed remedy been effective, or has it already been shown to be inadequate in addressing the competitive harms alleged in the complaint?

The Tunney Act Requires Consideration of the Consent Decree's<br>Effect on Individuals Alleging Specific Injury

The Tunney Act directs courts to consider the impact of the proposed consent decree "upon the public generally and individuals alleging specific injury from the violations set forth in the complaint . . . ." 15 U.S.C. § 16(e)(1)(B). NAA, acting on behalf of its member newspaper publishers, was the only entity to file a comment to the Antitrust Division's proposed consent decree.

As explained in NAA's motion, NAA members account for nearly 90 percent of daily newspaper circulation in the United States, and U.S. daily newspapers account for about 80 percent of newsprint consumption in the United States. As consumers of newsprint, NAA members have already borne the major brunt of the anticompetitive price increases that have resulted from the merger and will suffer the major impact from future anticompetitive price increases and output reductions. NAA, as the representative of U.S. daily and nondaily newspapers, is in the best position to inform the Court of the specific effects that have resulted and are likely to continue to result from the type of antitrust violation alleged by the Antitrust Division in its complaint against Abitibi and Bowater.

If NAA is not permitted to participate either as *amicus curiae* or as an intervenor, the only parties before the Court will be the Antitrust Division and AbitibiBowater, both of which have a vested interest in defending their agreed-upon resolution. Neither the Antitrust Division nor AbitibiBowater has any incentive voluntarily to provide the Court

with information or economic analysis that might cause the Court to question the effectiveness or appropriateness of their agreement. While the Court has the power and is authorized under the Tunney Act to request additional information from the parties, courts in an adversarial system are accustomed to resolving matters after hearing from advocates of opposing positions. As a representative of the primary consumers of newsprint, NAA has a strong incentive to provide this information and analysis to the Court. The antitrust laws, including the merger laws, are primarily intended to protect buyers from anticompetitive conduct by sellers. *Eastman Kodak v. Image Tech. Servs.*, 504 U.S. 451, 478 (1992).

For example, NAA informed the Antitrust Division in a letter dated March 10, 2008 that AbitibiBowater had initiated at the end of February a $60 per metric tonne price increase to be implemented in three $20 monthly installments during the second quarter of 2008, following a similar $60 per metric tonne price increase also initiated by AbitibiBowater and successfully implemented during the first quarter of 2008. Nonetheless, the Antitrust Division failed to inform the Court of this announced second quarter $60 per metric tonne price increase ($20 of which has already been successfully implemented) in its response to NAA's comment, despite being urged to do so by NAA in its March 10 letter to the Antitrust Division.[1] In its subsequent opposition to NAA's motion, the Antitrust Division acknowledges that it was NAA and not the Antitrust Division that brought the announced second quarter price increase to the attention of the Court, but does so only for the purpose of arguing NAA should not be allowed to

---

[1] NAA provided this information to the Court on April 8, 2008, as part of its motion for permission to appear as a*micus curiae* (March 10, 2008, letter from counsel for NAA to the Antitrust Division, attached as Attachment B to NAA's motion).

participate as *amicus curiae*. Neither in its response to NAA's comment nor in its subsequent opposition to NAA's motion does the Antitrust Division respond to NAA's substantive arguments in its March 10 letter to the Antitrust Division concerning the competitive implications of the announced second quarter price increase. (Antitrust Division's Opposition at 6) As a result, the Antitrust Division has provided neither an economic analysis nor its own conclusions regarding this competitively significant post-comment-period event to assist the Court in its public interest determination of the adequacy of the consent decree.

The Antitrust Division suggests NAA has nothing more to add now that the Court has been put on notice of the announced second quarter price increase and should therefore not be permitted to participate in the Tunney Act proceedings. (Antitrust Division's Opposition at 4, 6) Had NAA not filed a comment, however, the Antitrust Division and AbitibiBowater likely would argue NAA should not be allowed to participate as *amicus* because it did not exercise its right to comment, as provided by the Tunney Act.[2]

Contrary to the Antitrust Division's contention, NAA did not provide in its Motion for Leave to Appear as *Amicus* a detailed economic analysis of the announced second quarter price increases, but asked the Court for leave to participate so that it could offer that analysis and additional information about the already apparent and likely future

---

[2]    The Antitrust Division complains NAA filed its motion seeking leave to appear as *amicus curiae* without considering the Division's response. (Antitrust Division's Opposition at 3), but the Antitrust Division fails to explain why it did not respond for three and a half months. In recent years the Antitrust Division has responded to comments much more quickly. *See United States v. SBC Communications and AT&T*, 489 F. Supp. 2d 1, 8 (D.D.C. 2007) (five weeks); *United States v. Microsoft*, 2002 U.S. Dist. LEXIS 26551, *5, 12 (D.D.C. 2002) (one month); *see also United States v. AT&T and Dobson Communications*, 2008 U.S. Dist. LEXIS 21575, *8 (D.D.C. March 20, 2008) (apparently less than two months).

anticompetitive effects of the merger.  NAA would also respond to statements made by

the Antitrust Division in its response to NAA's comment that are incorrect or misleading.

*See* S. Rep. No. 93-298 at 6 (1973) ("the court must obtain the necessary information to

make its determination that the proposed consent decree is in the public interest").

As Jay L. Himes, Antitrust Bureau Chief of the Office of the New York Attorney

General, said just last year:

> Although a consent decree represents a negotiated settlement, it is
> not merely a contract between the parties.  The decree's approval is
> a judicial act by a branch of our government.  It is, therefore,
> imperative that the court avoid allowing the decree to become "an
> instrument of wrong to the public."

Jay L. Himes, "Judicial Review of Justice Department Consent Decrees:  Is the

Tunney Act Glass Half-Empty or Half-Full?," at 12-13, Comptel Plus Spring

Convention and Expo, Las Vegas, NV, February 28, 2007, *quoting United States*

*v. Swift & Co.*, 286 U.S. 106, 115 (1932).[3]

### District Courts in the District of Columbia Circuit Have Granted *Amicus* Standing in Tunney Act Proceedings Since the 2004 Tunney Act Amendments

The Tunney Act specifically gives the Court the right to allow participation by

non-parties as *amicus curiae* when the Court concludes that participation can assist the

Court in exercising its statutory responsibility to determine whether a proposed consent

decree is in the public interest.  In two recent Tunney Act proceedings, Judge Sullivan

and Judge Kollar-Kotelly permitted third parties to participate as *amici* for this purpose.

In both of these cases several of the third parties permitted to participate as *amici* had also

filed comments to the Antitrust Division's proposed consent decree, which did not deter

---

[3]   This reference can be found at:
www.oag.state.ny.us/business/new_antitrust/articles/COMPTEL_Remarks.Final.pdf

9

the court from allowing them to participate in the Tunney Act proceedings. *See United States of America v. SBC Communications and AT&T*, 489 F. Supp. 2d 1, 8-9 (D.D.C. 2007); *United States of America v. Microsoft*, 2002 U.S. Dist. LEXIS 26551 (D.D.C. 2002).

The most recent Tunney Act proceeding in which *amicus* standing was granted occurred just last year in *SBC Communications*. In that case, Judge Sullivan permitted six different groups and individuals to participate in the Tunney Act proceedings as *amicus curiae* for the purpose of presenting additional evidence to assist the court in making an informed determination of whether or not the proposed consent decree was in the public interest. 489 F. Supp. 2d 1, 8-9 (2007). The groups included competitors, purchasers, and consumer advocates, among others. *Id.*

The Antitrust Division opposed every motion filed by these groups and individuals to participate as *amicus curiae*, making many of the same arguments it makes in its opposition here. The court rejected each of the Antitrust Division's arguments against these groups and individuals. Instead, the court directed the Antitrust Division to provide it with additional materials to enable the court to make a more informed public interest determination, and provided each *amicus curiae* the opportunity to respond to the Antitrust Division's supplemental filing. *Id.* at 9. The responses of several *amici* included declarations by economists or other experts. *Id.* at 10. The court then held a hearing to discuss the supplemental filings and permitted each *amicus curiae* to participate in the hearing. Following the hearing, the court permitted the *amici* to file supplemental responses to the specific arguments made during the hearing. *Id.*

In *Microsoft*, the court permitted Computer & Communications Industry Association (CCIA) to participate as *amicus curiae* in the Tunney Act proceedings for the purpose of assisting the court in its determination regarding whether entry of the proposed consent decree was in the public interest. 2002 U.S. Dist. LEXIS 26551 at *6, 11-12. Like NAA, CCIA represented members of the industry directly affected by the merger. *Id.* at *4-5. In allowing CCIA to participate as *amicus curiae*, Judge Kollar-Kotelly allowed CCIA to present new issues and arguments that were not raised in the comments, and she allowed CCIA to address the court during the Tunney Act hearing. *Id.* at *11-12.

Just as several of the groups and individuals granted *amicus curiae* status had also filed comments in the *SBC Communications* and *Microsoft* cases, NAA's comment should not affect whether or not NAA should be granted *amicus* status in this case. As NAA explains in its motion, NAA has an economic analysis to offer the Court as well as information of anticompetitive behavior by AbitibiBowater that has occurred in the time since NAA's comment was filed in January. Therefore, this additional information and evidence would not repeat what was in NAA's comment filed nearly four months ago.

### Conclusion

The record is incomplete. NAA represents the interests most likely to be affected by this merger and is best positioned to provide the additional information the Court needs to make its public interest determination. Similarly situated petitioners have been allowed to participate in prior Tunney Act proceedings. For these reasons, NAA respectfully asks the Court to grant it leave to participate as *amicus curiae* in the Tunney

Act proceedings in this case by introducing evidence, filing a brief, and being heard at the

hearing, or in a proceeding before a special master, if one is appointed.


Respectfully submitted,


Alan. L. Marx
(*pro hac vice* motion pending)
Steven C. Douse
(*pro hac vice* motion pending)
Mark E. Hunt
(*pro hac vice* motion pending)
KING & BALLOW
1100 Union Street Plaza
315 Union Street
Nashville, Tennessee  37201
(615) 259-3456


Mohammad A. Syed
(D.D.C. Bar No. 476315)
KING & BALLOW
1100 Union Street Plaza
315 Union Street
Nashville, TN 37201
(615) 259-3456

Counsel for Newspaper Association
of America

## CERTIFICATE OF SERVICE

I, Mohammad A. Syed, one of the attorneys for Newspaper Association of America,

certify that on April 28th, 2008, the foregoing Reply by Newspaper Association of America in

Support of its Motion for Leave to Appear as Amicus Curiae was served on the following parties

via electronic mail:


*Counsel for Plaintiff*

Karl D. Knutsen, Esq.
U.S. Department of Justice
Anti-Trust Division, Litigation II
1401 H Street, NW
Suite 4000
Washington, DC 20530
(202) 514-0976
karl.knutsen@usdoj.gov

*Counsel for Defendant*

Joseph J. Simons, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1615 L Street, NW
Suite 1300
Washington, DC 20036
(202) 223-7300
jsimons@paulweiss.com

Mohammad A. Syed (D.D.C. # 476315)
KING & BALLOW
1100 Union Street Plaza
315 Union Street
Nashville, TN 37201
(615) 259-3456


*Counsel for Newspaper Association of
America*