**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) ) ) | |
| Plaintiff, | ) ) | CASE NO. 1:07-cv-01912 (RMC) |
| v. | ) ) | |
| **ABITIBI-CONSOLIDATED, INC.,** and **BOWATER INCORPORATED,** | ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OF NEWSPAPER ASSOCIATION OF AMERICA
IN OPPOSITION TO MOTION OF UNITED STATES
FOR ENTRY OF PROPOSED FINAL JUDGMENT**

**Preliminary Statement**

The story of this case is a simple one. Abitibi and Bowater, the two largest newsprint producers in North America, planned to merge. The Department of Justice, on behalf of the United States, challenged the merger but agreed to settle the case with a consent decree. The proposed decree required the merged firm to divest a newsprint mill in Snowflake, Arizona. Once the case was filed, Abitibi and Bowater consummated their merger and divested the mill.

The story does not end here, however, as the settlement is subject to public comment and judicial scrutiny under the Tunney Act, 15 U.S.C. §16(b)-(h). Before the Court can enter the decree, it must find that the settlement is in the public interest. This is the issue currently before the Court.

Whether the settlement is in the public interest depends on the adequacy of the divestiture. If it will prevent the harm predicted in the complaint, the settlement should be approved. If the settlement fails to accomplish that goal – in other words if the divestiture is ineffectual – it is not in the public interest and should be rejected.

NAA – the Newspaper Association of America – represents the interests of the nation's newspapers, the principal consumers of newsprint.[1] In the nine months since the merger, newspapers have experienced an unprecedented series of newsprint price increases initiated by the merged firm, now known as AbitibiBowater. These price increases cannot be explained as a function of rising costs, falling demand, or fluctuating exchange rates. The most logical and likely explanation, based on the available evidence, is that they are the result of strategic capacity reductions made possible by the merger.[2]

Ironically, the pre-divestiture outcome predicted by the Department of Justice in its complaint – a substantial lessening of competition, leading to increased prices to consumers of newsprint as a result of the merger – has come to pass. The post-divestiture outcome predicted in its Competitive Impact Statement – that the sale of Snowflake "will preserve competition in the North American newsprint market,"[3] – has not.

This striking divergence between the Department's prediction and reality seriously undercuts the rationale for approval of the proposed final judgment. Although the evidence would justify its outright rejection, NAA proposes that at a minimum the

---

[1] By order dated June 5, 2008, the Court permitted NAA to appear as *amicus curiae*.

[2] The facts and economic analysis in this memorandum are drawn from the Declaration of John H. Preston, which accompanies this memorandum and is submitted by NAA in support of its opposition to the Department of Justice's Motion for Entry of Proposed Final Judgment.

[3] Competitive Impact Statement (Docket No. 2) at 9.

Court conduct an evidentiary hearing to inquire more deeply into the adequacy of the divestiture. Such hearings are not routine – nor should they be given the limited nature of a Tunney Act proceeding – but the Court has before it a rare set of circumstances in which the proposed settlement has a substantial track record. To rely solely on the Department of Justice's pre-merger predictions without considering how well those predictions have held up in practice would be to ignore by far the best evidence on the central issue in this proceeding. NAA therefore requests that the Court deny the motion for entry of the proposed final judgment and, if material issues of fact remain unresolved, set the case for an evidentiary hearing.

### Standard of Review

The parties have already provided the Court with an extensive discussion of the text, legislative history, and judicial interpretations of the Tunney Act,[4] and they share a good deal of common ground as to the standards governing this proceeding.

NAA agrees with the Department of Justice that in applying the public interest test, the Court must consider "the relationship between the remedy secured and the specific allegations set forth in the government's complaint."[5] This is not "an unrestricted evaluation of what relief would best serve the public;" rather, the Court is to "review[] the remedy in relationship to the violations that the United States has alleged in

---

[4] *See* Competitive Impact Statement at 13-17; Motion of Newspaper Association of America for Leave to Appear as Amicus Curiae (Docket No. 6) at 2-4; Response of Plaintiff United States to Public Comments on the Proposed Final Judgment ("Response to Comments") (Docket No. 11) at 4-8.

[5] Competitive Impact Statement at 14; Response to Comments at 5. *See Microsoft*, 56 F.3d at 1458-62. The statute mandates consideration of a variety of factors, most of which are related in some way to the adequacy and competitive impact of the judgment. *See* 15 U.S.C. § 16(e)(1)(A)-(B).

its Complaint."[6]  To meet this standard, "[t]he government need not prove that the settlement[] will perfectly remedy the alleged antitrust harms; it need only provide a factual basis for concluding that the settlements are *reasonably adequate remedies for the alleged harms*."[7]  To borrow a phrase, the settlement must provide relief that is "meet for the case,"[8] – specifically directed at and effectively (even if not perfectly) resolving the violations identified in the complaint.

The Department of Justice makes much of the fact that courts regularly defer to its judgment about the efficacy of remedial provisions in consent decrees.[9]  This is true, but only when dealing with "predictions."[10]  Such deference is appropriate before the proposed remedies have been implemented and tested to the point where their effectiveness can readily be observed.  Once that happens, and their efficacy is a matter of observation rather than prediction, the rationale for deference no longer applies.  It may be difficult today to predict the outcome of this fall's presidential election, and one might be inclined to defer to an expert prognosticator, but wait six months and it will be

---

[6] Competitive Impact Statement at 16.

[7] *United States v. SBC Communications, Inc.*, 489 F. Supp. 2d 1, 17 (D.D.C. 2007) (emphasis added).  *See* Competitive Impact Statement at 15.

[8] *California Dental Ass'n v. FTC*, 526 U.S. 756, 781 (1999) (holding that the depth of examination of a restraint of trade under the rule of reason must be adapted to the "circumstances, details and logic" of the restraint).

[9] Competitive Impact Statement at 14-15.

[10] *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *SBC Communications*, 489 F. Supp. 2d at 17; *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003).

easy. That is the situation facing the Court in this case. The election has been held and the results are in. Before-the-fact predictions are moot.[11]

### Application of the Public Interest Standard

**I.  There is no dispute about the anticompetitive nature of the merger, only the adequacy of the divestiture.**

The complaint in this case plays a critical role in evaluating the proposed final judgment. It provides a frame of reference and set of principles for analyzing the newsprint market. In addition, by describing the adverse effects of the merger absent any relief, it provides a touchstone against which to measure the efficacy of the divestiture. It is, therefore, the proper place to begin.

This is not one of those Tunney Act cases where a party opposing the settlement takes issue with the scope of the complaint. NAA agrees with the allegations of the complaint and the theory of the case.[12] Taken as true, as they must be for purposes of this proceeding, they vividly illustrate the anticompetitive nature of the merger.

Newspaper publishers, who are by far the largest purchasers of newsprint, have no close substitutes for newsprint.[13] Demand for newsprint is highly inelastic with respect to changes in price,[14] meaning that newspaper publishers have little choice but to continue

---

[11] Although this applies to NAA's predictions as well as the government's, we take comfort in the fact that events have proven ours to be much closer to the mark. We also recognize that there may be instances in which parties choose to behave more circumspectly while a Tunney Act proceeding is ongoing, thus making it more difficult to discern the long-term effects of the judgment. That, however, is not this case.

[12] Even if NAA did not agree with the complaint it would not matter as the cases are clear that courts are not authorized, except perhaps in the most extreme circumstances, to go beyond the case that the government has brought when evaluating the effectiveness of the relief obtained. *See, e.g., Microsoft*, 56 F.3d at 1459.

[13] Complaint ¶¶ 9-10.

[14] Complaint ¶12.

buying newsprint even in the face of rapidly escalating prices. As a result of this lack of substitutes and inelastic demand, the production and sale of newsprint is a distinct line of commerce and a relevant product market within the meaning of the Clayton Act.[15] North America is the relevant geographic market within which newsprint producers compete.[16]

Prior to the merger, Abitibi and Bowater were the two largest newsprint producers in North America, with 25 and 16 percent of industry capacity.[17] Through joint-venture contracts and a sales management agreement, they controlled an additional 9 percent of North American newsprint capacity.[18] Their combination created a firm three times the size of the next largest competitor.[19]

Although declining demand for newsprint over time will cause newsprint producers to curtail production and reduce capacity, the combination of Abitibi's and Bowater's market shares will enable them to close capacity and increase prices sooner than would occur absent the merger.[20] "The merged firm will therefore have both the incentive and the ability to impose an anticompetitive price increase."[21] This exercise of market power will not be deterred by increased sales into the market on the part of

---

[15] Complaint ¶ 12.

[16] Complaint ¶15.

[17] Complaint ¶¶ 2, 16.

[18] Competitive Impact Statement at 6 n.5. The Department of Justice excluded this additional capacity from its competitive analysis because "under the structure of these arrangements, Defendants would not be able to benefit from a price increase on this capacity." *Id.*

[19] Complaint ¶ 2.

[20] Complaint ¶¶ 17-19.

[21] Complaint ¶ 20.

existing competitors or new entrants,[22] and the effect of the merger will be substantially to reduce competition and to increase prices in the North American newsprint market.[23]

NAA and the Department of Justice therefore begin with a shared premise: In the absence of effective relief, the Abitibi-Bowater merger will allow the merged firm to impose anticompetitive price increases. The Department of Justice asserts that the Snowflake divestiture is effective relief and has prevented such price increases. It is on this point that NAA and the Department part company.

II. **There is no dispute that AbitibiBowater has reduced capacity and raised prices significantly since the merger; the only question is whether these actions are the result of natural market forces or an exercise of market power made possible by the merger.**

Beginning immediately after the merger was consummated in October 2007, AbititiBowater orchestrated a steady series of price increases, supported by the closure of several mills.[24] In November 2007 AbitibiBowater announced the removal of 610,000 metric tonnes of North American newsprint capacity from active production. It then implemented a $25 price increase that Abitibi and Bowater attempted unsuccessfully to impose prior to the merger. In 2008, after the merger, it initiated a steady progression of $20-per-month price increases, raising the price from $560 per metric tonne in October 2007 to the June 2008 level of $700 per metric tonne. This represents a 25% price increase in the eight months immediately following the merger. These increases are scheduled to continue at least through September 2008, at which time the price will be $760 per metric tonne, a 36% increase over the price in October 2007. Although there

---

[22] Complaint ¶¶ 20-26.

[23] Complaint ¶¶ 16, 28.

[24] *See generally* Preston Declaration ¶¶ 19-29 & Chart 1.

has been no formal announcement by AbitibiBowater as of this date, newsprint buyers expect the price increases to continue through the end of the year.

The Department of Justice does not deny that AbitibiBowater has reduced capacity and that newsprint prices have increased. Instead it argues that these actions do not reflect an exercise of market power but are the result of natural market forces. In its response to public comments the Department identified three factors that it believes explain and justify the capacity reductions and price increases since the merger: "[t]he ongoing sharp decline in demand for newsprint in North America, increases in the prices of key inputs into the production of newsprint, and the continued decline in the value of the United States dollar."[25] These explanations, however, do not hold up under close examination.

### III. The price increases cannot be explained by falling demand, rising costs, or a fluctuating exchange rate.

John Preston of Economists Incorporated, who along with Dr. Kent Mikkelsen has conducted economic analyses of both the Abitibi-Bowater merger and the Snowflake divestiture for NAA,[26] tested the three explanations for the price increases offered by the Department of Justice and found them wanting.

Preston accepted the Department's estimate that newsprint demand was declining and would continue to decline at a rate of 5 to 10 percent per year.[27] This fact does not

---

[25] Response to Comments at 13.

[26] These papers were attached to NAA's public comments submitted to the Department of Justice in response to the proposed settlement. They were filed with the Court as attachments to the Department's Response to Comments (see Docket No. 11, Attachments 2-6).

[27] Preston Declaration at 11. Even though actual consumption is not a perfect proxy for demand, it is worth noting that consumption of newsprint has declined at a rate

help the Department's cause, however, because in a competitive market, declining demand leads to lower rather than higher prices.[28] Changes in demand do explain the reduction in prices that occurred in the year or so prior to the merger, but they do not explain (and indeed run counter to) the sharp run-up in price that has occurred in the nine months since the merger.[29]

The Department of Justice did not recognize or address this discrepancy, except to argue that falling demand for newsprint is a legitimate reason for closing, idling, or otherwise redeploying newsprint production capacity.[30] This is true, but the issue is one of timing and magnitude. The Department's theory of the case is that the merger allows AbitibiBowater to close capacity "sooner than it otherwise would."[31] That is to say that as the industry develops, AbitibiBowater would have an incentive at any given point in time to make a larger capacity reduction than it otherwise would. The key determinant of whether a capacity closure is anticompetitive (*i.e.*, occurs sooner or is of a greater magnitude than would be dictated by natural market forces) is whether it is necessitated by the mill's inability to cover its operating costs.

In a competitive market, the owner of a mill will continue to produce as long as the mill covers its operating costs and makes some contribution, however small, to fixed costs.[32] Closing a mill that is still able to sell its output at a profit above its operating

---

closely approximating the 10 percent decline in demand predicted by the Department of Justice. *Id* at 11 n.30.

[28] Preston Declaration ¶ 44 & n.42.

[29] Preston Declaration ¶ 45.

[30] Response to Comments at 14.

[31] Complaint ¶ 19.

[32] *See* Preston Declaration ¶ 43.

costs is a luxury that only a firm with market power can afford. Such a firm can forego the contribution of the mill's output because it serves the larger goal of reducing total capacity and increasing prices for the remainder of the firm's output. When the firm's total capacity is large enough to make this a profitable strategy, and it has the freedom to choose the timing of a plant closure rather than simply responding to the dictates of the marketplace, it has the power to raise prices above competitive levels by manipulating capacity and output.

It follows that declining demand, in and of itself, offers no support for AbitibiBowater's price increases. The closure-of-capacity explanation holds water only if the closures, idlings, and redeployments of newsprint capacity were cost-justified. This directs us to the second factor relied on by the Department: the increasing cost of key inputs.

Here again the facts do not square with the Department's assertion that these closures were necessary to bring the market into equilibrium.[33] The 610,000 metric tonnes of capacity removed by AbitibiBowater far exceeded the amount that would have been required to offset declining demand,[34] and as Chart 3 in the Preston Declaration demonstrates, prices are increasing at a much faster rate than costs.[35]

The third explanation offered by the Department of Justice for the price increases is fluctuating exchange rates for US and Canadian currency.[36] The Department is correct that an increase in the value of the Canadian dollar relative to the US dollar should lead

---

[33] Response to Comments at 14.

[34] Preston Declaration ¶ 44.

[35] Preston Declaration at 21.

[36] Response to Comments at 14-15.

to an increase in North American newsprint prices, given that production is concentrated in Canada and consumption in the United States.[37]

As with changes in demand, however, this factor actually runs counter to the observed pricing trends. When the value of the Canadian dollar relative to the US dollar increased during the period prior to the merger, the price of newsprint declined. Conversely, after the merger, when the trend reversed and the value of the Canadian dollar decreased against the US dollar, the price of newsprint increased.[38] The exchange rate therefore offers no comfort to those who seek an innocent explanation for post-merger price increases.[39]

This leaves us with only one plausible explanation for the price increases: they are an exercise of market power.[40] And this explanation, unlike those offered by the Department of Justice, fits the facts.

**IV.     Available facts and economic analysis support the hypothesis that the price increases are an exercise of market power made possible by the merger.**

The Court is faced with two competing characterizations of AbitibiBowater's conduct during the period from November 2007 to September 2008. Either it constitutes an exercise of market power made possible by the merger (what John Preston has labeled

---

[37] Preston Declaration ¶ 53.

[38] Preston Declaration ¶ 57.

[39] A final possibility is that exports of newsprint from North American mills to overseas locations have contributed to creating a tight market for newsprint. Such exports, however, were modest to begin with and were actually lower during the period from December 2007 to May 2008 than for either of the two preceding six-month periods. Because exports have declined rather than increased, they cannot account for the recent price increases. Preston Declaration at 24 n.54.

[40] Section 0.1 of the FTC/DOJ Horizontal Merger Guidelines, available online at http://www.usdoj.gov/atr/public/guidelines/hmg.htm, defines market power for a seller as "the ability profitably to maintain prices above competitive levels for a significant period of time."

the "Dominant Firm Hypothesis") or it reflects normal reactions to market forces of the sort that would occur in a competitive market (the "Competitive Response Hypothesis").[41] Preston tested these hypotheses against trends in demand, cost, exchange rates, and exports.[42] In each case, the facts were consistent with the Dominant Firm Hypothesis but not the Competitive Response Hypothesis.[43]

## V. The Snowflake divestiture is not a reasonably adequate remedy for the harms alleged in the complaint.

The obvious implication of the fact that AbitibiBowater is behaving like a dominant firm is that the Snowflake divestiture, representing only 3 percent of capacity, was just too small to do the job.[44] It failed to deprive AbitibiBowater of the critical mass needed to exercise unilateral market power.

The Department of Justice has expressed its confidence that "at the time it negotiated the proposed Final Judgment the divestiture of the Snowflake mill was in the public interest, based upon the best information available at that time [sic]."[45] Whether or not that is true, it is no longer relevant. Events have overtaken those judgments and

---

[41] Preston Declaration ¶ 18.

[42] Preston Declaration ¶¶ 19-40.

[43] Preston Declaration ¶¶ 45, 58-61.

[44] The inadequacy of a 3 percent divestiture is even more apparent when compared to the divestitures required in comparable cases. For example, the consent decree in *United States v. Altivity Packaging LLC and Graphic Packaging Int'l, Inc.*, Case No. 1:08-cv-00400 (D.D.C. March 5, 2008), involving a merger of coated recycled boxboard producers, required the merging firms to divest mills representing 11 percent of North American capacity. The firms' combined post-merger share of 42 percent is very close to the combined shares of Abitibi and Bowater, which was "over 40 percent." Complaint ¶ 16. Similarly, Georgia-Pacific's acquisition of Fort James Corporation resulted in a combined share of 36 percent of capacity in the away-from-home tissue market. The consent decree required divestiture of plants representing 11 percent of capacity. *See* http://www.usdoj.gov/atr/cases/index276.htm.

[45] Response to Comments at 13.

predictions. The Court's task is to look at the settlement as it exists today, including all of the developments in the newsprint industry during the past nine months.

Viewed in that light, the final judgment is not in the public interest. The capacity closures and price increases led by AbitibiBowater, combined with the absence of competitive justifications for those actions, demonstrate that the Snowflake divestiture was completely ineffectual. It is not a reasonably adequate remedy for the harms alleged in the complaint.

### **Appropriateness of an Evidentiary Hearing**

The Tunney Act "permits the Court to employ an array of techniques for gathering additional information" about a proposed consent decree "when necessary to make its public interest determination."[46] Among other things it may:

> (1) take testimony of Government officials or experts or such other expert witnesses, upon motion of any party or participant or upon its own motion, as the court may deem appropriate;
>
> (2) appoint a special master and such outside consultants or expert witnesses as the court may deem appropriate; and request and obtain the views, evaluations, or advice of any individual, group or agency of government with respect to any aspects of the proposed judgment or the effect of such judgment, in such manner as the court deems appropriate;
>
> (3) authorize full or limited participation in proceedings before the court by interested persons or agencies, including appearances amicus curiae, intervention as a party pursuant to the Federal Rules of Civil Procedure, examination of witnesses or documentary materials, or participation in any other manner and extent which serves the public interest as the court may deem appropriate[.][47]

A more open-ended invitation to do whatever is called for in the particular case is difficult to imagine.

---

[46] Response of Plaintiff United States to the NAA's Motion for Leave to Appear as Amicus Curiae (Docket No. 13) at 4.

[47] 15 U.S.C. § 16(f).

13

NAA believes the record as it stands is more than adequate to support a finding that the proposed settlement is not in the public interest. Nevertheless, we recognize that the Department of Justice claims superior knowledge by virtue of non-public information and a more accurate economic model of the industry.[48] As these have never been disclosed or tested, neither NAA nor the Court can properly evaluate their strength.

If the Department of Justice intends to rest its case for approval of the consent decree on economic modeling using non-public information, it must do more than repeat its assurances that, while it cannot disclose the basis for its conclusions, everything is fine and the market is performing as predicted.[49] "Trust us, we know what we're doing" is simply not good enough to give the Court a factual basis for its public interest determination, at least not where there is so much evidence to the contrary. Disclosing the previously secret information for the first time in reply, precluding any meaningful response by NAA, would be equally unacceptable.

If this matter is to be decided based on a choice between competing data sets and economic models, there is only one suitable forum. If the Department's model is good enough to rest the future of the newsprint and newspaper industries on, it is good enough to withstand the scrutiny of an evidentiary hearing.

## Conclusion

The Department of Justice's motion to enter the proposed final judgment is not well taken. Events since the merger have shown the divestiture that is at the heart of this settlement to be ineffective in preventing the harms predicted in the complaint. The settlement is therefore not in the public interest. The motion should either be denied

---

[48] Response to Comments at 11-13.

[49] *See* Response to Comments at 15.

outright or, if there are unresolved issues of fact material to the Court's public interest determination, the motion should be denied pending an evidentiary hearing.

Dated:  July 18, 2008 Respectfully submitted,

/s/ Steven C. Douse
Alan. L. Marx
(admitted pro hac vice)
Steven C. Douse
(admitted pro hac vice)
Mark E. Hunt
(admitted pro hac vice)
KING & BALLOW
1100 Union Street Plaza
315 Union Street
Nashville, Tennessee  37201
(615) 259-3456


/s/ Mohammad A. Syed
Mohammad A. Syed
(D.D.C. Bar No. 476315)
KING & BALLOW
1100 Union Street Plaza
315 Union Street
Nashville, TN 37201
(615) 259-3456

Counsel for Newspaper Association of America

**CERTIFICATE OF SERVICE**

I, Mohammad A. Syed, one of the attorneys for Newspaper Association of America, certify that on July 18, 2008, I electronically filed the foregoing Memorandum of Newspaper Association of America in Opposition to Motion of the United States for Entry of Proposed Final Judgment along with the attached Declaration of John H. Preston with the Clerk of the Court using the ECF system. This filing was electronically served on all parties indicated on the electronic filing receipt via the ECF system.

/s/ Mohammad A. Syed
Mohammad A. Syed
(D.D.C. Bar. No. 476315)
KING & BALLOW
1100 Union Street Plaza
315 Union Street
Nashville, TN 37201
(615) 259-3456

Counsel for Newspaper Association of America