**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
**UNITED STATES OF AMERICA,**      )
                                                    )
            **Plaintiff,**                         )
                                                    )            **CASE NO. 1:07-cv-01912 (RMC)**
            **v.**                                 )
                                                    )
**ABITIBI-CONSOLIDATED, INC.,**      )
**and BOWATER INCORPORATED,**      )
                                                    )
            **Defendants.**                      )
                                                    )
_____)


**MEMORANDUM OF NEWSPAPER ASSOCIATION OF AMERICA
IN OPPOSITION TO MOTION OF UNITED STATES
FOR ENTRY OF PROPOSED FINAL JUDGMENT**

**Preliminary Statement**

The story of this case is a simple one. Abitibi and Bowater, the two largest newsprint producers in North America, planned to merge. The Department of Justice, on behalf of the United States, challenged the merger but agreed to settle the case with a consent decree. The proposed decree required the merged firm to divest a newsprint mill in Snowflake, Arizona. Once the case was filed, Abitibi and Bowater consummated their merger and divested the mill.

The story does not end here, however, as the settlement is subject to public comment and judicial scrutiny under the Tunney Act, 15 U.S.C. §16(b)-(h). Before the Court can enter the decree, it must find that the settlement is in the public interest. This is the issue currently before the Court.

Whether the settlement is in the public interest depends on the adequacy of the divestiture. If it will prevent the harm predicted in the complaint, the settlement should be approved. If the settlement fails to accomplish that goal – in other words if the divestiture is ineffectual – it is not in the public interest and should be rejected.

NAA – the Newspaper Association of America – represents the interests of the nation's newspapers, the principal consumers of newsprint.[1] In the nine months since the merger, newspapers have experienced an unprecedented series of newsprint price increases initiated by the merged firm, now known as AbitibiBowater. These price increases cannot be explained as a function of rising costs, falling demand, or fluctuating exchange rates. The most logical and likely explanation, based on the available evidence, is that they are the result of strategic capacity reductions made possible by the merger.[2]

Ironically, the pre-divestiture outcome predicted by the Department of Justice in its complaint – a substantial lessening of competition, leading to increased prices to consumers of newsprint as a result of the merger – has come to pass. The post-divestiture outcome predicted in its Competitive Impact Statement – that the sale of Snowflake "will preserve competition in the North American newsprint market,"[3] – has not.

This striking divergence between the Department's prediction and reality seriously undercuts the rationale for approval of the proposed final judgment. Although the evidence would justify its outright rejection, NAA proposes that at a minimum the

---

[1] By order dated June 5, 2008, the Court permitted NAA to appear as *amicus curiae*.

[2] The facts and economic analysis in this memorandum are drawn from the Declaration of John H. Preston, which accompanies this memorandum and is submitted by NAA in support of its opposition to the Department of Justice's Motion for Entry of Proposed Final Judgment.

[3] Competitive Impact Statement (Docket No. 2) at 9.

Court conduct an evidentiary hearing to inquire more deeply into the adequacy of the divestiture.  Such hearings are not routine – nor should they be given the limited nature of a Tunney Act proceeding – but the Court has before it a rare set of circumstances in which the proposed settlement has a substantial track record.  To rely solely on the Department of Justice's pre-merger predictions without considering how well those predictions have held up in practice would be to ignore by far the best evidence on the central issue in this proceeding.  NAA therefore requests that the Court deny the motion for entry of the proposed final judgment and, if material issues of fact remain unresolved, set the case for an evidentiary hearing.

## **Standard of Review**

The parties have already provided the Court with an extensive discussion of the text, legislative history, and judicial interpretations of the Tunney Act,[4] and they share a good deal of common ground as to the standards governing this proceeding.

NAA agrees with the Department of Justice that in applying the public interest test, the Court must consider "the relationship between the remedy secured and the specific allegations set forth in the government's complaint."[5]  This is not "an unrestricted evaluation of what relief would best serve the public;" rather, the Court is to "review[] the remedy in relationship to the violations that the United States has alleged in

---

[4] *See* Competitive Impact Statement at 13-17; Motion of Newspaper Association of America for Leave to Appear as Amicus Curiae (Docket No. 6) at 2-4; Response of Plaintiff United States to Public Comments on the Proposed Final Judgment ("Response to Comments") (Docket No. 11) at 4-8.

[5] Competitive Impact Statement at 14; Response to Comments at 5.  *See Microsoft*, 56 F.3d at 1458-62.  The statute mandates consideration of a variety of factors, most of which are related in some way to the adequacy and competitive impact of the judgment.  *See* 15 U.S.C. § 16(e)(1)(A)-(B).

its Complaint."[6]   To meet this standard, "[t]he government need not prove that the settlement[] will perfectly remedy the alleged antitrust harms; it need only provide a factual basis for concluding that the settlements are *reasonably adequate remedies for the alleged harms*.'"[7]   To borrow a phrase, the settlement must provide relief that is "meet for the case,"[8] – specifically directed at and effectively (even if not perfectly) resolving the violations identified in the complaint.

The Department of Justice makes much of the fact that courts regularly defer to its judgment about the efficacy of remedial provisions in consent decrees.[9]   This is true, but only when dealing with "predictions."[10]   Such deference is appropriate before the proposed remedies have been implemented and tested to the point where their effectiveness can readily be observed.  Once that happens, and their efficacy is a matter of observation rather than prediction, the rationale for deference no longer applies.  It may be difficult today to predict the outcome of this fall's presidential election, and one might be inclined to defer to an expert prognosticator, but wait six months and it will be

---

[6] Competitive Impact Statement at 16.

[7] *United States v. SBC Communications, Inc.*, 489 F. Supp. 2d 1, 17 (D.D.C. 2007) (emphasis added).  *See* Competitive Impact Statement at 15.

[8] *California Dental Ass'n v. FTC*, 526 U.S. 756, 781 (1999) (holding that the depth of examination of a restraint of trade under the rule of reason must be adapted to the "circumstances, details and logic" of the restraint).

[9] Competitive Impact Statement at 14-15.

[10] *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *SBC Communications*, 489 F. Supp. 2d at 17; *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003).

easy.  That is the situation facing the Court in this case.  The election has been held and the results are in.  Before-the-fact predictions are moot.[11]

### Application of the Public Interest Standard

**I.     There is no dispute about the anticompetitive nature of the merger, only the adequacy of the divestiture.**

The complaint in this case plays a critical role in evaluating the proposed final judgment.  It provides a frame of reference and set of principles for analyzing the newsprint market.  In addition, by describing the adverse effects of the merger absent any relief, it provides a touchstone against which to measure the efficacy of the divestiture.  It is, therefore, the proper place to begin.

This is not one of those Tunney Act cases where a party opposing the settlement takes issue with the scope of the complaint.  NAA agrees with the allegations of the complaint and the theory of the case.[12]  Taken as true, as they must be for purposes of this proceeding, they vividly illustrate the anticompetitive nature of the merger.

Newspaper publishers, who are by far the largest purchasers of newsprint, have no close substitutes for newsprint.[13]  Demand for newsprint is highly inelastic with respect to changes in price,[14] meaning that newspaper publishers have little choice but to continue

---

[11] Although this applies to NAA's predictions as well as the government's, we take comfort in the fact that events have proven ours to be much closer to the mark.  We also recognize that there may be instances in which parties choose to behave more circumspectly while a Tunney Act proceeding is ongoing, thus making it more difficult to discern the long-term effects of the judgment.  That, however, is not this case.

[12] Even if NAA did not agree with the complaint it would not matter as the cases are clear that courts are not authorized, except perhaps in the most extreme circumstances, to go beyond the case that the government has brought when evaluating the effectiveness of the relief obtained.  *See, e.g., Microsoft*, 56 F.3d at 1459.

[13] Complaint ¶¶ 9-10.

[14] Complaint ¶12.

buying newsprint even in the face of rapidly escalating prices. As a result of this lack of substitutes and inelastic demand, the production and sale of newsprint is a distinct line of commerce and a relevant product market within the meaning of the Clayton Act.[15] North America is the relevant geographic market within which newsprint producers compete.[16]

Prior to the merger, Abitibi and Bowater were the two largest newsprint producers in North America, with 25 and 16 percent of industry capacity.[17] Through joint-venture contracts and a sales management agreement, they controlled an additional 9 percent of North American newsprint capacity.[18] Their combination created a firm three times the size of the next largest competitor.[19]

Although declining demand for newsprint over time will cause newsprint producers to curtail production and reduce capacity, the combination of Abitibi's and Bowater's market shares will enable them to close capacity and increase prices sooner than would occur absent the merger.[20] "The merged firm will therefore have both the incentive and the ability to impose an anticompetitive price increase."[21] This exercise of market power will not be deterred by increased sales into the market on the part of

---

[15] Complaint ¶ 12.

[16] Complaint ¶15.

[17] Complaint ¶¶ 2, 16.

[18] Competitive Impact Statement at 6 n.5. The Department of Justice excluded this additional capacity from its competitive analysis because "under the structure of these arrangements, Defendants would not be able to benefit from a price increase on this capacity." *Id.*

[19] Complaint ¶ 2.

[20] Complaint ¶¶ 17-19.

[21] Complaint ¶ 20.

existing competitors or new entrants,[22] and the effect of the merger will be substantially to reduce competition and to increase prices in the North American newsprint market.[23]

NAA and the Department of Justice therefore begin with a shared premise:  In the absence of effective relief, the Abitibi-Bowater merger will allow the merged firm to impose anticompetitive price increases.  The Department of Justice asserts that the Snowflake divestiture is effective relief and has prevented such price increases.  It is on this point that NAA and the Department part company.

**II.     There is no dispute that AbitibiBowater has reduced capacity and raised prices significantly since the merger; the only question is whether these actions are the result of natural market forces or an exercise of market power made possible by the merger.**

Beginning immediately after the merger was consummated in October 2007, AbititiBowater orchestrated a steady series of price increases, supported by the closure of several mills.[24]  In November 2007 AbitibiBowater announced the removal of 610,000 metric tonnes of North American newsprint capacity from active production.  It then implemented a $25 price increase that Abitibi and Bowater attempted unsuccessfully to impose prior to the merger.  In 2008, after the merger, it initiated a steady progression of $20-per-month price increases, raising the price from $560 per metric tonne in October 2007 to the June 2008 level of $700 per metric tonne.  This represents a 25% price increase in the eight months immediately following the merger.  These increases are scheduled to continue at least through September 2008, at which time the price will be $760 per metric tonne, a 36% increase over the price in October 2007.  Although there

---

[22] Complaint ¶¶ 20-26.

[23] Complaint ¶¶ 16, 28.

[24] *See generally* Preston Declaration ¶¶ 19-29 & Chart 1.

has been no formal announcement by AbitibiBowater as of this date, newsprint buyers expect the price increases to continue through the end of the year.

The Department of Justice does not deny that AbitibiBowater has reduced capacity and that newsprint prices have increased. Instead it argues that these actions do not reflect an exercise of market power but are the result of natural market forces. In its response to public comments the Department identified three factors that it believes explain and justify the capacity reductions and price increases since the merger: "[t]he ongoing sharp decline in demand for newsprint in North America, increases in the prices of key inputs into the production of newsprint, and the continued decline in the value of the United States dollar."[25]  These explanations, however, do not hold up under close examination.

### III.  The price increases cannot be explained by falling demand, rising costs, or a fluctuating exchange rate.

John Preston of Economists Incorporated, who along with Dr. Kent Mikkelsen has conducted economic analyses of both the Abitibi-Bowater merger and the Snowflake divestiture for NAA,[26] tested the three explanations for the price increases offered by the Department of Justice and found them wanting.

Preston accepted the Department's estimate that newsprint demand was declining and would continue to decline at a rate of 5 to 10 percent per year.[27]  This fact does not

---

[25] Response to Comments at 13.

[26] These papers were attached to NAA's public comments submitted to the Department of Justice in response to the proposed settlement. They were filed with the Court as attachments to the Department's Response to Comments (see Docket No. 11, Attachments 2-6).

[27] Preston Declaration at 11.  Even though actual consumption is not a perfect proxy for demand, it is worth noting that consumption of newsprint has declined at a rate

help the Department's cause, however, because in a competitive market, declining demand leads to lower rather than higher prices.[28]  Changes in demand do explain the reduction in prices that occurred in the year or so prior to the merger, but they do not explain (and indeed run counter to) the sharp run-up in price that has occurred in the nine months since the merger.[29]

The Department of Justice did not recognize or address this discrepancy, except to argue that falling demand for newsprint is a legitimate reason for closing, idling, or otherwise redeploying newsprint production capacity.[30]  This is true, but the issue is one of timing and magnitude.  The Department's theory of the case is that the merger allows AbitibiBowater to close capacity "sooner than it otherwise would."[31]  That is to say that as the industry develops, AbitibiBowater would have an incentive at any given point in time to make a larger capacity reduction than it otherwise would.  The key determinant of whether a capacity closure is anticompetitive (*i.e.*, occurs sooner or is of a greater magnitude than would be dictated by natural market forces) is whether it is necessitated by the mill's inability to cover its operating costs.

In a competitive market, the owner of a mill will continue to produce as long as the mill covers its operating costs and makes some contribution, however small, to fixed costs.[32]  Closing a mill that is still able to sell its output at a profit above its operating

---

closely approximating the 10 percent decline in demand predicted by the Department of Justice.  *Id* at 11 n.30.

[28] Preston Declaration ¶ 44 & n.42.

[29] Preston Declaration ¶ 45.

[30] Response to Comments at 14.

[31] Complaint ¶ 19.

[32] *See* Preston Declaration ¶ 43.

costs is a luxury that only a firm with market power can afford. Such a firm can forego the contribution of the mill's output because it serves the larger goal of reducing total capacity and increasing prices for the remainder of the firm's output. When the firm's total capacity is large enough to make this a profitable strategy, and it has the freedom to choose the timing of a plant closure rather than simply responding to the dictates of the marketplace, it has the power to raise prices above competitive levels by manipulating capacity and output.

It follows that declining demand, in and of itself, offers no support for AbitibiBowater's price increases. The closure-of-capacity explanation holds water only if the closures, idlings, and redeployments of newsprint capacity were cost-justified. This directs us to the second factor relied on by the Department: the increasing cost of key inputs.

Here again the facts do not square with the Department's assertion that these closures were necessary to bring the market into equilibrium.[33] The 610,000 metric tonnes of capacity removed by AbitibiBowater far exceeded the amount that would have been required to offset declining demand,[34] and as Chart 3 in the Preston Declaration demonstrates, prices are increasing at a much faster rate than costs.[35]

The third explanation offered by the Department of Justice for the price increases is fluctuating exchange rates for US and Canadian currency.[36] The Department is correct that an increase in the value of the Canadian dollar relative to the US dollar should lead

---

[33] Response to Comments at 14.

[34] Preston Declaration ¶ 44.

[35] Preston Declaration at 21.

[36] Response to Comments at 14-15.

to an increase in North American newsprint prices, given that production is concentrated in Canada and consumption in the United States.[37]

As with changes in demand, however, this factor actually runs counter to the observed pricing trends. When the value of the Canadian dollar relative to the US dollar increased during the period prior to the merger, the price of newsprint declined. Conversely, after the merger, when the trend reversed and the value of the Canadian dollar decreased against the US dollar, the price of newsprint increased.[38] The exchange rate therefore offers no comfort to those who seek an innocent explanation for post-merger price increases.[39]

This leaves us with only one plausible explanation for the price increases: they are an exercise of market power.[40] And this explanation, unlike those offered by the Department of Justice, fits the facts.

## IV.    Available facts and economic analysis support the hypothesis that the price increases are an exercise of market power made possible by the merger.

The Court is faced with two competing characterizations of AbitibiBowater's conduct during the period from November 2007 to September 2008. Either it constitutes an exercise of market power made possible by the merger (what John Preston has labeled

---

[37] Preston Declaration ¶ 53.

[38] Preston Declaration ¶ 57.

[39] A final possibility is that exports of newsprint from North American mills to overseas locations have contributed to creating a tight market for newsprint. Such exports, however, were modest to begin with and were actually lower during the period from December 2007 to May 2008 than for either of the two preceding six-month periods. Because exports have declined rather than increased, they cannot account for the recent price increases. Preston Declaration at 24 n.54.

[40] Section 0.1 of the FTC/DOJ Horizontal Merger Guidelines, available online at http://www.usdoj.gov/atr/public/guidelines/hmg.htm, defines market power for a seller as "the ability profitably to maintain prices above competitive levels for a significant period of time."

the "Dominant Firm Hypothesis") or it reflects normal reactions to market forces of the sort that would occur in a competitive market (the "Competitive Response Hypothesis").[41]  Preston tested these hypotheses against trends in demand, cost, exchange rates, and exports. [42]  In each case, the facts were consistent with the Dominant Firm Hypothesis but not the Competitive Response Hypothesis.[43]

## V.    The Snowflake divestiture is not a reasonably adequate remedy for the harms alleged in the complaint.

The obvious implication of the fact that AbitibiBowater is behaving like a dominant firm is that the Snowflake divestiture, representing only 3 percent of capacity, was just too small to do the job.[44]  It failed to deprive AbitibiBowater of the critical mass needed to exercise unilateral market power.

The Department of Justice has expressed its confidence that "at the time it negotiated the proposed Final Judgment the divestiture of the Snowflake mill was in the public interest, based upon the best information available at that time [sic]."[45]  Whether or not that is true, it is no longer relevant.  Events have overtaken those judgments and

---

[41] Preston Declaration ¶ 18.

[42] Preston Declaration ¶¶ 19-40.

[43] Preston Declaration ¶¶ 45, 58-61.

[44] The inadequacy of a 3 percent divestiture is even more apparent when compared to the divestitures required in comparable cases.  For example, the consent decree in *United States v. Altivity Packaging LLC and Graphic Packaging Int'l, Inc.*, Case No. 1:08-cv-00400 (D.D.C. March 5, 2008), involving a merger of coated recycled boxboard producers, required the merging firms to divest mills representing 11 percent of North American capacity.  The firms' combined post-merger share of 42 percent is very close to the combined shares of Abitibi and Bowater, which was "over 40 percent." Complaint ¶ 16.  Similarly, Georgia-Pacific's acquisition of Fort James Corporation resulted in a combined share of 36 percent of capacity in the away-from-home tissue market.  The consent decree required divestiture of plants representing 11 percent of capacity.  *See* http://www.usdoj.gov/atr/cases/index276.htm.

[45] Response to Comments at 13.

predictions.  The Court's task is to look at the settlement as it exists today, including all of the developments in the newsprint industry during the past nine months.

Viewed in that light, the final judgment is not in the public interest.  The capacity closures and price increases led by AbitibiBowater, combined with the absence of competitive justifications for those actions, demonstrate that the Snowflake divestiture was completely ineffectual.  It is not a reasonably adequate remedy for the harms alleged in the complaint.

### Appropriateness of an Evidentiary Hearing

The Tunney Act "permits the Court to employ an array of techniques for gathering additional information" about a proposed consent decree "when necessary to make its public interest determination."[46]  Among other things it may:

> (1) take testimony of Government officials or experts or such other expert witnesses, upon motion of any party or participant or upon its own motion, as the court may deem appropriate;
>
> (2) appoint a special master and such outside consultants or expert witnesses as the court may deem appropriate; and request and obtain the views, evaluations, or advice of any individual, group or agency of government with respect to any aspects of the proposed judgment or the effect of such judgment, in such manner as the court deems appropriate;
>
> (3) authorize full or limited participation in proceedings before the court by interested persons or agencies, including appearances amicus curiae, intervention as a party pursuant to the Federal Rules of Civil Procedure, examination of witnesses or documentary materials, or participation in any other manner and extent which serves the public interest as the court may deem appropriate[.][47]

A more open-ended invitation to do whatever is called for in the particular case is difficult to imagine.

---

[46] Response of Plaintiff United States to the NAA's Motion for Leave to Appear as Amicus Curiae (Docket No. 13) at 4.

[47] 15 U.S.C. § 16(f).

NAA believes the record as it stands is more than adequate to support a finding that the proposed settlement is not in the public interest. Nevertheless, we recognize that the Department of Justice claims superior knowledge by virtue of non-public information and a more accurate economic model of the industry.[48] As these have never been disclosed or tested, neither NAA nor the Court can properly evaluate their strength.

If the Department of Justice intends to rest its case for approval of the consent decree on economic modeling using non-public information, it must do more than repeat its assurances that, while it cannot disclose the basis for its conclusions, everything is fine and the market is performing as predicted.[49] "Trust us, we know what we're doing" is simply not good enough to give the Court a factual basis for its public interest determination, at least not where there is so much evidence to the contrary. Disclosing the previously secret information for the first time in reply, precluding any meaningful response by NAA, would be equally unacceptable.

If this matter is to be decided based on a choice between competing data sets and economic models, there is only one suitable forum. If the Department's model is good enough to rest the future of the newsprint and newspaper industries on, it is good enough to withstand the scrutiny of an evidentiary hearing.

### Conclusion

The Department of Justice's motion to enter the proposed final judgment is not well taken. Events since the merger have shown the divestiture that is at the heart of this settlement to be ineffective in preventing the harms predicted in the complaint. The settlement is therefore not in the public interest. The motion should either be denied

---

[48] Response to Comments at 11-13.

[49] *See* Response to Comments at 15.

outright or, if there are unresolved issues of fact material to the Court's public interest determination, the motion should be denied pending an evidentiary hearing.

Dated:  July 18, 2008                              Respectfully submitted,


/s/ Steven C. Douse
Alan. L. Marx
(admitted pro hac vice)
Steven C. Douse
(admitted pro hac vice)
Mark E. Hunt
(admitted pro hac vice)
KING & BALLOW
1100 Union Street Plaza
315 Union Street
Nashville, Tennessee  37201
(615) 259-3456


/s/ Mohammad A. Syed
Mohammad A. Syed
(D.D.C. Bar No. 476315)
KING & BALLOW
1100 Union Street Plaza
315 Union Street
Nashville, TN 37201
(615) 259-3456

Counsel for Newspaper Association of America

## <u>CERTIFICATE OF SERVICE</u>

I, Mohammad A. Syed, one of the attorneys for Newspaper Association of America, certify that on July 18, 2008, I electronically filed the foregoing Memorandum of Newspaper Association of America in Opposition to Motion of the United States for Entry of Proposed Final Judgment along with the attached Declaration of John H. Preston with the Clerk of the Court using the ECF system.  This filing was electronically served on all parties indicated on the electronic filing receipt via the ECF system.

/s/ Mohammad A. Syed
Mohammad A. Syed
(D.D.C. Bar. No. 476315)
KING & BALLOW
1100 Union Street Plaza
315 Union Street
Nashville, TN 37201
(615) 259-3456

Counsel for Newspaper Association
of America

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
　　　　　　　　　　　　　　　　　　　)
**UNITED STATES OF AMERICA,**　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　**Plaintiff,**　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)　　**CASE NO. 1:07-cv-01912 (RMC)**
　　　　**v.**　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
**ABITIBI-CONSOLIDATED, INC.,**　　　)
**and BOWATER INCORPORATED,**　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　**Defendants.**　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
_____)


# Declaration of John H. Preston

## I.　　Background and Qualifications

1.　　My name is John H. Preston.  I am a Senior Vice President at Economists Incorporated, an economic consulting firm in Washington, DC and Emeryville, CA specializing in the economic analysis of antitrust and regulation matters. I have been employed at Economists Incorporated since 1985.  My Curriculum Vitae is attached to this declaration as Attachment A.

2.　　Prior to working at Economists Incorporated, I was an economist at the Antitrust Division of the U.S. Department of Justice ("DOJ") from 1975 to 1985 where I worked on several paper industry matters.

3.　　My educational background includes an A.B. in English, which I received from Dartmouth College in Hanover, New Hampshire in 1966.  In 1972, I received an M.A. in Economics from the University of Michigan in Ann Arbor, Michigan and I became a Candidate in Philosophy in Economics at the University of Michigan in 1974.



4.     My general area of specialization is the application of microeconomic theory and industrial organization theory to antitrust and regulation matters.  My specific areas of specialization include the forest products industry (particularly newsprint and other groundwood printing papers), health care, and telecommunications.

5.     On behalf of the Newspaper Association of America ("NAA"), I provided several submissions in 2000 to the Antitrust Division of the U.S. Department of Justice ("DOJ") regarding the proposed merger of Abitibi-Consolidated ("Abitibi") and Donohue, the first and third largest manufacturers of newsprint in North America ("NA") at the time of the merger announcement.[1]

6.     I have been asked by NAA and its attorneys to provide a declaration with additional economic analysis of the adequacy of DOJ's settlement of the AbitibiBowater merger.[2] This declaration will accompany NAA's brief to be submitted to the Court on July 18, 2008 as part of the Tunney Act proceeding regarding the adequacy of DOJ's settlement with Abitibi and Bowater.

## II.     Prior Submissions in This Matter

7.     On January 2, 2008, NAA filed its comments with DOJ on the consent decree negotiated by DOJ with Abitibi and Bowater, which permitted the merger of the two newsprint manufacturers subject to the divestiture of Abitibi's Snowflake, AZ newsprint mill.[3]  Dr.

---

[1]     "Newsprint: A Market Focus Book," Pulp & Paper Week, 1999, p. 18.

[2]     Dr. Kent Mikkelsen, a colleague at Economists Incorporated, and I co-authored an economic analysis of the adequacy of the Snowflake divestiture, which was attached to NAA's Comments filed January 2, 2008. DOJ's Response to NAA's Comments was filed April, 18, 2008 (Docket No. 11) and DOJ's Response and NAA's Comments were published in the Federal Register on June 10, 2008.

[3]     The Complaint, Competitive Impact Statement ("CIS") and proposed final judgment ("PFJ") were filed by DOJ with the Court on October 23, 2007.  Abitibi and Bowater completed their merger on October, 29, 2007.  The merged company is named AbitibiBowater.  AbitibiBowater completed its divestiture of its Snowflake newsprint mill to Catalyst Paper Corp. ("Catalyst") in April 2008. (Source: AbitibiBowater press release, April 10, 2008.)  Catalyst is a manufacturer of newsprint and other forest products headquartered in British Columbia, Canada.

Economists
INCORPORATED

Mikkelsen and I provided an economic analysis which was attached to NAA's comments titled "An Economic Analysis of the Adequacy of the Snowflake Divestiture in the Settlement of *United States of America v. Abitibi-Consolidated, Inc. and Bowater, Incorporated*" ("Economic Analysis of the Adequacy of the Snowflake Divestiture").

8.     During the course of DOJ's investigation of the proposed merger of Abitibi and Bowater, Dr. Mikkelsen and I submitted to DOJ an economic White Paper and two Supplements to the White Paper on behalf of the NAA.  These DOJ submissions, which focused on the period 2002 to 2006, were attached to the Economic Analysis of the Adequacy of the Snowflake Divestiture and were filed with the Court.[4]

## III.   The Only Significant Economic Issue Remaining in This Matter Is Whether the Snowflake Divestiture is Adequate to Prevent Anticompetitive Conduct by AbitibiBowater

9.     I am in general agreement with DOJ's conclusions regarding (a) product market definition (newsprint),[5] (b) geographic market definition (North America),[6] (c) anticompetitive effects resulting from the merger (AbitibiBowater would have the incentive and ability to strategically close capacity sooner than it otherwise would to raise operating rates and the price of newsprint),[7] (d) whether a supply response or entry could defeat an exercise of market power by AbitibiBowater (a supply response or entry could not defeat an exercise of market power by AbitibiBowater),[8] and (e) the appropriate

---

[4]     The White Paper was submitted to DOJ on April 11, 2007, Supplement 1 to the White Paper was submitted to DOJ on July 9, 2007, and Supplement 2 to the White Paper was submitted to DOJ on July 20, 2007.  See p. 3 of the Economic Analysis of the Adequacy of the Snowflake Divestiture for more details on these submissions to DOJ.  The Economic Analysis can be found at Docket No. 11, Attachment 2.  The attachments to the Economic Analysis can be found at Docket No. 11, Attachments 3-6.

[5]     See Complaint, ¶¶ 9-12.

[6]     See Complaint, ¶¶ 13-15.

[7]     See Complaint, ¶ 19.

[8]     See Complaint, ¶¶ 20-26.



economic model to analyze the competitive effects of the merger (a dominant firm model).[9]

10.    The only significant economic issue remaining in this matter is whether the Snowflake divestiture is adequate to prevent anticompetitive conduct by AbitibiBowater.    The Snowflake divestiture reduced AbitibiBowater's share of total NA newsprint capacity from 40 percent to 37 percent.[10]    DOJ claims that this divestiture by AbitibiBowater, which is just 3 percent of NA newsprint capacity, is sufficient to prevent the anticompetitive conduct that otherwise would have occurred.

> The combination enhances Defendants' incentives to exercise market power because the merged firm will control a greater base of capacity over which the merged firm would benefit from an increase in newsprint prices after strategically closing, idling, or converting some of its capacity.    Without Snowflake's capacity, the merged firm would not be of sufficient size to be able to recoup the losses from such strategic closures through increases in prices on its remaining newsprint production.    The divestiture of Snowflake would adequately address the likelihood that the proposed merger substantially would reduce competition for newsprint in the United States.[11]

11.    We analyzed the adequacy of the Snowflake divestiture in our Economic Analysis of the Adequacy of the Snowflake Divestiture submitted on January 2, 2008.    We concluded that the Snowflake divestiture would not remedy the competitive problems identified by DOJ in the Complaint.    Our analysis showed that after the divestiture NA newsprint

---

[9]      See DOJ's Response, p. 12.

[10]     The annual newsprint capacity of the Snowflake mill is 375,000 metric tonnes, according to page 2 of the CIS.  However, none of the documents filed by DOJ with the Court in this case provides the NA newsprint capacity share of the Snowflake mill nor the amount of total NA newsprint capacity that would be necessary to calculate that share.   Based on total NA newsprint production and operating rates for November 2007, current total annual NA newsprint capacity is about 11.7 million metric tonnes, which would give the Snowflake mill a NA newsprint capacity share of about 3 percent.  Source: The November 2007 North American Newsprint Flash Report ("Flash Report"), published by the Pulp and Paper Products Council ("PPPC").  The members of the PPPC are NA pulp and paper  manufacturers, including most if not all NA newsprint manufacturers.  DOJ similarly did not identify the capacity share of the Snowflake mill in its Response.

[11]     See CIS, p. 6.

Economists
INCORPORATED

customers would pay significantly higher prices for newsprint due to the probable unilateral exercise of market power by AbitibiBowater.[12]

12.  DOJ acknowledges that it used a model similar to the model we used in our analysis, but claims that our analysis of the amount of divestiture required to prevent competitive harm differs significantly from its own for three reasons. (1) DOJ had more complete and accurate data. (2) We understated "the sensitivity of newsprint consumption to changes in price." (3) We assumed that the newsprint market was in equilibrium during 2007.[13]

13.  With respect to claim (1), DOJ provided no data, other facts, or analysis in its Response to support this claim.  If it had better data, DOJ has never disclosed them.  Although DOJ had the benefit of compulsory process, any information it obtained during its investigation is likely to be dated by now and, in some cases, obsolete, particularly in light of the rapid changes in the market during the past year.

14.  Claim (2) is inconsistent with ¶12 of the Complaint, which states that "demand for newsprint is highly inelastic with respect to price."  The accuracy of the Complaint's characterization of the market's price inelasticity and the assumptions we made about price sensitivity in our prior analysis are borne out by recent events.

15.  With respect to claim (3), we did not assume that the newsprint market was in equilibrium during 2007, and, in any event, our conclusions did not depend on the market being in equilibrium during that period.  DOJ provided no data, other facts or analysis in its Response to show that the first quarter 2008 $60 per metric tonne price increase was fully or even substantially cost-justified, which, according to the data available to us, it was not.

---

[12]  See Economic Analysis of the Adequacy of the Snowflake Divestiture, pp. 1-5 and pp. 12-15.

[13]  See DOJ Response, pp. 12-13.



# IV.   The Scope of My Declaration

16.    Since the filing of our Economic Analysis of the Adequacy of the Snowflake Divestiture on January 2, 2008, more than six months have passed.  During that time, AbitibiBowater announced two additional price increases of $60 per metric tonne to be implemented during the second and third quarters of 2008 in monthly increments of $20.  According to *Pulp & Paper Week*, newsprint prices increased from $560 per metric tonne in October 2007, the month in which DOJ gave its approval for the merger, to $700 in June 2008. This price increase of $140 represents an increase of 25.0 percent since October 2007.  If the third quarter price increase is fully implemented, as is expected according to trade press reports, the price of newsprint in September will be $760, which would be a 35.7 percent increase in the eleven months since DOJ approved the merger in October 2007. For comparison purposes, I note that DOJ often uses a hypothetical "small but significant and nontransitory" price increase of around 5 percent when defining relevant markets.[14]

17.    The focus of the analysis in my declaration will be on the period January 2006 through September 2008.  I will analyze the following trends: NA newsprint price, NA newsprint demand, NA newsprint cost, the export of newsprint from NA mills to overseas locations, and the Canadian$/US$ exchange rate.  I will examine these trends in the context of key events that occurred in the NA newsprint market during this period, especially DOJ's settlement with Abitibi and Bowater on October 23, 2007.

18.    I label my hypothesis that AbitibiBowater has exercised market power over the period November 2007 to September 2008 the "Dominant Firm Hypothesis."[15]  I label the principal competing hypothesis the "Competitive Response Hypothesis," which appears

---

[14]    See Department of Justice and Federal Trade Commission *Horizontal Merger Guidelines*, Issued:  April 2, 1992, Revised, April 8 1997, §1.1.  The *Horizontal Merger Guidelines* can be found through the following link:  http://www.usdoj.gov/atr/public/guidelines/hmg.htm#11

[15]    For more information on the dominant firm model, see the Economic Analysis of the Adequacy of the Snowflake Divestiture, Section B. 1. Unilateral Effects and the Dominant Firm Model, pp. 7-8, and Appendix A. Merger Analysis, Unilateral Effects, and the Dominant Firm Model, pp. 19-21.

Economists
INCORPORATED

to be DOJ's hypothesis to explain NA newsprint prices both before[16] and after the merger.  Based on the demand, cost, export, and exchange rate trends, I will analyze whether the observed trend of newsprint prices over the period January 2006 to September 2008 is consistent with the Competitive Response Hypothesis or with the Dominant Firm Hypothesis.

---

[16]     See DOJ's Response, p. 19.

## V.    Economic Analysis of NA Newsprint Prices from January 2006 to September 2008

### A.   Newsprint Prices and Key AbitibiBowater Events from January 2006 to September 2008

19.    Chart 1 below shows monthly newsprint prices from January 2006 to September 2008.[17]

Chart 1 also shows key events during this period.

**Chart 1.  NA Price of Newsprint per Metric Tonne (30 lb, East, US$) and Key AbitibiBowater Events in the NA Newsprint Market from January 2006 to September 2008**



---

[17]        Source for prices: *RISI Pulp & Paper Week*, third week of each month, p. 3.

### B.  A Chronology of Key Events in the NA Newsprint Market from January 2006 to September 2008

20.    **February 2006:**  Newsprint producers attempted to implement a $40 per metric tonne price increase for NA newsprint.  Only $25 of the $40 price increase was successfully implemented.[18]

21.    **June 2006:**  Abitibi and Bowater began merger discussions.  Abitibi announced a $40 per metric tonne price increase for NA newsprint for August 2006.[19]

22.    **August 2006:**  An attempt by newsprint producers to implement the $40 per metric tonne price increase for NA newsprint announced by Abitibi in May 2006 failed.[20]

23.    **January 2007:**  The NA price of newsprint fell each month from September 2006 to January 2007.  Abitibi and Bowater announced their plan to merge.

24.    **September 2007:**  The NA price of newsprint continued to fall each month from January 2007 to September 2007.  The price in September 2007 was $565.[21]  An attempt by producers to implement a $25 per metric tonne price increase for NA newsprint failed.

25.    **October 2007:**  The NA price of newsprint declined to $560 per metric tonne.  On October 23, DOJ filed a complaint and consent decree with Abitibi and Bowater requiring the divestiture of Abitibi's Snowflake mill (3 percent of NA newsprint capacity).  The AbitibiBowater merger was completed on October 29.

26.    **November 2007:**  A month after the merger was completed, AbitibiBowater announced the closure of 610,000 metric tonnes of NA newsprint capacity in the first quarter of

---

[18]    Source:  *Pulp & Paper Week*, June 19, 2006, p. 2.  While I have used East Coast newsprint prices for my analysis, *Pulp & Paper Week* reports identical prices for the West Coast during this period.  Newsprint manufacturers also make a 27.7 lb grade of newsprint, a somewhat lighter and more expensive grade per metric tonne compared to 30 lb newsprint.  The use of the prices of 30 lb newsprint in my declaration does not affect my analysis or conclusions.  The prices of 30 lb and 27.7 lb. newsprint generally move in tandem.

[19]    Source: *Pulp & Paper Week*, June 19, 2006, p.2 and AbitibiBowater Amendment 3 to the Form S-4 Registration Statement ("Form S-4") filed with the SEC, June 4, 2007, p. 70.

[20]    Source: *Pulp & Paper Week*, October 23, 2006, p. 1.

[21]    Source:  *Pulp & Paper Week*, September 17, 2007, p. 1, and October 22, 2007, p. 9.

Economists
INCORPORATED

2008[22] and a $20 per metric tonne NA newsprint price increase for each month of the first quarter of 2008. The newsprint capacity closures included the following: (1) the permanent closure of the Shawinigan, QC mill (115,000 metric tonnes of newsprint capacity), (2) the permanent closure of the Dalhousie, NB mill (200,000 metric tonnes of newsprint capacity), (3) the indefinite idling of the Mackenzie, BC mill (195,000 metric tonnes of newsprint capacity), and (4) the shift of newsprint capacity at the Calhoun, TN mill to another grade of paper (100,000 metric tonnes of newsprint capacity). These capacity closures and grade shift were scheduled to be completed by the end of the first quarter of 2008. In addition, the previously idled Gatineau, QC #3 machine (idled earlier in 2007; 80,000 metric tonnes of newsprint capacity) and the previously idled Lufkin, TX mill (idled since December 2003; 150,000 metric tonnes of newsprint capacity) were permanently closed. By December 2007, the previously failed $25 price increase was fully implemented, raising the NA price of newsprint from $560 in October to $585 in December 2007.[23]

27. **February 2008:** AbitibiBowater announced a $20 per metric tonne NA newsprint price increase for each month of the second quarter of 2008.[24] AbitibiBowater announced the divestiture of its Snowflake mill to Catalyst.[25] In February 2008, the NA price of newsprint increased to $620 per metric tonne, $60 above the October 2007 price of $560.

28. **April 2008.** AbitibiBowater announced the completion of the divestiture of its Snowflake mill to Catalyst.[26] In April 2008, the NA price of newsprint increased to $660 per metric tonne, $100 above the October 2007 price of $560.

---

[22] In addition to the capacity closures of AbitibiBowater, there were other capacity closures at about the same time by other manufacturers of NA newsprint. For example, Tembec indefinitely idled its #3 newsprint machine at its Kapuskasing, ON newsprint mill in October 2007. That indefinite idling was extended in April 2008. According to a Tembec news release dated April 21, 2008, the "extended idling of paper machine #3 is driven by a shortage of economic fibre supply."

[23] Source: *Pulp & Paper Week*, December 3, 2007, pp. 1-2 and AbitibiBowater presentation at Citigroup Global Paper and Forest Products Conference, December 4, 2007, pp. 4-5.

[24] Source: *Pulp & Paper Week*, February 25, 2008, p. 1.

[25] Source: AbitibiBowater press release, February 11, 2008.

[26] Source: AbitibiBowater press release, April 10, 2008.

Economists
INCORPORATED

29.   **May 2008.**   AbitibiBowater announced a $20 per metric tonne NA newsprint price increase for each month of the third quarter of 2008.[27]   According to trade press reports, successful implementation of the third quarter price increase is expected.   By June 2008, the NA price of newsprint increased to $700 per metric tonne, $140 above the October 2007 price of $560.[28]

### C. A Perspective from the Trade Press and from Newsprint Buyers for Newspaper Publishers on Key Events Before and After the AbitibiBowater Merger

30.   In our Economic Analysis of the Adequacy of the Snowflake Divestiture, we addressed the period immediately prior to the completion of the merger.[29]   We explained that while the merger was under review by DOJ, Abitibi and Bowater did not engage in dominant firm behavior.   It was during this period that the NA price of newsprint steadily declined until October 2007 when the merger was approved by DOJ.   We also explained it was apparent that newsprint industry analysts and newsprint competitors of Abitibi and Bowater were waiting for the merger to be completed in anticipation that a merged Abitibi-Bowater would increase NA newsprint prices by shutting down enough newsprint capacity to create a tight market.   We also explained that it was apparent that these same analysts and competitors believed that Abitibi and Bowater would not take any significant actions to remove capacity from the market until after DOJ's merger review was completed.   We referred to excerpts from trade press articles in Supplement 1 to the White Paper supporting each of these points.[30]

---

[27]   Source:  *Pulp & Paper Week*, May 16, 2008, p. 1.

[28]   While the final results are not in, several newsprint buyers for newsprint publishers have indicated that it appears that the $20 per metric tonne price increase for July 2008 announced by AbitibiBowater will be fully implemented.  If it is fully implemented, the NA price of newsprint will be $720 per metric tonne, in July 2008, $120 above the October 2007 price of $560.

[29]   See Economic Analysis of the Adequacy of the Snowflake Divestiture, pp. 10-12.

[30]   See Supplement 1 to the White Paper, pp. 13-14.

Economists
INCORPORATED

31.    In our Economic Analysis of the Adequacy of the Snowflake Divestiture, we also addressed the period immediately after the completion of the merger.[31]  We explained that in announcing significant capacity closures and a $60 per metric tonne price increase in November, AbitibiBowter was exercising market power as a dominant firm.  RISI economist Kevin Conley was quoted on p.5 of the December 10, 2007 edition of *Pulp & Paper Week*:

> AbitibiBowater's capacity closures will obviously provide the upward pressure for an extended price recovery in 2008, as operating rates soar past the magic 95% threshold generally needed for prices to rise.  Without AbitibiBowater's bold move [to remove 610,000 metric tonnes of newsprint capacity from the NA newsprint market], operating rates and prices would have continued to languish at low levels until the highest-cost mills could no longer survive, eventually leading to the inevitable closures needed to balance the North American market.

Note that Mr. Conley stated that "without AbitibiBowater's bold move, operating rates and prices would have continued to languish at low levels until the highest-cost mills could no longer survive."  Mr. Conley is describing the NA newsprint market that would have existed "but for" AbitibiBowater's large capacity closures, a competitive newsprint market with lower prices and the gradual closure of newsprint capacity as newsprint demand continued to fall. Mr. Conley's statement is entirely consistent with the Dominant Firm Hypothesis and the price increases that have occurred since the merger. It is completely inconsistent with the Competitive Response Hypothesis.

32.    We also provided cites to relevant *Pulp & Paper Week* articles[32] including an article on p.1 of the December 10, 2007 edition titled "Newsprint giant AbitibiBowater embraces industry leadership, eyes $200/tonne North American newsprint price increase."  We commented on that article, stating the following: [33]

---

[31]    See Economic Analysis of the Adequacy of the Snowflake Divestiture, pp. 12-15.

[32]    See Economic Analysis of the Adequacy of the Snowflake Divestiture, p. 13.  See also NAA's Comments, pp. 5-7.

[33]    See Economic Analysis of the Adequacy of the Snowflake Divestiture, p. 14.

Economists
INCORPORATED

The combined AbitibiBowater is seeking to "leverage the North American (newsprint) price up to the price in Europe and not the other way around," according to AbitibiBowater President and CEO David Paterson.[34] If AbitibiBowater is successful in "leveraging" the North American newsprint price up to the price of newsprint in Europe, that will result in a $200 per metric tonne price increase or about 36 percent over the North American price of $560 per metric tonne in October 2007.[35]

AbitibiBowater's stated goal will be reached in September 2008 if the final month of the third quarter price increase announced by AbititibiBowater is successfully implemented. Price will have risen to $760, which will be $200 greater than the price at the time of the merger. There is nothing in Mr. Paterson's statement or in the article quoting Mr. Paterson which is consistent with the Competitive Response Hypothesis. Mr. Paterson's statement and the article are entirely consistent with the Dominant Firm Hypothesis.

33.    In February 2008, AbitibiBowater announced a $60 per metric tonne price increase for the second quarter of 2008.  According to *Pulp & Paper Week*, "North American and world newsprint market leader AbitibiBowater stunned market participants by announcing a second quarter $60/tonne price increase."[36] The article said that other NA newsprint producers were expected to follow AbitibiBowater's lead.

34.    In May 2008, AbitibiBowater announced a $60 per metric tonne price increase for the third quarter of 2008.  In an article titled "AbitibiBowater announces third $60/tonne newsprint hike of 2008; US buyers face a record nine $20 monthly hikes in a row," *Pulp & Paper Week* reported that other NA newsprint producers were expected to also "increase their own prices in the third quarter."[37]

---

[34]    Source*: Pulp & Paper Week*, Dec. 10, 2007, p. 1.  According to the Pulp & Paper Week article, Mr. Paterson made these remarks at the Citi Investment Research Basic Materials Symposium in the first week of December 2007.

[35]    "Newsprint prices in Europe were close to $200/tonne higher than in the USA in November."  Source: *Pulp & Paper Week*, Dec. 10, 2007, p. 1.

[36]    Source: *Pulp & Paper Week*, February 25, 2008, p. 1.

[37]    Source:  *Pulp & Paper Week*, May 16, 2008, p. 1.

Economists
INCORPORATED

35.     In a June 20, 2008 article, *Pulp & Paper Week* reported the successful implementation of the $20 per tonne price increase for May 2008 and the likely successful implementation of the $20 per metric tonne price increase for June 2008.  The article attributes the successful implementation of these pricing increases despite declining demand to "producers' tight control of the supply side."[38]

> Sources said the continued advancement of pricing in the face of ongoing substantial declines in newsprint consumption by US daily newspapers was a testament to producers' tight control of the supply side of the industry's supply/demand equation.

36.     In a June 27, 2008 article, *Pulp & Paper Week* reported that while the third quarter $60 per metric tonne price increase was expected to be fully implemented, it might not be as easily implemented as the $60 per metric tonne price increases in the first two quarters of 2008.  One newsprint investment analyst said he expected AbitibiBowater will announce additional newsprint capacity closures after its Phase II operations review is completed to support the third quarter price increase.[39]

37.     In the preparation of my Declaration, I received comments from a number of newsprint buyers for US newspaper publishers concerning (1) the current state of the newsprint market in the US; (2) their expectation for newsprint price increases in the third quarter of 2008; (3) their expectation for newsprint price increases in the fourth quarter of 2008; and (4) whether they believe newsprint price increases that have occurred in 2008 would have occurred in the same magnitude and time frame absent the AbitibiBowater merger.

38.     These newsprint buyers (1) describe the current U.S. newsprint market as "tight;" (2) believe that the third quarter $60 price increase will be fully implemented; (3) some buyers expect there will be a fourth quarter price increase of $60 while other buyers believe there may be a price increase of $60 or a price increase of a lesser amount; (4)

---

[38]     Source: *Pulp & Paper Week*, June 20, 2008, p. 1.

[39]     Source: *Pulp & Paper Week*, June 27, 2008, p. 8.

Economists
INCORPORATED

believe that absent the AbitibiBowater merger, the price increases, if any, that would have occurred would have been of a lesser magnitude and implemented more slowly than the price increases that have occurred following the AbitibiBowater merger.

### D.  Newsprint Prices and Demand

39.    In its Response, DOJ describes the recent and expected future decline in the NA demand for newsprint.

> Demand for newsprint in the North American market "has declined over the last several years at a rate of approximately 5 to 10 percent per year because of a significant decline in demand for newspapers.…This decline in the demand for newsprint is projected to continue…."

40.    Chart 2 below shows the NA price of newsprint from January 2006 through September 2008.   Based on DOJ's conclusion regarding the downward trend of demand, I have also inserted two lines in Chart 2 indicating the level of NA demand over the period January 2006 to September 2008 if demand fell at 5 percent to 10 percent per year from January 2006.[40]

---

[40]    Source:  For January 2006 consumption, see PPPC *North American Newsprint Statistics Monthly Bulletin,* May 2008, p. 2.  If demand falls at a 5 percent annual rate over the period January 2006 to September 2008, demand would fall by 112,000 metric tonnes or 12.8 percent.  If demand falls at a 10 percent annual rate over the period January 2006 to September 2008, demand would fall by 214,000 metric tonnes or 24.4 percent.   Between January 2006 and May 2008, the NA consumption of newsprint fell 229,000 metric tonnes from 879,000 metric tonnes to 650,000 metric tonnes, a decline of 26.1 percent.  Source: Pulp and Paper Products Council ("PPPC") *North American Newsprint Statistics Monthly Bulletin,* May 2008, p. 2.





**Chart 2. NA Price of Newsprint per Metric Tonne (30 lb, East, US$) and 5% and 10% Annual Declines in NA Demand for Newsprint (1,000 Metric Tonnes) from January 2006 to September 2008**

41.  The monthly NA price of newsprint declined $115 or 17.0 percent between September 2006 and October 2007. The downward trend in price is consistent with a downward trend in demand.

42.  After October 2007, the price and demand trends diverge sharply. The monthly NA price of newsprint increased $140 or 25.0 percent between October 2007 and June 2008 despite continued falling demand. If the third quarter price increase is fully implemented, as is expected, the monthly NA price of newsprint will increase $200 or 35.7 percent between October 2007 and September 2008.

Economists
INCORPORATED

43.    According to microeconomic theory, a significant decline in demand in a competitive market with a normal, upward-sloping industry supply curve should lead to a decline in price,[41] all other things held equal.  As price falls, the newsprint capacity with the highest cost becomes uneconomic because the price no longer covers the variable costs of operation.  Firms respond by closing such high-cost capacity.  The new equilibrium price is established below the level of the previous equilibrium price.

44.    The significant increases in price that have occurred in the NA newsprint market since October 2007 do not conform to this competitive pattern.  Instead of a falling price, actual and announced price increases have moved price to a level 12.6 percent above the highest monthly prices seen during the previous two years. DOJ's Response implies that the recent price increases are simply a "lurch from one equilibrium to another."[42]  There is a scenario under which capacity closures could cause price to "lurch" temporarily above a plausible equilibrium level, but that scenario does not apply here.  If newsprint capacity were composed of a relatively small number of facilities, each with a substantial share of total NA newsprint capacity, it might not be possible to close the amount of capacity that would smoothly move the market to the new equilibrium.  For example, if a 10 percent reduction in capacity would restore equilibrium but the smallest unit of capacity accounted for 15 percent of the total, it is possible that capacity closures might sometimes "overshoot" the required amount, possibly resulting in a temporary increase in price above what would otherwise be the equilibrium price.  This "lumpiness" issue does not occur in the NA newsprint industry, however.  Individual units of capacity are small relative to overall capacity.  As discussed above, AbitibiBowater achieved its recent

---

[41]    Declines in the amount demanded at any given price, which is what DOJ is referring to in the passage cited above, are indicated in price-quantity space by downward shifts of the downward-sloping demand curve against the upward sloping supply curve.  Holding the supply curve constant, a downward shift in the demand curve results in a lower price at a new equilibrium.  This is to be distinguished from moving up or down an existing demand curve in response to an upward or downward shift in the supply curve. Holding the demand curve constant, an upward shift of the supply curve will result in a higher equilibrium price. See pp. 64 to 67 of the White Paper for a discussion on how to distinguish between shifts in the newsprint demand curve and movements along the newsprint demand curve.

[42]    See DOJ's Response, p. 14.

610,000 metric tonne capacity reduction by closing or converting newsprint capacity at four different locations. A competitive response would have removed a smaller amount of capacity, if any, bringing price to a level consistent with a downward trend resulting from steadily declining demand for newsprint.[43]

45.    These price and demand trends are not consistent with the Competitive Response Hypothesis. They are consistent with the Dominant Firm Hypothesis. Between the third quarter of 2006 and the fourth quarter of 2007, Abitibi and Bowater did not act as a dominant firm and, as a consequence, prices fell as demand declined as would be expected in a competitive market. After the completion of the merger in October 2007 AbitibiBowater had a sufficient amount of capacity to profitably engage in dominant firm behavior despite the divestiture of the Snowflake mill. In the first quarter of 2008, AbitibiBowater strategically closed 610,000 metric tonnes of NA newsprint capacity to create a tight market leading to steady price increases from October 2007 to July 2008 and likely to September 2008. The Snowflake divestiture did not remove the incentive of AbitibiBowater to engage in strategic dominant firm behavior to achieve these anticompetitive prices.

## E. Newsprint Prices and Costs

46.    If changes in demand do not explain the post-merger price increases,[44] do changes in the delivered cost of newsprint[45] explain these price increases? In order to answer this

---

[43]    A newsprint mill is not the smallest unit of capacity that can be shut down. For example, Bowater shut down its #3 newsprint machine at its Gatineau, QC newsprint mill in early 2007 while continuing to operate two other newsprint machines. Source: AbitibiBowater presentation at Citigroup Global Paper and Forest Products Conference, December 4, 2007, pp. 4-5 and RISI newsprint cost data (see below).

[44]    As explained in the discussion of Chart 2, the declines in demand indicate that prices should have fallen, not risen, in the post-merger period.

[45]    A newsprint mill's delivered cost to a customer location is the variable cost of production (called "cash cost" in the paper industry) plus the cost of delivery. For a given basis weight of newsprint (e.g., 30 lb), the variable cost of production will be the same for each customer. The cost of delivery, however, will vary by customer depending on the customer location or locations in relation to the location of the mill. In general, the cost of delivery to a customer located close to a mill will be lower than the cost of delivery to a customer located farther away from that mill.

Economists
INCORPORATED

question, I analyzed RISI's cost benchmarking data for NA newsprint mills ("RISI NA newsprint cost data"). I was told by a RISI representative that most NA newsprint manufacturers, including AbitibiBowater, subscribe to RISI's cost benchmarking data services for NA newsprint.

47.    At a web site location, RISI describes its cost benchmarking services.[46] This description is attached as Attachment B.

48.    RISI's NA newsprint cost benchmarking brochure summarizes the methodology RISI uses to estimate quarterly mill costs. This brochure is attached as Attachment C. The brochure contains the following summary of RISI's cost benchmarking methodology.

> **Methodology**
>
> Recognized as the preeminent manufacturing cost benchmarking information source for the pulp and paper industry, RISI's benchmarking data is produced and maintained by experienced pulp and paper engineers supported by a proven methodology. Cash manufacturing costs for each mill are estimated using a mass and energy balance approach that incorporates data drawn from publicly available sources, and supplemented by surveys and interviews where required. This bottom-up approach results in a high level of transparency that enables customers to compare mills more effectively because they have a clear understanding of the assumptions supporting the results. Data sources include industry publications, capacity reports, directories, site visits, equipment suppliers and engineering studies.

RISI also supplies a more detailed description of its cost benchmarking methodology to subscribers, which is attached as Attachment D.

49.    Chart 3 below shows the average quarterly NA price of newsprint from the first quarter of 2006 though the third quarter of 2008.[47] Chart 3 also shows the NA weighted average

---

[46]    Source: http://www.risiinfo.com/pages/product/pulp-paper/mill-cost-benchmarking.jsp . In addition to NA newsprint mills, RISI provides cost benchmarking services covering newsprint mills in Europe and Asia, and covering mills producing 6 other types of printing papers as well as other types of paper, paperboard, and pulp in various regional locations.



cost of newsprint delivered to Chicago from NA newsprint mills ("NA delivered cost") from the first quarter of 2006 through the first quarter of 2008,[48] which is the most recent quarter available from RISI.[49]

---

[47]     For each quarter, the monthly prices shown in Chart 1 were averaged.

[48]     Source: RISI NA newsprint cost data. For each quarter, the cash (variable) cost plus delivery cost to Chicago for each NA mill in operation in that quarter was weighted by each mill's share of total NA newsprint capacity and summed to calculate weighted average delivered cost. While not all mills ship to Chicago, the use of Chicago as a destination for the calculation of delivery costs does not affect my conclusions since the purpose of Chart 3 is to compare price and cost trends over time. In the first quarter of 2008, the cost of delivery was about 10 percent of the delivered cost to Chicago.

[49]     Both prices and costs do not include discounts, if any. Since I am examining price and cost trends, the existence of discounts, if any, does not affect my analysis and conclusions.

Economists
INCORPORATED

**Chart 3.  NA Price of Newsprint Per Metric Tonne (30 lb, East, US$) from 1st Quarter 2006 to Third Quarter 2008 and Weighted Average Cost Per Metric Tonne (30 lb, US$) of Newsprint Delivered to Chicago From North American Newsprint Mills from 1st Quarter 2006 to 1st Quarter 2008**



50.    From its level in the first quarter of 2006, the quarterly average NA price of newsprint increased slightly to $675 in the third quarter of 2006 and then declined steadily to $572 in the third and fourth quarters of 2007, a decline of $103 per metric tonne or 15.3 percent.[50]  Over most of this period, the NA weighted average delivered cost of newsprint was essentially flat.  As expected, declining demand for newsprint reduces price when cost is unchanged.  Due to the declining demand for newsprint, price continued to fall

---

[50]    See also the discussion of the NA price of newsprint in relation to Charts 1 and 2 above.

Economists
INCORPORATED

from the first quarter of 2007 to the third quarter of 2007 even though the NA weighted average delivered cost of newsprint rose by 5.7 percent. Thus, rising cost did not cause price to rise before the AbitibiBowater merger was approved.

51.    Between the fourth quarter of 2007 and the first quarter of 2008, the quarterly average price increased $48 per metric tonne or 8.5 percent. The NA weighted average delivered cost of newsprint increased only 1.6 percent that quarter, or only 4.9 percent when the preceding quarter is included. Even though cost continued to increase after the merger at about the same rate as before the merger, post-merger price increased instead of decreasing as it did in the pre-merger period.

52.    RISI's mill cost estimates are not yet available for the second quarter of 2008. Based on the cost trend from the first quarter of 2007 the first quarter of 2008, it is not likely that increases in cost will explain the $108 increase in price between the fourth quarter of 2007 and the second quarter of 2008. Similarly, it is not likely that increases in cost will explain the $168 increase in price between the fourth quarter of 2007 and the third quarter of 2008.[51]

**F. Newsprint Prices and Changes in the Canadian$/US$ Exchange Rate**

53.    In its Response, DOJ states that the US dollar has lost value relative to the Canadian dollar (or, conversely, the Canadian dollar has gained value relative to the US dollar) "which has the effect of raising the costs of Canadian producers of newsprint--the bulk of North American newsprint capacity is located in Canada--and hence the price of newsprint."[52] While I agree that increases in the value of the Canadian dollar relative to the US dollar raise the costs of Canadian newsprint mills, recent changes in

---

[51]    As noted above, the successful implementation of the third quarter price increase is expected according to trade press reports.

[52]    See DOJ's Response, pp. 14-15.

Canadian$/US$ exchange rate do not explain NA newsprint prices either before or after the merger of Abitibi and Bowater.

54.     Chart 4 below shows the average monthly value of the Canadian dollar relative to the US dollar over the period January 2007 to June 2008.[53]

### Chart 4.  Value of the Canadian Dollar Relative to the US Dollar from January 2007 to June 2008



55.     Between January 2007 and November 2007, the average monthly value of the Canadian dollar per US dollar increased steadily from US$0.852 to US$1.040.  Since November

---

[53]     Source:  http://oanda.com/convert/fxhistory, Conversion Table: CAD to USD (Interbank rate).

2007 the value of the Canadian dollar has fallen from US$1.040 to US$0.985 in June 2008.

56.     As seen in Chart 1, the NA price of newsprint declined each month from January 2007 to October 2007 before increasing $10 per metric tonne in November 2007.   Between November 2007 and June 2008, the NA price of newsprint increased steadily from $570 per metric tonne to $700 per metric tonne.

57.     If the movements of NA newsprint price were explained by exchange rate changes, an increase in the value of the Canadian dollar relative to the US dollar should lead to an increase in NA newsprint prices.   Similarly, a decrease in the value of the Canadian dollar relative to the U.S. dollar should lead to a decrease in NA newsprint prices. Instead, the opposite has occurred.  When the value of the Canadian dollar relative to the US dollar increased, the NA price of newsprint declined.   When the value of the Canadian dollar relative to the US dollar decreased, the NA price of newsprint increased.[54]

## VI.  Conclusion

58.     In my declaration I have analyzed whether NA newsprint prices before and after the AbitibiBowater merger could be explained by changes in demand and costs as well as changes in the Canadian dollar/US dollar exchange rate.   See Sections V.D. to V.F below.   My conclusion is that in the period immediately before the AbitibiBowater merger, prices in the NA newsprint market were competitively-determined.   In the period

---

[54]     It may be suggested that the price increases can be explained by increases in the export of newsprint from NA mills to overseas locations ("exports").  I compared exports for two six-month periods December 2006 to May 2007 and June 2007 to November 2007 with exports for the most recent six-month period December 2007 to May 2008.  Exports for the period December 2006 to May 2007 (comparable period in terms of seasonality) were 54,000 metric tonnes greater than for the period December 2007 to May 2008 and exports for the period June 2007 to November 2007 were 173,000 metric tonnes greater than for the period than for the period December 2007 to May 2008.  Since exports declined rather than increased from the two earlier periods, changes in exports cannot account for the price increases following the AbitibiBowater merger.  PPPC *North American Newsprint Statistics Monthly Bulletin*, May 2008, p. 2.

Economists
INCORPORATED

after the AbitibiBowater merger, however, prices were not competitively-determined. Given demand and cost trends, the observed prices post-merger are not consistent with the Competitive Response Hypothesis. The observed prices post-merger are consistent with the Dominant Firm Hypothesis.

59.     In Sections V.A. to V.C. above, I have examined key events that occurred before and after the AbitibiBowater merger. Section V.C. provides contemporaneous trade press accounts of these key events. All of these trade press accounts are consistent with and describe dominant firm behavior. They are not at all consistent with nor do they describe competitive behavior. Note especially, RISI Economist Kevin Conley's statement in December 2007 that without AbitibiBowater's "bold move" to close a large amount of NA newsprint capacity, "operating rates and newsprint prices would have continued to languish at low levels…."[55] Note also that David Paterson, President and CEO of AbitibiBowater, told an investment conference right after AbitibiBowater's capacity closure announcement that AbitibiBowater needed to "leverage" the NA newsprint price up to the level of the European newsprint price, which was about $200 per metric tonne higher at the time of his remarks.[56] AbitibiBowater has been able to accomplish what Mr. Patterson said it needed to do. By its exercise of market power, AbitibiBowater will have raised the price of NA newsprint by $200 per metric tonne if the third quarter price increase is fully implemented. Mr. Conley's prediction of an extended price recovery following AbitibiBowater's capacity closures has also been borne out. DOJ's prediction of competitive pricing has not been borne out.

60.     As cited in Section V.C. above, newsprint buyers for US newspaper publishers believe that absent the AbitibiBowater merger, the price increases, if any, that would have occurred would have been of a lesser magnitude and implemented more slowly than the price increases that have occurred following the AbitibiBowater merger.

---

[55]     See ¶31 above.

[56]     See ¶33 above.

61.     The results of my analysis of price, demand and cost trends before and after the merger, contemporaneous trade press reports describing key events before and after the merger, and the post-merger experience of newsprint buyers for US newspapers all provide strong support for the Dominant Firm Hypothesis.  They are all completely inconsistent with the Competitive Response Hypothesis.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true.

/s/ John H. Preston
John H. Preston

July 18, 2008

Economists
INCORPORATED

# Attachment A

# Curriculum Vitae of John H. Preston

Economists
INCORPORATED

# CURRICULUM VITAE

## John H. Preston

| | |
|---|---|
| **Office** | Economists Incorporated |
| | 1200 New Hampshire Avenue, N.W., Suite 400 |
| | Washington, D.C. 20036 |
| | (202) 833-5237 |
| | preston.j@ei.com |
| **Home** | 18505 SE Heritage Oaks Lane |
| | Tequesta FL 33469 |
| | (561) 575-2310 |
| | jhp2004@comcast.net |
| **Education** | A. B. English, Dartmouth College (1966) |
| | M. A. Economics, University of Michigan (1972) |
| | Candidate in Philosophy in Economics, University of Michigan (1974) |
| **Professional Experience (Consulting)** | Senior Vice President, Economists Incorporated (December 1998-Present) |
| | Vice President, Economists Incorporated (December 1995-December 1998) |
| | Economist, Economists Incorporated (April 1985-December 1995) |
| **Selected Matters** | Proposed *Abitibi-Consolidated/Donohue newsprint merger.* On behalf of NAA, provided analysis to DOJ concerning the likely anticompetitive effects of the merger. |
| | Proposed *Norske Skog/Pacifica newsprint merger.* On behalf of the Canadian Competition Bureau, provided an analysis of the econometric analysis presented by the merging parties to the Bureau. |



**Selected Matters (continued)**

*Coated Groundwood Paper Anti-Dumping Investigation.* Helped prepare response to Anti-dumping investigation of the ITC on behalf of European groundwood paper manufacturers. Participated in presentation to ITC.

Proposed *MCI/Sprint Merger.* Provided affidavits to DOJ, FCC, and European Commission analyzing the competitive effects of the proposed merger on behalf of British Telecom and AT&T. Testified before the European Commission on this matter.

*British Telecom/AT&T Global Venture.* Provided economic analysis on a wide range of competition issues concerning the global venture, including presentations to the European Commission and DOJ.

Proposed *SBC/AT&T and Verizon/MCI mergers.* On behalf of BT, analyzed competitive effects of the two telecommunications mergers. Provided affidavits to DOJ, FCC and European Commission and made presentations to DOJ and FCC staffs.

*Timberlawn v. Tenet Healthcare, et al.* Provided affidavit, deposition testimony, and trial testimony on behalf of defendants in the alleged monopolization of psychiatric hospitals in the Dallas area by NME.

*WellPoint/HSI merger.* Analysis of the competitive effects of this proposed merger of two of the largest HMOs in California and participation in meetings with DOJ.

*PacifiCare/FHP merger.* Analysis of the impact of this proposed merger on the provision of Medicare HMO services in California. Made written and oral presentations to the FTC staff and senior management.

*Sale of General Dynamics' Missile Division to Hughes Aircraft and General Dynamics' Jet Fighter Division to Lockheed.* Helped prepare antitrust analysis and participated in presentations to DOJ and FTC on these defense industry mergers.

Economists
INCORPORATED

| | |
|---|---|
| **Professional Experience (Antitrust Division)** | Economist (January 1975-April 1985) Economic Policy Office Antitrust Division U.S. Department of Justice |
| **Honors** | Special Achievement Award for work on *U.S. v. Hospital Affiliates International, Inc. and American Health Services, Inc.* (1980) |
| | Outstanding Performance Rating (1980-1981) |
| | Outstanding Performance Rating (1981-1982) |
| | Outstanding Performance Rating (1982-1983) |
| | Outstanding Performance Rating (1983-1984) |
| | Meritorious Award (1983) |

*Selected Matters*

| | |
|---|---|
| **Testimony Affidavit** | *U.S. v. Hospital Affiliates International, Inc., and American Health Services, Inc.* In 1980, submission of an affidavit to the U.S. District Court in New Orleans analyzing the competitive effects of the proposed merger of three psychiatric hospitals in New Orleans, LA. |
| **Deposition Testimony** | *U.S. v. British Columbia Forest Products, et. al.* In 1981, deposition testimony on the preparation of the trial exhibits for the challenge of an acquisition of a coated groundwood paper plant by a firm partially owned by two other manufacturers of coated groundwood paper. |
| | *U.S. v. State Board of Certified Public Accountants of Louisiana.* In 1984, deposition testimony on product and geographic market definition and competitive effects of restrictions on advertising and solicitation by the Louisiana board of accountants. |

Economists
INCORPORATED

| | |
|---|---|
| **Grand Jury Testimony** | *U.S. v. Gary L. McAliley et. al.*  In 1980, testimony before a grand jury in Alabama on the effects of an alleged agreement between attorneys in Coffee County, Alabama to raise fees for real estate closings. |
| **Other Filed Cases** | *U.S. v. National Medical Enterprises, et. al.* Hospital merger case. |
| | *U.S. v. American Consulting Engineers Council.* Prohibitions on free designs and on participation in design competitions. |
| | *U.S. v. Alaska Board of Registration for Architects, Engineers and Land Surveyors*  Competitive bidding ban. |
| | *U.S. v. First Multiple Listing Service*  Alleged exclusion of competitors by owners of an essential facility. |
| **Investigations** | *Georgia-Pacific Acquisition of Hudson Pulp & Paper.*  This merger was investigated by DOJ for antitrust implications in a number of paper and paperboard product lines. |
| | *Acquisition of Hospital Affiliates International by Hospital Corporation of America* (1981).  Merger of two major hospital management companies. |
| | *South Florida Physicians' Boycott* (1983).  Boycott by physicians to place pressure on the legislature to enact malpractice insurance legislation favorable to physicians. |
| | *Stanislaus Preferred Provider Organization (SPPO)* (1984). Agreement by physician members of SPPO not to contract with any other PPOs allegedly in order to forestall the development of PPO competition in Stanislaus County. |
| **Policy Matters** | *The Division's position on the Health Care Cost Containment Act of 1983* (1984).  This position was delivered in testimony by Charles F. Rule, Deputy Assistant Attorney General, to a Senate Subcommittee. |
| | *Letter to the Health Care Financing Administration (HCFA)* (1984).  This letter expressed the Division's views on certain proposals which would restrict the dissemination of information collected by Professional Review Organizations. |

Economists
INCORPORATED

*The Division's policy toward the health care sector in general and preferred provider organizations (PPOs) in particular* (1985).  This policy was expressed in a paper presented by J. Paul McGrath, Assistant Attorney General, to the National Health Lawyers Association and the ABA.

*Business Review commenting on plans by the Southwest Michigan Health Systems Agency (HSA)* (1982).  The HSA wanted to publish rates charged by hospitals within the HSA.

*Business Review commenting on a proposal by the Maryland Health Care Coalition* (1982).  The Coalition wanted to collect and disseminate information concerning the incentive effects of different types of insurance policies.

*Letters to the ABA and State Supreme Courts* (1982-1984).  These letters expressed the Division's views on restrictions on advertising and solicitation contained in the ABA's Model Rules.

**Publications**  "An antitrust analysis of the *Alliant* decision and defense industry mergers," *International Merger Law*, April 1993 (w/ Philip B. Nelson)  [Note: a shorter version appeared in *Economists Ink* (Winter 1993), a newsletter published by Economists Incorporated.]

"Coated Groundwood Paper Anti-Dumping  Investigation," *Economists Ink* (Winter 1993).

"The Supreme Court Establishes a Standard for Predatory Bidding" [*Weyerhaeuser v. Ross-Simmons Hardwood Lumber*] *Economists Ink* (Winter 2007).

Economists
INCORPORATED

# Attachment B

# Using RISI's Cost Benchmarking Data

**RISI's Cost Benchmarking Service**

RISI's cost benchmarking service covers over 2,500 pulp, paper & board machines in about 1,400 mills thoughout the world and provides subscribers with machine level and/or mill level product cost profiles. It is delivered by way of the Analytical Cornerstone tool, a user interface connected to a database of information and distributed by CD-ROM to be installed on user's desk or lap-top computer.

Ease of use
Analytical Cornerstone's intuitive interface enables you to quickly get the information you need without extensive training. Data can be conveniently exported for use in reports, presentations and analyses

Quarterly updates
The database is kept fresh with quarterly updates to geographical unit costs. Facility mass and energy balances are updated every 18-24 months. Updates are included in your annual subscription at no additional charge.

Use the Analytical Cornerstone database to measure cost competitiveness across all natural expense categories:

- Fiber
- Chemicals
- Fuel
- Electricity
- Hourly Labor
- Salary Labor
- Maintenance and Materials

Source:  http://www.risiinfo.com/pages/product/pulp-paper/mill-cost-benchmarking.jsp

Economists
INCORPORATED

# Attachment C

# RISI Brochure: NA Newsprint Cost Benchmarking Data



# North American Newsprint | Cost Benchmarking Data

## Overview

The North American Newsprint Cost Benchmarking Data is your most important tool for understanding and assessing your manufacturing cost competitiveness.

Containing timely and valuable information on manufacturing costs for 44 mills producing newsprint, the North American Newsprint report gives you the information you need to measure your cost competitiveness in every area of the production process. From categorized expense details for individual paper machines and/or mills to regional summaries of supply costs, find the details you need to make more effective business decisions and improve your competitive position.

For more information, contact Dan Temple at 770.373.3020 or dtemple@risiinfo.com; if you are located in Europe, contact Matt Graves at +32.2.536.0747 or mgraves@risiinfo.com; if you are located in Latin America, contact Greg Ardoullie on +32.2.536.0753 or gardoullie@risiinfo.com or visit www.risiinfo.com/benchmarking.

## Grade Covered:
- North American Standard Newsprint (45 - 48.8 gsm)



*Sample cost-of-supply curve*

## Report Features:
- Discussion of supplier capacity share and changes in ownership.
- Detailed study results section, including aggregate cost curves highlighting the different benchmark grades and detailing cash costs and delivery costs (study specific) to Chicago, Illinois.
- Mill-by-mill listing, detailing the production process and manufacturing costs by natural category (see reverse for more information).
- Efficiency measures (labor productivity and paper machine productivity by mill).

## Methodology

Recognized as the preeminent manufacturing cost benchmarking information source for the pulp and paper industry, RISI's benchmarking data is produced and maintained by experienced pulp and paper engineers supported by a proven methodology. Cash manufacturing costs for each mill are estimated using a mass and energy balance approach that incorporates data drawn from publicly available sources, and supplemented by surveys and interviews where required. This bottom-up approach results in a high level of transparency that enables customers to compare mills more effectively because they have a clear understanding of the assumptions supporting the results. Data sources include industry publications, capacity reports, directories, site visits, equipment suppliers and engineering studies.

## Detailed Mill Listings

Maps and detailed listings for approximately 44 mills producing newsprint are included. Each facility listing contains essential production details, including:

- A simplified process flowsheet, diagramming the production process

- A facility description, including an assessment of strengths and weaknesses

- Facility cost benchmark

- A cost estimate summary by grade

- Manufacturing cost details by natural expense categories for each grade produced. Natural expense categories include:

    - Fiber

    - Chemicals

    - Fuel

    - Electricity

    - Labor (hourly and salaried)

    - Maintenance and Materials



*Sample process flowsheet diagramming the mill's production process.*



*Sample manufacturing cost comparison chart detailing costs by natural expense category.*

## CD-ROM Available

A disk is available with this report, allowing you to sort through the details behind the cost curves and to extract information into Excel spreadsheets.

## Also Available

Related Reports:

- European Newsprint

- Asian Newsprint including bonus coverage of select mills in Africa, Latin America and Oceania

- North American Uncoated Mechanical

- Global Directory

Analytical Cornerstone®: Get full electronic access to selected cost benchmarking data and the capability of doing "what if" scenarios and adding your changes to individual mills or regional unit costs. Analytical Cornerstone and Scenario Manager are the engines behind each of our cost benchmarking reports and your most powerful tool for understanding and modeling production costs.

Custom Data: RISI can provide customized data to meet your information and budget needs.

## For more information, contact us (see last page) or visit www.risiinfo.com/benchmarking

## Table of Contents – North American Newsprint Data

### Introduction
- Background
- Objective
- Cash Cost Methodology
- Cash Cost Description
- Concept for Estimating Cash Costs
- General Comments
- Time Basis
- Fiber Cost Estimates
- Chemical Cost Estimates
- Energy Cost Estimates
- Labor Cost Estimates
- Material Cost Estimates
- Delivery Cost Estimates
- Regional Unit Cost Assumptions

### Results
- Introduction
- Capacity Share Comparison
- North American Newsprint Cost of Supply –
  Sorted by Producer then Cash Cost
- Cost of Supply Curves
- North American Newsprint Cost of Supply –
  Sorted by Cash Cost with Region Indicated
- North American Newsprint Cost of Supply –
  Sorted by Region then Cash Cost
- North American Newsprint Cost of Supply –
  Sorted by Delivered (Local) Cash Cost
- Paper Machine Productivity
- Labor Productivity
- Furnishes by Mill
- North American Newsprint Comparison Cost Curve –
  2005 versus 2003, Sorted by Cash Cost
- Newsprint Comparison Cost Curve – For North American and
  European Producers Delivered to Chicago

### Mill Detail Alphabetical Listing
- Introduction
- Description and General Comments
- Abbreviations
- Conversion Factors
- Glossary of Symbols
- Mill Abitibi-Consolidated – Amos, QC

- Abitibi-Consolidated – Baie Comeau, QC
- Abitibi-Consolidated – Clermont, QC
- Abitibi-Consolidated – Grand Falls, NF
- Abitibi-Consolidated – Iroquois Falls, ON
- Abitibi-Consolidated – Kenora, ON
- Abitibi-Consolidated – Mackenzie, BC
- Abitibi-Consolidated – Shawinigan, QC
- Abitibi-Consolidated – Snowflake, AZ
- Abitibi-Consolidated – Thorold, ON
- Alabama River Newsprint – Claiborne, AL
- Alberta Newsprint – Whitecourt, AB
- Atlantic Packaging – Whitby, ON
- Augusta Newsprint – Augusta, GA
- Blue Heron Paper – Oregon City, OR
- Blue Heron Paper – Pomona, CA
- Boise – Deridder, LA
- Bowater – Calhoun, TN
- Bowater – Coosa Pines, AL
- Bowater – Dalhousie, NB
- Bowater – Gatineau, QC
- Bowater – Grenada, MS
- Bowater – Liverpool, NS
- Bowater – Thunder Bay, ON
- Catalyst Paper – Crofton, BC
- Catalyst Paper – Elk Falls, BC
- Catalyst Paper – Powell River, BC
- Howe Sound – Port Mellon, BC
- Inland Empire Paper – Millwood, WA
- Katahdin Paper – East Millinocket, ME
- Kruger – Bromptonville, QC
- Kruger – Corner Brook, NF
- Kruger – Trois Rivières, QC
- North Pacific Paper – Longview, WA
- Papier Masson – Masson-Angers, QC
- Ponderay Newsprint – Usk, WA
- SP Newsprint – Dublin, GA
- SP Newsprint – Newberg, OR
- Stora Enso North America – Port Hawkesbury, NS
- Tembec – Kapuskasing, ON
- Tembec – Pine Falls, MB
- White Birch Paper – Ashland, VA
- White Birch Paper – Québec City, QC
- White Birch Paper – Riviere du Loup, QCHokuetsu

# Order Form – North American Newsprint Data

## Four easy ways to order:

**Fax**
Attn: Dan Temple
770.373.3005

**Mail**
RISI
900 Circle 75 Parkway
Suite 1150
Atlanta, GA 30339

**Web**
www.risiinfo.com/
benchmarking

**Call**
Dan Temple
770.373.3020
dtemple@risiinfo.com

**In Europe**
Matt Graves
+32.2.536.0747
mgraves@risiinfo.com

**In Latin America**
Gregory Ardoullie
+32.2.536.0753
gardoullie@risiinfo.com

**Get the latest updates to RISI Newsprint Reports!**

To order please call, email us, or complete and return this form.

Please check the update you'd like to purchase:

\_\_ North American Newsprint Mill by Mill (data updated quarterly on disk)..........................US$14,000

\_\_ Asian Newsprint Mill by Mill (data updated quarterly on disk) ..........................................US$14,000

\_\_ European Newprint Mill by Mill (data updated quarterly on disk) .....................................US$14,000

\_\_ Purchase all 3 studies with the latest quarterly updates and

get a special discounted price......................................................................................US$25,000

TOTAL ........................................................................................................................$_____

Please complete the information below:

Signature:_____

First Name:_____

Last Name:_____

Title: _____

Company:_____

Address:_____

City: _____ State/Province: _____

Postal Code:_____Country:_____

Phone: _____

Fax: _____

E-mail. _____

☐ Check here if you do not wish to receive communication about other select offers from RISI via email.



Economists
INCORPORATED

# Attachment D

# RISI Cost Benchmarking Methodology

# Methodology

RISI

Cost Benchmarking

900 Circle 75 Parkway, Suite 1150

Atlanta, GA  30339  USA

www.risiinfo.com



# TABLE OF CONTENTS

 METHODOLOGY OVERVIEW.................................................................................................................................. 2
CASH COST METHODOLOGY INTRODUCTION.................................................................................................. 4
METHODOLOGY DESCRIPTION............................................................................................................................ 5
CONCEPT FOR ESTIMATING CASH COSTS ....................................................................................................... 6
FACILITY PROCESS FLOWSHEETS & COSTS..................................................................................................... 8
FACILITY PROCESS FLOWSHEETS & COSTS - CONTINUED ........................................................................... 9
GENERAL COMMENTS........................................................................................................................................ 10
TIME BASIS........................................................................................................................................................... 11
FIBER COST ESTIMATES.................................................................................................................................... 12
CHEMICAL COST ESTIMATES............................................................................................................................ 13
CHEMICAL COST ESTIMATES – COATING........................................................................................................ 14
ENERGY COST ESTIMATES ............................................................................................................................... 15
LABOR COST ESTIMATES .................................................................................................................................. 16
MATERIAL COST ESTIMATES............................................................................................................................. 17
DELIVERY COST ESTIMATES............................................................................................................................. 18
REGIONAL UNIT COST ASSUMPTIONS............................................................................................................. 19
COST OF SUPPLY CURVES................................................................................................................................. 20
POINTS TO REMEMBER...................................................................................................................................... 21

1



## METHODOLOGY OVERVIEW

Cash manufacturing costs are estimated at the product/machine/mill level using an input-output (bottom-up) balance approach. A mass and energy balance is prepared for each mill to determine the consumption associated with each process step.

RISI cost engineers first determine the level of output of each grade and product manufactured for each machine at a mill using a detailed product calculation model that determines consumption levels for each mill process and paper machine.

Data are drawn from a variety of publicly available sources including pulp and paper directories, magazine articles, company reports and websites, and technical seminars. This data is supplemented by surveys and interviews conducted by staff as required.

Unit consumptions levels are estimated drawing on technical data on fiber furnishes, yields, in-process energy use, and manning.

Unit cost files are maintained on fiber, wages, chemicals, fuels, and electr5ical rates. Each unit cost is the prevailing "market" cost for that mill's geographical region. "Market prices", not "transaction prices" are used for geographical unit cost.

Unit costs are combined with the unit consumption output of our mass and energy balances to produce cost per ton by natural expense.



## METHODOLOGY OVERVIEW – continued



RISI

## CASH COST METHODOLOGY INTRODUCTION

Generally, the manufacturing cash cost estimates shown in Cornerstone are based on an update of our process flowsheets developed from mass and energy balances.  The computations yield unit costs consumptions developed for each benchmark product manufactured on each machine at each mill.

Additionally, the most recently available regional unit cost information is utilized.  Unit costs are developed on a quarterly basis.

The unit consumptions and unit costs are combined to develop the cash manufacturing cost estimate for each product manufactured on each production machine.  This information is presented on a machine and/or mill level for the user.  The information is available via several different spreadsheet (i.e., sorted by cash cost, delivered cost, product line, etc.)  views along with corresponding curves in the Reporting and Graphing area in Cornerstone.

**Note: the cash manufacturing cost estimates do not include indirect costs including taxes, insurance, SG&A, depreciation or interest charges**.



## METHODOLOGY DESCRIPTION

We use an accurate method of estimating cash costs based on an analysis of products manufactured on each individual paper machine at each mill. The methodology has been developed through many years of experience.

Cash costs for each benchmark product have been estimated assuming the machine operates at its shown capacity. Cash cost estimates are included for these products manufactured on each paper machine included in Cornerstone.

Cash costs are defined as the "out-of-pocket costs" associated with making a product. More specifically, we define cash costs to be machine-level costs for fiber, chemicals, electrical power, fuel, hourly labor, salaried labor, materials and other consumables. These cost components are termed natural expense categories.

5



## CONCEPT FOR ESTIMATING CASH COSTS

The general concept used to estimate cash costs is illustrated below.  Basically, a "virtual fence" is erected around the process unit (paper machine) and all inputs and outputs across this fence are estimated.

Unit consumptions are determined by completing mass and energy balances.  Since no two mills (and virtually no two machines) are alike, these balances are unique for each mill/machine.  We use process flow diagrams to show each mill's process and to summarize the computations.

Cost estimates for each natural expense category are then calculated by multiplying the unit consumptions by the appropriate unit cost assumptions.  The unit costs are generally estimated on a regional basis, and adjustments are made for specific situations when deemed appropriate.  A total cash manufacturing cost estimates is obtained by summing the natural expense categories.

More specific comments for each natural expense category are provided in this section.



## CONCEPT FOR ESTIMATING CASH COSTS – continued



RISI

## FACILITY PROCESS FLOWSHEETS & COSTS

The flowsheets are a simplified overview of the mill's manufacturing and energy processes, which provide the basis for material and energy balances. The abbreviations, symbols glossary, and conversion chart all help explain the process.

The individual cost summaries detail the mill/machine name, location, cash manufacturing costs broken down by natural expense category; fiber, chemical, fuel, electrical power, hourly labor costs, salaried labor costs, and materials costs (including contract maintenance labor and landfill).

The regional unit cost for each element is shown, followed by an adjustment. Adjustments to regional costs are made to account for price differences within a region, or if specific information about a mill/machine is known. Adjustments may be made to the chemical costs if a mill has some unusual technology or is located adjacent to a chemical manufacturing facility. Also, adjustments may be made if a mill is in a remote location.

An adjusted cost is then calculated and is used to determine the total manufacturing cost for the product at the machine or mill level.

Unit consumption for each item consumed is shown to the right of the adjusted cost. The units vary according to the measure commonly used for each item. The total cash manufacturing cost for a particular item is obtained by multiplying the adjusted unit cost by the unit consumption. A total for that natural expense category is then calculated. By summing the cost elements, we derive a total cash manufacturing cost estimate for a product for a particular machine or mill at a particular location. A unit consumption indicates the consumption of a particular item per finished ton of product.

Under the fiber section, wood cost is shown in local currency, based on the weight under bark delivered to mill at the scale.

The chemicals section indicates the cost of chemicals used to produce a finished ton of product, including pulping, papermaking, and "other" chemicals. The "other" category includes defoamers, water treatment, boiler feedwater treatment, effluent treatment, and other miscellaneous chemicals used throughout the mill.

Fuels and electrical power costs are calculated using local currency rates applied to the units in which prices are normally quoted; i.e., barrels of oil, tons of coal, or thousand cubic feet of natural gas.

8



## **FACILITY PROCESS FLOWSHEETS & COSTS - continued**

The labor figures are all in local currency rates and are adjusted for regional loading factors to account for benefits, overtime rates, etc.

Finally, the materials, supplies, contract maintenance, and landfill costs are shown in local currency.

The stacked bar graph to the right of the cost table give a visual representation of the product's estimated manufacturing costs. The total height of each bar represents the total cash manufacturing cost. The height of the various shaded regions within each bar represent the relative cost of the respective natural expense category (i.e., fiber, chemicals, energy, labor, and materials).

➢ The first bar represents the cash manufacturing cost estimate for the product at the individual machine or mill level.

➢ The second bar depicts the average cash manufacturing cost estimate for all machines or mills for that product.

➢ Lastly, the third bar highlights the cash manufacturing cost estimate for the lowest cost machine or mill that product.

9



## GENERAL COMMENTS

The capacity tonnages listed for the products in the spreadsheets and cost summaries are capacities in finished short tons (FST) or finished metric tons (FMT). The exception is market pulp, which is generally shown in air-dried metric tons (ADMT). The actual material balance calculations shown in the process flowsheets have been completed in bone-dry short tons (BDST) or bone-dry metric tons (BDMT).

To aid in understanding, a glossary of commonly used symbols, listing of abbreviations and conversions can be accessed by clicking this button on the Quick Access menu of Cornerstone.

The cost estimates available in Cornerstone or product-specific and can be accessed by the user at the machine or mill level. Previously, RISI presented cost estimates based at the mill level. In order to provide higher value to our clients, machine-level benchmarking data was developed to provide greater insight by presenting manufacturing cost estimates for each benchmark product by machine.

10



## TIME BASIS

The objective of our work is to provide an accurate estimate of the cash manufacturing costs with the most current information available.

The mill and paper machine capacities are based on our surveys, annual reports, and industry directories, as well as information available from other public sources (the internet, magazine articles and other publications, conferences and personal knowledge).

Labor levels have been based on the latest available data, company information and industry directories.

Regional unit costs are based on data available from quarterly averages

Exchange rates are based on quarterly averages.

11



## FIBER COST ESTIMATES

Wood fiber consumption is based on typical and/or known yields for the pulping process involved.

Wood fiber costs are estimated on a regional basis. Regional wood fiber costs may be adjusted for particular circumstances within a region when that information is available. Average regional wood densities are used to convert prices from a volumetric basis to a weight basis.

Wood prices can be sensitive to supply and demand. Our wood costs are based on regional quarterly averages.

Purchased market pulp, pulp substitutes, and recovered fiber prices are also estimated on a regional basis. Pulp subs and other recovered paper prices may also be adjusted for delivery costs. These prices can be volatile; the figures shown are based on quarterly averages.

12



## CHEMICAL COST ESTIMATES

 Chemical cost estimates have been made for the various process pulping areas involved in the manufacture of each product. These generally include mechanical pulping, deinking, papermaking and other mill areas (water/wastewater treatment, etc.)

The use of chemical recovery was assumed where chemical pulp is produced.  Any revenue from the sale of by-product chemicals have been included in the net chemical costs for each mill/machine.

These chemicals costs have been developed on a per ton basis, then proportioned based on the product and fiber furnish.  For example, if the paper machine's fiber furnish includes 15% integrated kraft pulp, 15% of the cost of the chemicals to product a ton of kraft pulp would be included in the total cost of chemicals used to produce a ton of that product on that machine.

13



## CHEMICAL COST ESTIMATES – Coating

An important point to note about coating is that there is no universal coating formulation.  Most mills, even those within a multi-mill organization, have developed their own unique formulations over time which are guarded as proprietary manufacturing information.  In our work, we make some general assumptions in order to compare various manufacturers of coated products.

Most mills use a basis beginning composition of clay and calcium carbonate with a small amount of titanium dioxide, although some may use different grades or different rations of each.  Starch and/or latex binders are added to hold the coating together.

The above mixture is then fin-tuned by adding various enhancements to the final coating mixture, such as optical brighteners, dyes, insolubilezers, defoamers, etc.

We have generalized these assumptions to arrive at a representative coating for each of the coated products in Cornerstone.  While the specifics of each coating may change from mill to mill as well as from grade to grade, the cost does not change appreciably.

14



## ENERGY COST ESTIMATES

Estimates for both fuel and electrical power consumption are based upon the grades produced and the mill/machine process equipment used to produce them.

The unit costs for fuel and electricity are based on the regional industrial rates obtained from various sources, including the U.S. Department of Energy's Energy Information Administration, surveys of utility companies, International Energy Agency statistics, Energy User News, Wall Street Journal, personal knowledge, and experience.  Again, adjustments are made to regional or mill rates when more specific information is available.

Credits are estimated for by-products such as waste steam (heat recovery), hog fuel, black liquor, etc. when applicable.

15



## LABOR COST ESTIMATES

Labor cost estimates for each pulp and paper mill include hourly labor costs and salaried labor costs. There are two components for hourly labor costs – operations labor cost and maintenance labor cost. Three variables determine the level of cost for operations and maintenance labor – average wage rate, number of hours worked per year, and number of days of operation per year. Reference data are available from a number of sources including the U.S. Department of Labor – Bureau of Labor Statistics, other countries' government agencies, industry contacts and our knowledge and experience.

There are also two components for salaried labor costs – exempt labor cost and non-exempt labor cost. Typical exempt positions include production manager, plant engineer, technical manager, etc. Typical non-exempt positions include clerical support in such areas as mill administration, accounting, etc. As above, the same variables are used in determining the level of cost for salaried labor (also similar reference data is accessed for this information).

16



## MATERIAL COST ESTIMATES

Material costs are estimated using an approach developed from historical data which relates maintenance material costs to maintenance labor costs, plus additional direct costs depending on the grades produced. Materials, sometimes called consumables, include maintenance parts, contract maintenance, supplies, shipping supplies, felts, wires, and other incidental costs not included in other natural expense categories.

RISI uses regional benchmark data on maintenance man-hours per metric ton that have been obtained by surveys and various industry publications. When a mill/machine's actual maintenance man-hours per metric ton are above or below the benchmark, an adjustment is made to calculate the maintenance materials component. Also, the variance in the maintenance man-hours per metric ton from the benchmark is indicative of the contract maintenance needed to supplement the mill's resources.

17



## DELIVERY COST ESTIMATES

In order to provide accurate delivery cost estimates, RISI hired the services of logistics company.  This company provides a report that details delivery estimates for each pulp, paper and board mill to the important global market destinations.  In addition to this logistics report, RISI regularly receives feedback from producers and shipping companies to incorporate in determining shipping costs, etc.

The delivery cost estimates for each producing mill to the relevant market destination include costs associated with five logistical segments (where applicable):

➢ combination of rail and truck transportation from each mill to most likely domestic port or market

➢ water transportation from domestic port of entry

➢ rail and truck transportation from port of entry to market

➢ loading/unloading charges

➢ canal passage charges.

18



## REGIONAL UNIT COST ASSUMPTIONS

Regional unit cost assumptions can be accessed by clicking on *Regional Unit Costs* from the Quick Access menu in Cornerstone.  The costs are given in local as well as U.S. currency.  The unit costs that are shown represent quarterly averages for the items shown.  For non-U.S. unit costs, Cornerstone converts these costs to U.S. dollar using the respective quarterly average exchange rate.

The unit cost data are used as a base for each mill/machine, but the specific situation or location may prompt an adjustment to the price.

19



## COST OF SUPPLY CURVES

The cash cost data generated for each product for each machine and/or mill can be assembled into cost curves in the *Reporting & Graphing* are of Cornerstone.  The width of each bar is proportional to the machine's capacity to produce the product and the height is equal to the machine's or mill's cash manufacturing (or delivered) cost estimate.  The same data can be sorted in different ways to help develop a better understanding of the industry cost structure.

The cash cost curves are accompanied by spreadsheets summarizing each machine's cash manufacturing data for each natural expense category.  A breakdown of the elements of each category is found in the individual cost summaries in the *Facility Detail* area of Cornerstone.

The spreadsheets also list the capacity of each machine and/or mill on a daily and annualized basis.  The daily basis is used to calculate the cash manufacturing cost; however, each product may not be produced on a full time basis.

20



## POINTS TO REMEMBER

RISI uses a bottom-up approach to estimating manufacturing costs at each mill; supported by mass and energy balances and process flowsheets.

RISI manufacturing costs are transparent allowing you to compare each machine/mill's detailed cost estimates for overall product cost, unit cost and individual process consumption levels.

The Analytical Cornerstone model and database have been designed to be user-friendly and contains a series of spreadsheets and cost curves permitting "standard" sorts (most used by industry analyst), as well as the ability to do special sorts and modifications via a filtering mechanism.

RISI utilizes a wide range of information to determine quarterly unit costs for each geographical region and consumable item, keeping costs current and reflecting up-to-date business conditions.

Unit costs are established using "market" prices for each facility's geographical location.  <u>No "transfer" prices are used!</u>

Cornerstone's "what if" module, Scenario Manager, permits clients to change machine/mill costs and consumptions, shut and add capacity, change individual or multiple unit cost elements in one or multiple geographic regions, and change exchange rates.

21

