**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CASE NO:  1:07-cv-1912 (RMC) |
| v. | JUDGE: Collyer, Rosemary M. |
| ABITIBI-CONSOLIDATED INC. and BOWATER INC., | DECK TYPE: Antitrust |
| Defendants. | DATE STAMP: August 8, 2008 |

**REPLY BY THE UNITED STATES TO NAA'S OPPOSITION TO MOTION FOR <u>ENTRY OF THE PROPOSED FINAL JUDGMENT</u>**

**INTRODUCTION**

The United States and the Newspaper Association of America ("NAA") agree that the issue before the Court is whether the relief that the United States has secured in the proposed Final Judgment meets the Tunney Act's public interest standard.[1]  Under this standard,

> balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General.  The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree.

*United States v. Bechtel Corp*., 648 F.2d 660, 666 (9th Cir. 1981).  As the United States explains below, the public interest standard is a reasonableness test that incorporates substantial deference to the Attorney General.

The United States disagrees with NAA on whether the relief required by the proposed

---

[1]Antitrust Procedure and Penalties Act, 15 U.S.C. § 16 (b)-(h) (herein, the "Tunney Act" or "Act").

1

Final Judgment is adequate to the preserve competition that would have been lost as a result of the defendants' merger. The decision to require that relief, the divestiture of the Snowflake mill in Snowflake, Arizona, was the result of a comprehensive nine-month investigation and was based on the same detailed economic modeling that the United States used in deciding to challenge the parties' transaction by bringing this case in the first instance. NAA's claim that the Snowflake divestiture is inadequate is based on flawed economic arguments that AbitibiBowater, Inc. ("AbitibiBowater") exercised market power post-merger by closing capacity and increasing newsprint prices. The United States attaches herewith the Declaration of Dr. Nicholas Hill to explain how the United States crafted the proposed remedy and to demonstrate why NAA is wrong. In making a public interest determination, of course, the Court need not determine which economist is correct; it only needs to find that the United States has presented a reasonable basis for the proposed settlement.

This reply brief is organized as follows: after discussing the applicable law, the United States explains why the Snowflake divestiture is an appropriate remedy. The United States then explains why the nominal price increases upon which NAA relies do not demonstrate that AbitibiBowater has exercised market power and appear instead to be the result of non-merger related economic trends – a conclusion reinforced by the fact that newsprint price trends are consistent with price trends for similar high volume paper products not affected by the merger. In addition, the United States explains that NAA ignores a critical fact: the mills that AbitibiBowater closed were losing money during the investigation and at the time that they were closed, which is enough in itself to undermine NAA's economic conclusions. Finally, the United States explains that the evidentiary hearing requested by NAA is unprecedented and unnecessary.

## ARGUMENT

**I.     The Court Must Enter The Proposed Final Judgment If It Determines That The Proposed Final Judgment Meets The Public Interest Standard.**

The Tunney Act provides that before entering the parties' settlement as its judgment, the Court must "determine that the entry of such judgment is in the public interest."  15 U.S.C. § 16(e)(1).  Although the Act provides a non-exclusive list of factors that the Court "shall consider" in making its determination,[2] the Act offers no explicit directives regarding the standard the Court is to apply in making its determination.  Indeed, the statute does not define the key phrase "in the public interest."  *United States v. SBC Communications, Inc.*, 489 F. Supp. 2d 1, 10 (D.D.C. 2007) ("*SBC*").   In the three decades since its enactment, the courts (in particular, those of this circuit) have drawn on the Act's language, structure, context, and legislative history to flesh out that standard and the nature of this Court's task.  As Judge Sullivan found in his recent decision

---

[2]A court is to consider these factors (15 U.S.C. § 16(e)(1)):

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

Prior to a 2004 amendment to the Tunney Act, the section provided that the court "may," rather than "shall," consider the listed factors, and there were some differences in the factors listed.  Overall, however, "the 2004 amendments effected minimal changes" to the statute.  *United States v. SBC Communications, Inc.*, 489 F. Supp. 2d 1, 11 (D.D.C. 2007) ("*SBC*").

examining the effect of the 2004 amendments to the Act, the "body of law interpreting the Tunney

Act's vague language" continues to govern post-amendment Tunney Act proceedings. *Id.* at 11.

The United States has alleged conduct violating the antitrust laws – the defendants' planned

merger – and the competitive harm that would result if the merger were permitted to go forward as

defendants contemplated.  The United States' settlement expresses its conclusion that the proposed

decree adequately remedies (or prevents) the harm alleged in the Complaint, and that it would

therefore be in the public interest for the Court to enter it.[3]  The sole question for the Court is

whether to reject that conclusion.

A court does not properly reject a proposed consent decree on the ground that a better

decree can be imagined.  The test instead is whether "the remedies [are] so inconsonant with the

allegations charged as to fall outside of the 'reaches of the public interest.'"  *Microsoft*, 56 F.3d at

1461; *see SBC*, 489 F. Supp. 2d at 16 (noting that there "is no indication . . . that Congress

intended to overrule [*Microsoft*'s 'reaches of the public interest'] holding" by the 2004

Amendments).  Thus a court may not "engage in an unrestricted evaluation of what relief would

best serve the public interest."  *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988)

(citation omitted).  Instead, it must recognize that Congress intended that the applicable public

interest concept encompass "compromises made for non-substantive reasons inherent in the

---

[3]The Court's task here is not to determine the appropriate remedy for a violation of the antitrust laws, as if the case had been litigated and defendants found liable.  A settlement is before the Court, and "there are no *findings* that the defendant has actually engaged in illegal practices." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1460-61 (D.C. Cir. 1995).  Thus, "for the district judge to assume that the allegations in the complaint have been formally made out is unwarranted." *Id.* at 1461.  Moreover, no trial record exists, because the case settled before trial.  For a Tunney Act court to create such a record to inform its determination would effectively require trial-type proceedings, depriving the parties of the benefit of resolving cases by settlement rather than litigation.

process of settling cases through the consent decree procedure," H.R. Rep. No. 93-1463, at 12 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6535, 6542. Embodied in precedent, the broad "reaches of the public interest" standard logically follows from the Tunney Act's basic concept of judicial consideration of a *settlement*,[4] and rejects the view that a court may simply "interpose its own views of the appropriate remedy over those the government seeks as part of its overall settlement." *Id.* at 1458.

After a court addresses the specific factors listed in the Tunney Act, its public interest determination properly focuses on whether the terms of the decree are ambiguous, whether the court "can foresee difficulties in implementation," and whether the proposed decree, as opposed to defendants' conduct or other causes, would "positively injure[]" third parties. *Microsoft*, 56 F.3d at 1462.[5] But the primary focus in almost every case is whether "the remedies provided in the decree [are] adequate to the allegations in the complaint," *id.* at 1457, in light of the "reaches of the public interest" standard.

In these circumstances, where an expert executive branch agency conducts an extensive investigation and concludes that the public interest is served by a particular settlement, a court should exercise considerable caution before declining to enter the proposed judgment. The

---

[4]If courts acting under the Tunney Act disapproved proposed consent decrees merely because they did not contain the exact relief which the court would have imposed after a finding of liability, defendants would have no incentive to consent to judgment and this element of compromise would be destroyed. The consent decree would thus as a practical matter be eliminated as an antitrust enforcement tool, despite Congress' directive that it be preserved. *United States v. American Tel. & Tel. Co.*, 552 F. Supp. 131 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983). *See also Microsoft*, 56 F.3d at 1456 ("The Tunney Act was not intended to create a disincentive to the use of the consent decree.").

[5]No one has alleged that any of these matters raise concerns about the proposed decree in this proceeding.

5

decision to settle properly lies within the agency's "rather broad discretion." *Microsoft*, 56 F.3d at 1461. The "balancing of competing social and political interests affected by a proposed antitrust consent decree must be left . . . . to the discretion of the Attorney General." *Bechtel*, 648 F.2d at 666.

Beyond deference to the Attorney General's implicit balancing of interests, the court properly gives deference to the United States' judgments as to the efficacy of remedial provisions. While the degree of deference may vary with the extent of the court's familiarity with the market and other factors, *Microsoft*, 56 F.3d at 1461, the Court of Appeals has made clear that even a court with considerable relevant expertise should not lightly reject the United States' predictions. *Id.*[6]

Accordingly, the question is not whether the United States' view of the efficacy of the remedies provided in the proposed decree is correct, but rather whether the United States has established an "ample foundation for [its] judgment call" and thus shown "its conclusion reasonable." *Microsoft*, 56 F.3d at 1461; see also *SBC*, 489 F. Supp. 2d at 21 ("Even accounting for [shortcomings that could reduce the effectiveness of the proposed settlements], the United States has presented a reasonable basis for concluding that the proposed settlements will replace much of the competition lost to the mergers, if perhaps not all of it. Therefore, the Court finds that the proposed settlements are reasonably adequate, and thus within the reaches of the public interest.").

---

[6]Thus, in the case of the AT&T decree – "a decree the oversight of which had been the business of a district judge for several years," *Microsoft*, 56 F.3d at 1460, the Court of Appeals instructed that the district judge should not reject an agreed-upon modification of the decree unless it had "'exceptional confidence that adverse antitrust consequences [would] result – perhaps akin to the confidence that would justify a court in overturning the predictive judgments of an administrative agency." *Id.* (quoting *United States v. Western Electric Co.*, 993 F.3d 1572, 1577 (D.C. Cir. 1993)).

**II.      The United States' Judgment Regarding the Scope of Relief Is Reasonable**

The relief required under the proposed Final Judgment – the divestiture of the Snowflake, Arizona newsprint mill – remedies the harm to competition alleged in the Complaint and easily satisfies the public interest standard.[7]  During the course of its comprehensive nine-month investigation, the United States conducted extensive discovery pursuant to 15 U.S.C. §§ 1311-1314, employed significant resources to review and analyze this information, determined that the proposed merger would result in a substantial lessening of competition in the North American newsprint market, and reached the conclusion that the divestiture of the Snowflake mill would restore the competition that the merger would have otherwise eliminated.[8]  As part of this investigation, the United States obtained a substantial production of documents and information from the merging parties and issued 37 Civil Investigative Demands to third parties.  In total, the

---

[7]  As explained in the United States' Competitive Impact Statement and Response to Public Comments, the United States' investigation found that under existing newsprint industry market conditions, such as sharply declining demand, the merged firm's loss of newsprint capacity from the divested Snowflake mill would reduce its total capacity such that it would not have enough newsprint capacity to benefit sufficiently from the post-merger price increase to offset the costs associated with shutting down profitable mills.  (United States' Response to Public Comments, at 10-11 & 14-15; Competitive Impact Statement, at 7-8).

[8]NAA characterizes the United States' assertion that it has better data that it cannot divulge as the "trust us" defense and implies that the United States should disclose the confidential and competitively sensitive information upon which it bases its analysis.  (NAA Memorandum, at 14).  Such a practice could be harmful to antitrust enforcement and the United States is unaware of any Court that has required the United States to disclose antitrust investigatory information to an amicus.  The United States was able to efficiently obtain information in this case in part because of the Antitrust Division's strict policy against disclosing – and strong record of protecting – confidential information.  If Courts were to make a practice of requiring disclosure of such confidential information to trade associations and other third parties, companies may be more likely to resist discovery, making it more difficult for the United States to obtain the information it needs to make proper enforcement decisions.  Courts could also place an additional burden upon themselves of overseeing motion practice relating to Civil Investigative Demands.  *See* 15 U.S.C. § 1314(1).

United States received and considered more than 150,000 pages of material. The United States also conducted more than 60 interviews with customers, competitors, and other individuals with knowledge of the industry, including NAA.

To analyze the likely competitive effects of the merger, the United States used standard microeconomic theories to model competition in the newsprint industry – analyzing a comprehensive data set of prices, sales, production volumes, individual mill costs, capacities and forecasts of North American newsprint demand. (*See* Response to Public Comments, at 14-15. *See also* Competitive Impact Statement, at 7-9 ("CIS")). To help the Court understand the United States' analysis and why NAA's claims are not correct, the United States is submitting with this Reply the Declaration of Dr. Nicholas Hill, a Research Economist with the Department of Justice, which, *inter alia*, discusses the methodology the Department employed in reaching its conclusion.

This economic model used by the United States predicted that given mill costs and falling demand, Abitibi-Consolidated Inc. ("Abitibi") and Bowater Inc. ("Bowater") would close unprofitable capacity regardless of the merger. (Hill Declaration, ¶ ¶ 9-11). The model also predicted, however, that the merger would likely cause the combined firm to close profitable plants as well in order anticompetitively to increase the price of newsprint. (*Id*.) The merger created this incentive by combining the newsprint production capacity of the two firms, thereby increasing the volume of newsprint over which the combined firm would benefit from a price increase.

The United States used this same economic model to identify a divestiture that would be sufficient to remove the merged firm's incentive to close profitable capacity by reducing the volume of production over which the merged firm would benefit from a price increase. (*Id*. at 11). When an expert agency uses standard economic models to predict anticompetitive effects and then uses

these standard models to fashion relief, there is certainly a reasonable basis for determining that the settlement proposed by the United States is in the public interest.

### III.    Post-Merger Increases In Newsprint Prices Are More Consistent With Subsequent Non-Merger-Related Events Such As Input Cost Increases Than With Market Power

NAA claims that post-merger increases in nominal newsprint prices prove that the merged firm is exercising market power.  However, NAA's assertion that the merger caused newsprint prices to increase is not persuasive when one looks at real newsprint prices, which account for inflation.  Real newsprint prices are actually lower than the nominal prices that NAA reports and recent fluctuations in input prices, currency exchange rates, and other factors played important roles in the recent newsprint price increases that NAA has identified.  Without further analysis of input costs, exchange rate fluctuations, and other factors that have also driven prices higher for a variety of other paper grades, the general observation by NAA's expert, Mr. John H. Preston, that newsprint prices have increased fails to support his conclusion that AbitibiBowater is exercising market power as a result of the merger.  (*See* Hill Declaration, ¶¶ 12, 22-23).

### 1.    Real Newsprint Prices Have Trended Downward Over Time and Actually Have Declined Since The Merger Announcement

Dr. Hill reviewed ten years of public newsprint sales data and adjusted the data for inflation.  The real newsprint price data make it clear that the recent increase in newsprint prices is neither dramatic nor unprecedented, and that the nominal price increases NAA relies upon are not a result of an exercise of market power by the merged firm, but instead are entirely consistent with the volatile history of newsprint prices.  (Hill Declaration, ¶¶ 12-15, 19).  Real newsprint prices appear to be trending downward over time.  (*Id.* at ¶ 19).  In fact, the real price of newsprint is lower today than when the merger was announced.  (*Id.* at ¶ 15).  By ignoring the larger context,

focusing on a short time period, and presenting only a limited amount of information to the Court, NAA tells an incomplete and misleadingly simple story.

      2.     Currency Exchange Rates Have Affected U.S. Newsprint Prices as Canadian Producers Have Less Incentive To Produce Newsprint

NAA's expert, Mr. Preston, recognizes that a rising Canadian dollar relative to the American dollar raises the cost of Canadian production. (Preston Declaration, ¶ 53). However, Mr. Preston fails to adjust properly his analysis for currency changes over time and therefore does not account for a significant non-merger effect on prices in the newsprint industry. (*See* Hill Declaration, ¶ ¶ 16-19).

The exchange rate and its effect on Canadian producers are important to American newsprint consumers because more than half of the newsprint consumed in the United States is produced in Canada and many of the marginal newsprint producers, whose costs determine industry pricing, are located in Canada. (*Id.* at ¶ 16). In addition, Canadian producers have had less incentive to continue producing newsprint as their manufacturing costs have increased while their real revenues have not kept pace with these costs. (*Id.* at ¶ 17). One reason the cost of producing newsprint in Canada has increased is because the Canadian dollar has gained against the American dollar. (*Id.* at ¶ 16). Meanwhile, the average real price that Canadian producers receive for newsprint in Canadian dollars has fallen over time. (*Id.* at ¶ 17). These facts are also consistent with Dr. Hill's observation that it is Canadian – rather than American – mills which have reduced capacity as the Canadian dollar has gained value relative to the American dollar. (*Id*. at ¶ 27).

      3.     Input Costs Have Increased and Price Trends of Other Grades of Paper Are Similar to Newsprint

Dr. Hill posits that another way to determine whether AbitibiBowater has been exercising

market power or simply responding to rising input costs is to compare price trends for newsprint with products that have similar input costs. (Hill Declaration, ¶ 22). Since the merger was announced, the costs of fiber and fuel – two of newsprint's and similar paper products' major inputs – have increased significantly. (*Id.* at ¶ 14, n.6). Dr. Hill then demonstrates that the prices of three other grades of paper also rose significantly. (*Id*. at ¶ 23). The fact that the prices of newsprint and other grades of paper rose together suggests that factors other than the merger have driven newsprint prices higher, and undermines NAA's assertion that market power explains the nominal newsprint price increases that have been observed post-merger.

## IV.    NAA's Market Power Argument Ignores Important Facts

### A.    The Merged Firm Has Closed Only Unprofitable Mills

NAA adopts the Complaint's theory of harm that the combined firm would have the incentive to close profitable mills earlier than it would absent the merger. (NAA Memorandum, at 5). Relying on a dominant firm theory, NAA recognizes that a test for whether a firm is dominant is the firm's ability to close profitable mills:

> In a competitive market, the owner of a mill will continue to produce as the mill **covers its operating costs** and makes some contribution, however small, to fixed costs. Closing a mill that is still able to sell its output at a **profit** above its operating costs is a luxury that only a firm with market power can afford . . . .

(NAA Memorandum, at 9-10 (emphasis added)). NAA then goes on to assert that AbitibiBowater closed 610,000 metric tonnes of newsprint capacity in late 2007 "in an exercise of market power," which has caused newsprint prices to increase. (*Id.* at 11. *See also id.* at 7-10).

NAA's explanation of the exercise of market power by a dominant firm – in this instance AbitibiBowater – through closing profitable mills fatally disregards the fact that all the evidence

11

available indicates that the mills that AbitibiBowater closed were actually unprofitable. (Hill

Declaration, ¶ 25 (quoting AbitibiBowater Executive Chairman John Weaver as stating: "All of the

capacity closed was in a negative cash position.")). The United States has confirmed the

unprofitability of the closed mills by reviewing the defendant's confidential profit and loss

statements at these mills. The United States explained that "the three mills that AbitibiBowater

closed after the merger were unprofitable" in its Response to Public Comments, (Response to

Public Comments, at 9), a public document that was filed with this Court and which was served on

NAA. Nevertheless, NAA has ignored this critical fact. It has failed to respond to the United

States' assertion in this proceeding or to AbitibiBowater's similar statement to the financial

community, and it has not provided any evidence that the closed mills were profitable.

NAA's faulty factual assumption that the mills that closed were profitable leaves it with no

evidence that AbitibiBowater exercised market power as a dominant firm. The United States

agrees that closing profitable mills may be some evidence that market power was exercised. Here,

however, NAA's factual premise is simply not true.

B.     Other Newsprint Producers Are Closing Mills

If AbitibiBowater were exercising market power in order to drive newsprint prices up,

other firms in the industry would have a strong incentive to keep their mills open and even

attempt to increase production in order to profit from those higher prices. (Hill Declaration, ¶

26). However, several other firms also closed capacity in 2007 and 2008. (*Id.*). That these

firms closed their mills is not consistent with NAA's claim that AbitibiBowater is a dominant

firm exercising market power. (*Id.*). Instead, these closures suggest that the combined firm's

decision to reduce unprofitable capacity was driven by factors other than the merger. (*Id.*).

**V.      Granting NAA's Request For An Evidentiary Hearing Would Be Unprecedented And Such A Hearing Is Unnecessary**

Despite stating that the existing record is "more than adequate" to make a public interest determination, (NAA Memorandum, at 14), NAA contends that "if this matter is to be decided based on a choice between competing data sets and economic models," then an evidentiary hearing is needed.   (*Id.*).   That is not the legal standard, however.   The Court is not faced with a choice between competing data sets and economic models, but with the question of whether the proposed Final Judgment is in the public interest.   The record is more than adequate for the Court to decide the question that is actually before it, and thus an evidentiary hearing is both unnecessary and ill-advised.[9]

Although the Tunney Act permits a court to conduct an evidentiary hearing when necessary, 15 U.S.C. § 16(f), Congress contemplated that "the trial judge will adduce the necessary information through the least complicated and least time-consuming means possible." S. Rep. No. 93-298, at 6 (1973) ("Senate Report"); *accord* H.R. Rep. No. 93-1463, at 8 (1974), reprinted in 1974 U.S.C.C.A.N. 6535, 6539 ("House Report").   Ordinarily, this principle rules out an evidentiary hearing.[10]   Indeed, the United States is unaware that an evidentiary hearing has

---

[9]A Court that wishes to compare economic models and recreate the investigation would preside over a significant discovery process.  The United States was able to conduct a comprehensive merger review because it dedicated a staff of up to ten attorneys and two economists, plus a support staff such as paralegals, research assistants, and clerical and technical staff.  Updating the review and providing the Court with an updated set of facts to compare the competing economic models would require the entry of a protective order and an extensive period for significant discovery, including discovery outside of the United States.

[10]The various materials the Tunney Act does require, *see* 15 U.S.C. § 16(b), together with the record (if any) created prior to settlement, will usually suffice.  *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) ("Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to

13

*ever* been held in a Tunney Act proceeding in any jurisdiction.[11]

NAA's argument does not warrant departing from standard Tunney Act practice in this case. The Court must decide whether entry of the proposed decree would be within the "reaches of the public interest," which in turn requires deciding not whether the United States' conclusion expressed in the CIS and in Dr. Hill's Declaration is correct, but rather whether "the government has presented a reasonable basis for concluding that the proposed settlements will replace much of the competition lost to the merger[]." *SBC*, 489 F. Supp. 2d at 21. That question is easily answered here on the basis of the existing record and it is unnecessary to take the unprecedented step of holding an evidentiary hearing to determine whether entry of the proposed Final Judgment is in the public interest.

---

comments alone"). *See also* The Antitrust Procedures & Penalties Act: Hearings on S. 782 & S. 1088 Before the Subcomm. on Antitrust & Monopoly of the Senate Committee on the Judiciary, 93d Cong., at 152-53 (1973) ("Senate Hearings") (testimony of Hon. J. Skelly Wright) ("an experienced judge, who does have the facility of getting to the point and getting others to get to the point, can arrive at a public interest determination in most cases without using" additional tools); Senate Report at 6 ("[w]here the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized"). The 2004 amendments to the Tunney Act explicitly stated that nothing in § 16(f) "shall be construed to require the court to conduct an evidentiary hearing." 15 U.S.C. § 16(f)(2). Even absent a settlement, no evidentiary hearing on relief is required where there are "no disputed factual issues regarding the matter of relief." *United States v. Microsoft Corp.*, 253 F.3d 34, 101 (D.C. Cir. 2001) (en banc) (per curia).

[11]The United States searched Antitrust Division records for the past twenty years and also conducted a Westlaw search for Tunney Act evidentiary hearings without finding any indication that such a hearing has ever been held.

**CONCLUSION**

For the reasons set forth in this Memorandum, the Motion To Enter the Proposed Final Judgment, the United States' Response to Public Comments, and the CIS, there is plainly a reasonable basis for the United States' conclusion that the proposed Final Judgment is in the public interest.  The United States therefore requests that the Court so find, deny NAA's request for an evidentiary hearing, and enter the proposed Final Judgment.

Dated: August 8, 2008                              Respectfully Submitted,

                                                              /s/ Karl Knutsen
                                                   Karl D. Knutsen
                                                   Ryan Danks
                                                   Rebecca A. Perlmutter
                                                   Michelle Seltzer (D.C. Bar No. 475482)
                                                   Trial Attorneys
                                                   Litigation I Section
                                                   Antitrust Division
                                                   United States Department of Justice
                                                   1401 H St., N.W., Suite 4000
                                                   Washington, D.C. 20530
                                                   Telephone: (202) 514-0976
                                                   Facsimile:   (202) 307-5802

## CERTIFICATE OF SERVICE PURSUANT TO LOCAL RULE 5.4

I hereby certify that on August 8, 2008, I caused a copy of the foregoing Reply by the United States to NAA's Opposition to Motion for Entry of the Proposed Final Judgment to be served on the following individuals:

CM/ECF automatic electronic notification

**Counsel for Defendant Abitibi-Consolidated Inc.**

Joseph J. Simons, Esq. (jsimons@paulweiss.com)

Moses Silverman, Esq. (msilverman@paulweiss.com)

Danielle Monnig Clark, Esq. (dclark@paullweiss.com)

Paul, Weiss, Rifkind, Wharton & Garrison LLP

1615 L Street, NW, Suite 1300

Washington, DC 20036-5694

**Counsel for Defendant Bowater Incorporated**

Danielle Monnig Clark, Esq. (dclark@paulweiss.com)

(see above for address)

**Counsel for Amicus Newspaper Association of America**

Mohammad A. Syed, Esq. (msyed@kingballow.com)

King & Ballow

1100 Union Street Plaza

315 Union Street

Nashville, TN 37201

Notice delivered by other means (electronic mail)

**Counsel for Amicus Newspaper Association of America**

Alan L. Marx, Esq. (amarx@kingballow.com)

Mark E. Hunt, Esq.

Steven C. Douse, Esq.

King & Ballow

(See above for address)

    /s/   Rebecca Perlmutter

Rebecca A. Perlmutter, Esq.

U.S. Department of Justice

Antitrust Division

1401 H Street, NW, Suite 4000

Washington, DC 20530

Telephone: (202) 307-6456

Facsimile: (202) 307-5802

Email: rebecca.perlmutter@usdoj.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 1:07-cv-01912 (RMC) |
| v. | ) | |
| | ) | |
| ABITIBI-CONSOLIDATED, INC., | ) | |
| and BOWATER INCORPORATED, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# Declaration of Nicholas Hill

## 1   Background and Qualifications

1.    My name is Nicholas Hill. I am an economist at the Antitrust Division of the United States Department of Justice ("DOJ"). I have been employed at the Antitrust Division since 2006. My Curriculum Vitae is attached to this declaration as Exhibit A.

2.    I have a B.A. in Economics and International Studies and an M.Sc. in Quantitative Development Economics from the University of Warwick in the United Kingdom. These degrees were awarded in 1994 and 1995, respectively. I have a Ph.D. in economics from the Johns Hopkins University. This degree was awarded in 2007, though I completed all of the requirements for the degree in 2006.

3.    While at the Antitrust Division, I have worked on industries ranging from health care to computer software. The industry on which I have spent the most time is the paper industry. I have worked on the Abitibi-Bowater matter since it began in January 2007, though I have also worked on other matters in the same period.[1] On the Abitibi-Bowater matter I was involved in every aspect of the case from interviews to econometric modeling.

---

[1] Notably, I lead the Antitrust Division's economic team that has been working on the Division's investigation of the paper industry merger between Graphic Packaging and Altivity (United States v. Altivity Packaging LLC et al., No. 1:08-cv-00400 (D.D.C. filed March 5, 2008)).

## 2    Overview of My Declaration

4.    The purpose of this declaration is to respond to the declaration filed by Mr. John H. Preston on behalf of the Newspaper Association of America ("NAA"). In his declaration, Mr. Preston argues that the merger between Abitibi and Bowater created market power and that the divestiture required by the United States Department of Justice, namely the sale of Abitibi's Snowflake, Arizona mill, was insufficient and did not adequately dissipate this market power. To support his argument Mr. Preston relies chiefly upon two facts: since the merger, the price of newsprint has increased and AbitibiBowater has reduced its newsprint capacity. He also purports to show that the increase in the price of newsprint cannot be explained by increases in the cost of producing newsprint or by fluctuations in the exchange rate between the Canadian and U.S. dollars.

5.    Mr. Preston's conclusions are based upon evidence that is presented out of context. He analyzes a narrow window of time that obscures broad trends and ignores important information. In this declaration I place recent events in their proper context and explain why they do not support Mr. Preston's claim that the divestiture of the Snowflake mill was not a sufficient remedy.

6.    To this end, I analyze two strands of evidence. The first strand of evidence concerns the price of newsprint. After adjusting for cost inflation and exchange rate fluctuations, the price of newsprint is lower today than it was when the merger was announced. The price has risen in 2008, but this is to be expected given that the price of newsprint was below the cost of producing newsprint for many mills in 2007. Further, the recent history of the price of newsprint closely mirrors that of the prices of other types of paper that face similar cost inflation and exchange rate fluctuations but were unaffected by the merger of Abitibi and Bowater.

7.    The second strand of evidence concerns recent capacity reductions. Mr. Preston notes that AbitibiBowater has closed a significant amount of newsprint capacity in 2008, but he presents no evidence that the closed mills were profitable. In fact, all the mills that were closed were unprofitable. Further, AbitibiBowater's competitors have significantly reduced their own capacity in the past two years, a fact that is difficult to reconcile with the claim that AbitibiBowater is acting as a dominant firm. A more likely explanation is that other forces that have rendered marginal newsprint mills unprofitable—e.g., rising input costs, exchange rate fluctuations and falling demand—are driving capacity reductions.

## 3    The Department of Justice's Investigation

8.    Before addressing events since the merger of Abitibi and Bowater, I will briefly discuss the economic analysis performed during the DOJ's investigation. We first defined an antitrust market of North American newsprint. We then modeled the effect of the merger using a dataset that contained extensive information about the newsprint market. We concluded that without relief the merger would give

the merged firm an incentive to close profitable capacity that it would not close but for the merger. We then used the same model to identify a divestiture that would remove the merged firm's incentive to close this capacity. Mr. Preston agrees with all of our work except for our conclusion that the divestiture of the Snowflake mill constitutes adequate relief, which he claims has been shown to be incorrect. Because of this, I will now detail how the DOJ performed its economic analysis.

9.   The DOJ analyzed the Abitibi-Bowater transaction using an approach called the capacity closure method.[2] The key assumption of the capacity closure method is that if a firm wishes to raise the price, it will do so by closing otherwise profitable capacity.[3] Using this assumption, one can measure a firm's incentive to close profitable capacity by calculating its profit under every possible set of capacity closures that it could undertake. The firm's profit under the most profitable set of capacity closures can then be compared to the firm's current profit. The firm will choose to close profitable capacity—i.e., exercise market power—if and only if doing so results in a larger profit than it currently earns.

10.  The capacity closure method requires accurate mill level data on the costs of all of the mills owned by the firm. The DOJ obtained such data for all of the mills owned by the parties. Using these data and many others that described competitive conditions in the newsprint industry, the DOJ analyzed the merger using the capacity closure method. It concluded that a number of mills owned by Abitibi and Bowater would close in the near future whether or not the merger was approved. These mills were older, unprofitable Canadian facilities that had been battered by a strengthening Canadian dollar and rising costs and that had little future because of declining demand.

11.  However, the DOJ also concluded that the merger would give AbitibiBowater the incentive to close some profitable mills that the individual firms would not close absent the merger. The DOJ therefore evaluated whether the incentive to close profitable capacity could be removed via divestiture. This was done by rerunning the capacity closure method many times, each time assuming that AbitibiBowater had divested a different set of mills. This process identified all of the divestitures that removed the merged firm's incentive to close profitable capacity. Given the possibility that demand would fall more rapidly than predicted—and hence render some currently profitable mills unprofitable—the DOJ wanted to ensure that any divested capacity would remain profitable for the foreseeable future. The DOJ therefore selected Snowflake, a highly efficient American mill, as the capacity to be divested.

---

[2]The capacity closure method was subsequently used to analyze the merger between Altivity and Graphic Packaging. While the same method was used in both cases, the specifics of the two cases differed significantly, with the most important difference being that demand was not falling in the Altivity-Graphic Packaging matter.

[3]The use of this assumption in this case is supported both by newsprint industry wisdom and by the economics of newsprint mills (i.e., their high fixed costs).

## 4   The Price of Newsprint

12.      Mr. Preston claims that the recent rise in the price of newsprint is the result of an exercise of market power by AbitibiBowater. This claim is the centerpiece of Mr. Preston's declaration, so I have examined the price of newsprint in some detail. My conclusion is that the price of newsprint, when viewed in the proper context, does not support the claim that the merger created market power for AbitibiBowater.

13.      When analyzing the price of newsprint, a natural way to begin is by graphing the nominal price of newsprint over time.[4]  Figure 1 presents RISI's estimate of the newsprint price for the past ten years.[5]  Three points are immediately obvious from the figure. First, the nominal price of newsprint is at its highest point in the past ten years. Second, the price of newsprint has been volatile over the past ten years. Third, the price of newsprint has been climbing steadily since the later part of 2007.



Figure 1:  Newsprint Prices in U.S. Dollars

14.      While graphing the nominal price of newsprint is a good starting place, it is important to realize that the cost of producing newsprint has also risen over the past

---

[4]A price is said to be nominal if it has not been adjusted for inflation. A price is said to be real if it has been adjusted for inflation. Real prices allow for meaningful comparisons across time while nominal prices do not.

[5]RISI is a paper industry trade organization that collects data on the price of newsprint and other paper grades. Their price data are widely used in the industry. The specific price that I use is the East Coast price of 48.8 gram newsprint, which is an industry benchmark.

ten years and that increases in costs are eventually reflected in increased prices.[6] One way to control for cost inflation—and hence to observe the true trend in the price of newsprint—is to deflate the nominal price of newsprint using a measure of the increase in a broad range of prices over time.[7] A nominal price that has been deflated is known as a real price. Figure 1 also includes the real price of newsprint over the past ten years, which is the nominal price deflated by the Bureau of Labor Statistics' ("BLS") measure of price changes across all manufacturing industries.[8]

15.  Examining the real price of newsprint over time makes a number of things clear. First, the real price of newsprint has fallen since the merger was announced (the vertical line near 2007 denotes the announcement of the merger). Second, the recent rise in the real price of newsprint is neither dramatic nor unprecedented. Third, before it began to rise in 2008, the real price of newsprint was close to its historical low.

16.  Thus far I have focused on the price of newsprint expressed in U.S. dollars, but more than half of the newsprint produced in North America is produced in Canada. Canadian producers must pay their input costs in Canadian dollars while receiving payment for their output in U.S. dollars (the vast majority of newsprint is sold in the United States). A fall in the value of the U.S. dollar vis-à-vis the Canadian dollar is therefore equivalent to an increase in costs for Canadian producers. As Mr. Preston puts it in paragraph 53 of his declaration "increases in the value of the Canadian dollar relative to the U.S. dollar raise the costs of Canadian newsprint mills." The price of newsprint in Canadian dollars is therefore of great interest given that many of the marginal newsprint mills—i.e., the mills whose costs eventually determine the industry price—are located in Canada.

17.  Figure 2 presents the nominal and real prices of newsprint in Canadian dollars.[9] Whichever of these two series one examines, one draws the same conclusions. First, the prices that Canadian producers have received for their newsprint have fallen steadily over time. In effect, this means that the costs of Canadian newsprint producers have risen over time. Second, the price of newsprint is lower now than it was at the time that the merger was announced. Third, the price of newsprint displays significant volatility.

---

[6] Since the merger was announced the cost of two of the major inputs into newsprint production, fiber and fuel, have increased significantly. The cost of freight, which is typically paid for by newsprint producers, has likely also increased.

[7] Ideally I would control precisely for the impact of cost inflation, but I lack the data necessary to do so. I therefore present two methods of controlling for cost inflation, one that I discuss now and one that I discuss at the end of this section.

[8] I deflated the nominal price of newsprint by dividing it by the BLS's "total manufacturing industries" producer price index (the BLS's ID for this series is OMFG).

[9] I converted the U.S. dollar price of newsprint into Canadian dollars using monthly historical exchange rate data downloaded from the Bank of Canada's website (http://www.bankofcanada.ca/en/rates/exchform.html). I do not have an equivalent to the BLS deflator for Canada. I therefore deflated the nominal Canadian dollar price using the BLS deflator.



Figure 2: Newsprint Prices in Canadian Dollars

18.  In summary, one can draw several conclusions from Figures 1 and 2. First, once one controls for cost inflation, the current price of newsprint is neither historically nor abnormally high. Indeed, it is below the price at the time that the merger was announced. Second, the price received by Canadian producers (i.e., the marginal producers of newsprint) has fallen dramatically over time. Third, before rising in 2008, the price of newsprint was close to its historical low.

19.  These conclusions are reinforced by Figure 3, which depicts the average yearly real price of newsprint from 1998 to 2008.[10]  The average real price of newsprint in Canadian dollars has fallen sharply over time, and its present level is the lowest on record. The average real price of newsprint in U.S. dollars appears to be trending downward over time, though the series displays significant volatility.

20.  A relevant question to consider is what might account for the volatility displayed by the price of newsprint. A plausible explanation is that while closing a newsprint mill is costly to the mill's owner, the closure benefits all newsprint producers by putting upward pressure on the price. Firms will therefore resist closing mills in the hopes that another firm will close capacity first. As a result, when prices fall firms may engage in a war of attrition in which they tolerate losing money on their most costly mills in the short run in the hope that a rival will capitulate and close capacity first. Such a war would create a lag in the response of capacity to price

---

[10]Averaging the prices helps remove some of their volatility and helps makes long term trends clear.

6



Figure 3: Average Yearly Real Newsprint Prices

signals and could cause the price to fall sharply. And, if the price falls far enough, firms may close a large amount of capacity, which could cause a sharp rise in price. In combination these effects could make the price of newsprint bounce around its long term trend and mean that it reacts to changes in market conditions with a lag.

21. While explicitly adjusting the price of newsprint to control for the effects of cost inflation is mandatory if one wishes to compare prices over time, it may under or overstate the impact of cost inflation. The source of the potential error is that while one adjusts the price using a broad measure of price inflation, the cost inflation in a particular industry may be higher or lower than in the economy as a whole.

22. Another strategy for putting the price of newsprint in context is to compare it to the prices of other goods in the same industry. The three most common categories of printing and writing paper are uncoated freesheet paper, coated paper and uncoated mechanical paper. The papers in these categories have similar inputs to newsprint, like newsprint they are produced in significant quantities in Canada, and their prices are unlikely to have been affected by the merger of Abitibi and Bowater. If the prices of paper grades in these categories have behaved in the same way as the price of newsprint, it would seem to be unlikely that the recent rise in the price of newsprint is due to the merger of Abitibi and Bowater.

23. Figure 4 compares the nominal U.S. dollar price of newsprint to the average of the

Figure 4: Nominal Paper Prices

prices of three commonly used types of printing and writing paper.[11] The price series in Figure 4 are strikingly similar. A notable trend that is common to both series is that prices have risen significantly since the first third of 2007. Given that the prices of the other types of paper are unlikely to have been affected by the merger, this trend supports the DOJs contention that market forces—particularly cost inflation and exchange rate fluctuations—are likely responsible for the recent increase in the price of newsprint.

## 5    Capacity Reductions

24.    Chart 3 in Mr. Preston's declaration plots the price of a tonne of newsprint against a measure of the average cost of producing a tonne of newsprint. The goal of this chart is to support Mr. Preston's argument that increases in the cost of producing newsprint cannot explain the recent rise in the price of newsprint. The chart is misleading because it ignores the basic economic fact that market prices respond to the cost of the marginal mill (albeit with a lag) and not to the cost of the average mill. A firm that owns a mill that is losing money will not keep operating that mill

---

[11]Deflating the prices and adjusting for the exchange rate would affect each price series identically and would not affect the comparisons. The specific grades used are formbond uncoated freesheet (20 lb.), coated number 5 (40 lb.) and supercalendered A paper (35 lb.), an uncoated mechanical paper. The price data are from RISI.

because the average industry mill is making money.

25. The best evidence that AbitibiBowater's reduction of its newsprint capacity does not represent an exercise of market power is that the mills closed by AbitibiBowater were losing money. Mill level cost data gathered by the DOJ show that the closed mills were losing money when they were closed. Further proof is that when the mills were closed the executive chairman of AbitibiBowater, John Weaver, stated on a conference call with financial analysts that "all of the capacity closed was in a negative cash position."[12] There is no evidence that suggests that the closed mills were profitable.



Figure 5: Capacity Reductions by Firm by Year

26. If AbitibiBowater were acting as a dominant firm, one would not expect to see its competitors reducing their newsprint capacity. Instead, one would expect its rivals to be enjoying higher prices while operating their capacity to its utmost. Figure 5, which displays the history of capacity reductions in the newsprint industry since 2000, shows that while AbitibiBowater significantly reduced its newsprint capacity in 2007 and 2008, so did its competitors. This history of capacity reductions is at odds with the theory that AbitibiBowater's capacity reductions were an exercise of market power. Another point worth noting is that the capacity reductions in 2007 and 2008 are entirely consistent with the pattern of capacity reductions since 2000.

---

[12]Fair Disclosure Wire, AbitibiBowater Earning Call, at *2 (May 8, 2008) (attached as Exhibit B).

27.    A final point to make about the history of capacity reductions is that it has been increasingly dominated by the closure of Canadian assets. Figure 6 depicts capacity reductions by country since 2000. This figure makes two important points. First, it supports my earlier conclusion that the strengthening of the Canadian dollar vis-à-vis the U.S. dollar has significantly weakened Canadian mills. Second, it highlights the fact that the marginal newsprint mills are now in Canada.



Figure 6: Capacity Reductions by Country by Year

## 6   Conclusion

28.    I have examined the claim by Mr. Preston that the merger of Abitibi and Bowater created market power and found it to be contrary to the available evidence. Once adjusted for cost inflation and exchange rate fluctuations, newsprint prices are lower now than when the merger was announced. Further, trends in the price of newsprint are consistent with trends in the prices of similar paper grades that were unaffected by the merger. AbitibiBowater has closed newsprint capacity since the merger was announced, but all of the closed mills were losing money. Such closures were expected with or without the merger and are not anticompetitive. And, while AbitibiBowater has closed capacity, so have its competitors, which is inconsistent with the contention that AbitibiBowater is acting as a dominant firm. In short, the evidence since the merger is consistent with the view that the divestiture of the Snowflake mill constitutes adequate relief.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief

Executed on 8 August 2008

/s/ Nicholas Hill

_____

Nicholas Hill, Ph.D.

**Exhibit A**

## Nicholas D. Hill

| | |
|---|---|
| CONTACT INFORMATION | U.S. Department of Justice<br>Antitrust Division<br>600 E Street, N.W.<br>Suite 10000<br>Washington, DC 20530 |

Phone: (202) 307-0514
Fax: (202) 514-5847

E-mail: nicholas.hill@usdoj.gov

EMPLOYMENT

**U.S. Department of Justice, Antitrust Division**

Research Economist, August 2006 —

EDUCATION

**Johns Hopkins University**

Ph.D., Economics, May 2007

**University of Warwick**

M.Sc., Quantitative Development Economics, 1995

B.A., Economics and International Studies, 1994

AREAS OF EXPERTISE

Industrial organization, applied microeconomics, political economy

WORKING PAPERS

*Analyzing Mergers Using Capacity Closures* (2008).

*The Year in Review: Economics at the Antitrust Division, 2007-2008* (2008). Co-authored with Ken Heyer.

*Sequential Primaries, Pandering, and Information Transfer* (2005)

HONORS AND AWARDS

Best Work by an EAG Staff Economist: Theory, 2007-2008

TEACHING

*Visiting Professor — Johns Hopkins University*

Graduate Microeconomic Theory I, Fall 2007

**Exhibit B**

Q1 2008 AbitibiBowater Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire May 8, 2008 Thursday

Challenges remain, but our actions have mitigated the adverse impact of these inflationary issues. We expect continued momentum in our earnings improvement in the coming quarters as we realize both synergies and favorable market pricing trends. From a synergies perspective, by the end of the first quarter, we had achieved an annual run rate of $180 million. The amount realized helped to partially offset rising costs I just mentioned.

One of the major components achieved thus far was a work force reduction of nearly 2,500 people or approximately 14% of the work force. There has also been a shift in production to produce the right grades on the right machines. In addition, we have projects reducing energy and chemical usage at various sites. We are working aggressively on synergies and we are confident we will achieve the full $375 million annual runway by the end of 2009.

During the quarter, we successfully completed the capacity closures related to our Phase 1 strategic review of operations. As you recall, we closed nearly 1 million tons of newsprint and specialty production. All of the capacity closed was in a negative cash position. During the implementation of our phase one action plan, we also undertook and continue to work on Phase 2, which is about setting priorities and direction for the Company, while focusing on cost control.

Phase 2 involves the comprehensive review of all aspects of the business in an effort to further reduce costs, improve our manufacturing platform, and better position the Company in the global marketplace. In spite of the continued decline in North American newsprint consumption our overall business fundamentals are improving. Thus, additional production closures will not be announced at this time.

Although progress has been achieved over the past few months, labor restructuring, energy and fiber costs remain key issues to be addressed in Eastern Canada. Therefore, we continue to evaluate further action as we work through these key issues.

Examples of Phase 2 actions include the restart of the specialty machine at Dolbeau with a much lower cost structure, an increase in our sales target to $375 million, and the launch of a sales process for the South Korean mill and other assets, a reduction in fiber cost and improved access to biomass at Eastern Canada, a reduction in staffing, a commitment to explore avenues to grow our value added coated and specialty business.

We introduced two new environmentally friendly [Hi-Brite] products. A commitment to grow our international sales reducing the exposure to challenges facing North America and the idling of 50% of our lumber production and the consolidation of some of our lumber operations.

Since the end of the first quarter, we have successfully refinanced the AbitibiBowater subsidiary in a very difficult capital markets environment. In addition, we sold the Snowflake Arizona mill in April and have received the proceeds. We have achieved sales proceeds of approximately $220 million to date in the asset sales program.

We have made and continue to make the decisions that we believe are essential to improving the Company's financial position. We remain extremely focused on positioning the Company to deliver the synergies and improving our financial results. With that, I will turn the call over to Dave.

DAVID PATERSON, PRESIDENT, CEO, ABITIBIBOWATER INC.: Thank you, John. From an operations standpoint, we remain steadfast with a focus upon realizing price improvements, and synergy cost savings. As John pointed out, we faced a $27 million increase in pulp and paper fiber costs and a $5 million increase in energy costs during the quarter. However, we were able to partially offset these item with cost control. The synergies are real and they are falling to the bottom line.

I will now cover our key markets. Looking first at news print. Through March, total U.S. consumption was reported down 8.5% year-over-year which is an improvement over the trends we saw last year. Industry production was in line with this decline, and was down by 9%. Industry exports have increased by 2% year-over-year.

Exports in general have been hindered by global logistical issues affecting all exports as well as the fact that we closed two of our export mills. We have implemented each of the announced pricing increases between November of last year and May of in year and we anticipate implementing the announced June increase. Pricing in many of our offshore markets is moving up on a rapid pace. One exception is Europe where the price is set on an annual basis.

In local currency, the price in Europe declined by 7% to 8% year-over-year. However, Europe remains a very attractive market for [dollar faced] manufacturers. Markets like India have seen price increase by $50 in the first quarter and by an additional $100 per ton in the second quarter. Excluding North America, global newsprint demand is up about 1% through March with significant increases primarily in Asia and Latin America.

Q1 2008 AbitibiBowater Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire May 8, 2008 Thursday

Combined exports from both former companies in 2007 totaled 1.6 million tons from North America, which was up about 6% over 2006. We intend to increase our export shipments in 2008, by over 10%, limited only by logistics.

Turning to commercial printing papers. Demand for coated mechanical papers in North America is up 4% through March. Helped by a strong demand the shipment to capacity ratio reached 102% during March. Total demand for uncut and mechanical increased 4.7% through March with gains of just over 5% in super calendar paper and almost 10% in the standard grades.

The negative developments in the U.S. economy have not yet meaningfully affected customer orders for our products. We have experienced double-digit growth in uncoated free sheet substitutes and Hi-Brites during the first quarter as customers look to find ways to mitigate rising paper printing and mailing costs. April price increases averaging $50 to $60 per ton have been announced for all our coated grades and most all of our uncoated grades as have been reported by third parties.

Shifting now to the global pulp market. World shipments continue to be strong. March shipments were at about 3.6 million tons, up 4% over March 2007, and 6% year-to-date. Total inventories are in good shape at about 34 days of supply, which is around the 10-year average. We have implemented several price increases recently.

Moving to the wood products business. According to the U.S. Census Bureau, housing starts fell under a million units on a seasonally adjusted basis in March which was their lowest total in 17 years. Lumber prices in recent weeks have improved marginally but remain uneconomic.

With a decline in demand and pricing we are minimizing production where possible and are continually analyzing the right strategies to supply fiber to our mills. As John mentioned, we are operating at nearly 50% of capacity. As part of Phase 2, we have consolidated some of our sawmill operations in Eastern Canada, reducing operating costs in those areas significantly.

In summary, for the pulp and paper markets we're seeing price improvements in virtually every grade we produce. Our order books are full. We remain committed to matching our customers' demand for paper and expect continued production cost improvements. I will now turn the call over to Bill Harvey. Bill?

WILLIAM HARVEY, SVP, CFO, ABITIBIBOWATER INC.: Thanks, Dave. Before I begin, I'd point out that as you're probably aware we reissued our press release this morning. There was a minor change in the product line information, relating to the wood product segment. There was no change in the financial statements.

Secondly, I would like to remind everyone that any comparisons I do related to the fourth quarter are a little apples-to-oranges since the fourth quarter included three months of Bowater's results and two months of Abitibi's results reflecting the October 29 merger date. That being said, for the first quarter we reported a net loss of $248 million, or $4.32 per share on sales of $1.7 billion.

Excluding special items, the net loss for the quarter was $215 million, or $3.74 per share. Special items, net of tax, consisted of the following: A $44 million gain relating to foreign currency changes; $16 million gain relating to asset sales; A $17 million loss relating to closure costs and severances; And a $76 million charge relating to tax adjustments.

Overall, results in the first quarter were negatively impacted by a sharp rise in wood and recycled fiber, energy and chemical costs. Compared to the fourth quarter, fiber costs in chemicals for our pulp and paper business, increased by over $40 million. During the quarter, we saw a very positive trend in our cost performance as we began to realize synergies.

The significant costs pressures we experienced had begun at the outset of the quarter. However, by the end of the quarter, we had offset these cost pressures and had gained very significant traction. The manufacturing cost improvement across the board in all our grades, when you compare January to March, was over $20 per ton and in some areas over $50 per ton.

The $180 million annual run rate for synergies is tangible. In the quarter we realized almost $40 million in the bank. I would also highlight, that we measure synergies versus how the two companies performed in 2006. So that actions taken in 2007 are included on our synergy calculation. That being said, the quarter-to-quarter improvement is meaningful and we expect more to come.

Interest expense in the first quarter totaled $129 million. As you are aware, we successfully completed a refinancing of our Abitibi subsidiary on April 1. As a consequence, our interest expense will increase by approximately $22 million per quarter beginning in the second quarter.

Q1 2008 AbitibiBowater Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire May 8, 2008 Thursday

In summary, the refinancing included a $413 million private placement due 2011, a $350 million, 364-day term loan, $293 million of new notes from an exchange offer now due in 2010, and a $350 million convertible debenture due 2013. Our capital spending in the first quarter totaled $35 million. We expect spending in 2008 to be in the $150 million to $200 million range.

From a liquidity perspective as of March 31 our Bowater subsidiary had liquidity of $308 million consisting of $130 million of cash and approximately $200 million of unused bank lines. As of April 1 when the refinancing was completed Abitibi had liquidity of $185 million represented by invested cash. As of April 15, after the sale of Snowflake and a repayment of a portion of the term loan, our Abitibi subsidiary had invested cash of $277 million.

Our outlook for the second quarter is optimistic. We expect to build on the current positive trend with a substantial improvement over the first quarter. We have faced significant cost inflation pressures, but we're mitigating these through synergies and realizing substantial price improvements. I expect our business segments to show an EBITDA increase similar to the improvement we saw between the fourth quarter and the first quarters.

DUANE OWENS: [Carolyn] will now open the lines for questions.

Questions and Answers

OPERATOR: Thank you. (OPERATOR INSTRUCTIONS) There will be a brief pause for the participants to register for questions. Thank you for your patience.

The first question is from Chip Dillon from Citi. Please go ahead.

CHIP DILLON, ANALYST, CITIGROUP: Yes, good morning. First of all I missed the CapEx number for the first quarter. What was that again, Bill?

DAVID PATERSON: $35 million.

WILLIAM HARVEY: Yes, $35 million, Chip.

CHIP DILLON: $35 million. Okay. And then you mentioned you saw, you expect EBITDA improvement in the segments, I guess you said, but from the -- it would be the same from the -- in the first and second as it was from the fourth quarter to first. I don't -- I guess if you could talk a little bit about the newsprint number, which seemed like it -- improved about $25 million, looking at the pace of pricing and throwing in some synergies it would seem like maybe you would more than that.

Could you address that and also could you talk a little bit about the corporate expense line which was I think when you strip out the one time items was about $76 million. Is that expected to stay up at that level?

WILLIAM HARVEY: Yes, chip. I think when I talked about the business I was grouping them. I think we had approximately $100 million improvement across all business areas including lumber, pulp, coated, et cetera. And what I really -- I did not mean that any specific area would increase by the same amount. I meant in aggregate we could expect a similar $100 million improvement.

CHIP DILLON: Okay.

WILLIAM HARVEY: And you are right on the -- on this corporate and other line we do, are targeted to lower that. There weren't a lot of one-time charges.

In fact, there were some special items not taken, but I could think of as one-time type of events in the first quarter. We're targeting to get that number at the corporate line, to be a more stable number at $70 million or below.

CHIP DILLON: $70 million or below in the second quarter?

WILLIAM HARVEY: I think we're targeting that as where we need to get it to. I can't tell you that we -- it is $70 million is in the bank, in the second quarter, but that's our target.

CHIP DILLON: Okay. And then as you look at the newsprint market, we saw some pretty strong numbers in January and February, both domestic -- well, not -- domestically I wouldn't say "strong" but certainly not as bad, but March was certainly a disappointment.

And what is the marketplace look like today? You mentioned some very strong pricing in Asia. But overall, with the difficulty in getting shipping, the logistics, are you still able to -- is the market still pretty tight here in North America?

Q1 2008 AbitibiBowater Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire May 8, 2008 Thursday

DAVID PATERSON: Chip, this is Dave. The -- yes, the market remains tight. I guess I would make a couple of points from an AbitibiBowater perspective. The capacity we closed in the first quarter really didn't come out full effect was -- March was the first month and all those mills were out of the system.

When we look at our inventory, normally you would expect an inventory build in the first quarter and almost all sectors. We didn't have that despite having some vessel problems particularly in the month of March. And as we look into April and now May, shipments are strong, both export and domestic. So I consider the market in good shape.

CHIP DILLON: Okay. And if you -- you mentioned a 10% increase in exports. It would seem like, with the pricing you're seeing over in Asia and with the dollar averaging -- continuing to average down, although I know it is up in the last week, that you could probably do better if you could export more. Is it just a matter of logistics or is it -- is there other reasons why you wouldn't be increasing your exports even more?

DAVID PATERSON: Well, I think -- I think logistics is the short-term issue which we're addressing. We have done some things to get that fixed. Also, we do have a large and important North American customer base that we want to support. And we work very closely with them. So it is a balancing act to some degree.

But of course if we continue to see these sort of 8% to 10% declines on the U.S. side we have to take that tonnage either to alternative products offshore, or close capacity. And right now, the best alternative is to go offshore.

CHIP DILLON: And okay. And then this lastly, it sounds from your announcement this morning, that you're considering coated paper to be quite core. So, it sounds like the last thing you would be doing is looking to exit that business and as you think about growing it, is the most likely conversion the resurrection of the one that was being thought about at, I think, Thunder Bay or are there other facilities at -- that would be more attractive?

DAVID PATERSON: Well, I think we have got a number of facilities across our system both in the U.S. and Canada that are conversion eligible. We're evaluating all of those. And I think you will be hearing back from us fairly soon in terms of direction.

But, from our point view, facilities that have the craft pulp TMP and recycle capabilities give us unique ways to convert from newsprint to alternative products and we're examining all of those. But you will hear from us soon.

CHIP DILLON: And I'm sorry, one last quick one. Is -- looking at the cash flows, and seeing the net debt continue to increase in the first quarter, do you have a goal, as to when you think you could be free cash as a Company overall, neutral? Do you think you could be in in the third quarter with all -- assuming the coated paper -- well, of course it is stuck -- and assuming the June price increase in newsprint? Is that possible?

WILLIAM HARVEY: Yes, I think it is possible. But I think if you look at what -- $100 million improvement in EBITDA in the second quarter and take into account we are investing in working capital as you see from the AR line, we -- I think the second -- the third quarter is -- is possible.

CHIP DILLON: Got it. Thank you.

OPERATOR: Thank you. The next question is from Peter Ruschmeier from Lehman Brothers. Please go ahead.

PETER RUSCHMEIER, ANALYST, LEHMAN BROTHERS: Thank you. Good morning. Apologize up front for my voice. The D&A for the quarter was a little higher than I expected. I was curious, Bill, if you could help us out with a pro forma D&A number for the closures as we should think about it for the second quarter and beyond?

WILLIAM HARVEY: Yes, the D&A again, remember I -- remember, Pete, that the D&A in the Q4 reflected only two months of ACI. But -- and you're quite right that there were closures, et cetera, so, we expect in Q2 that number to drop to about the $180 million range.

PETER RUSCHMEIER: Okay. That's helpful. Then on the cost side of the equation I believe you said pulp and paper costs overall $40 million sequential increase.

I am curious if you can help us to understand where the run rate might be today if costs were to hold flat relative to the first quarter?

WILLIAM HARVEY: Again, that -- that $40 million increase really reflected in pulp and paper the impact solely of fiber, chemicals and energy. So that's just the cost inputs that hit us, what we could consider on the price side in the quarter.

Q1 2008 AbitibiBowater Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire May 8, 2008 Thursday

And we did also see a sequential improvement month-by-month from January, February, to March. Especially March. I think March really is when the first, the system ran in an optimized fashion and we saw a dramatic improvement in operations in March. That's what we mentioned the costs that had dropped almost in every area by about $20 from February to March.

PETER RUSCHMEIER: Okay. In terms of cost per unit?

WILLIAM HARVEY: Cost per unit.

PETER RUSCHMEIER: Got it, okay. Lastly, if I could just ask for some guidance on clarifying your pro forma net debt position, if you start with the $5.665 billion and if we adjust for the refinancing and for the Snowflake proceeds, where is that number today?

WILLIAM HARVEY: I think it is just trying to think, Chip. I think it is approximately $6 billion today. I am just -- let me just look that up, I will come back and clarify that. I will apologize. On this call we will put up the number.

PETER RUSCHMEIER: Okay. Super. Thank you very much.

OPERATOR: Thank you. The next question is from Mark Connelly from Credit Suisse. Please go ahead.

MARK CONNELLY, ANALYST, CREDIT SUISSE: Thank you. I was just hoping you could give us a little bit more flavor for the situation in the export markets. You talked in both your comments and in the prepared notes about the logistics issue. I wondered if you could give us a sense of how much of a restriction that is right now for you?

Obviously, it is not something you can fix overnight, so I was trying to get a sense of how big it is? And secondarily I wondered if you could just give us an update on your competitive position relative to a European producer, rough estimate of delivered costs to where your customers are?

DAVID PATERSON: I will take a crack at it, Mark. I guess starting with the logistics question, I think that there are really two components that we need to improve on. One is just the ability to secure and book vessel space or containers for vessels. I think the surge -- I don't think it is just the pulp and paper industry that is exporting more these days. I think with the exchange rate the U.S. is in general exporting more and trading patterns have shifted.

So it is finding the space. And we put a process, internal process in to make it easier to do business with AbitibiBowater on the export side and we have already seen in the month of April significant improvement in booking and scheduling of vessels.

The second one, and perhaps more important in the long term sense is we need some investment by governments in infrastructure projects, both in Canada and the U.S., to support increased exports. We're working with governments to get that done. That's things like warehouses and piers, and roads.

And we have several facilities, particularly in Eastern Canada, that could be taken offshore to a greater degree if the infrastructure was there to support it. And it has two benefits for us. One, of course, it takes tons out of the North American market but also, loading on a vessel and shipping to Europe or the Mediterranean is pretty cost effective from Eastern Canada versus trying to truck or rail down to the U.S.

And, so that's a good trade-off for us on a mill net basis. In terms of Europe, the key, of course, for us is exchange rate. And with the euro at $1.54 -- I haven't looked today, but I think it is $1.54 this week. We are very cost competitive both from Canada and the U.S. Our delivered costs, particularly to Western Europe, will be higher on a per ton basis, but I think because of the exchange rate our mill nets are very good, and we continue to be focused on growing where it makes sense in Western Europe and the Med out of Eastern Canada.

PETER RUSCHMEIER: Perfect, thank you.

DAVID PATERSON: Thank you.

OPERATOR: Thank you. The next question is from Joe Stivaletti from Goldman Sachs. Please go ahead.

JOE STIVALETTI, ANALYST, GOLDMAN SACHS: Hi. I had a few things. One, was the -- on the lumber business, with all the closures and what not. If the market conditions stay similar to what they have been, will you be able to shrink that loss more with some of these further closures beyond what the improvement we saw from Q4 to Q1?

DAVID PATERSON: Well, I think -- I think right now we were running at rate that makes sense for us. We are encouraged by our ability to significantly lower our costs there, and the second part of any lumber operation question in Canada is the support of our **paper mills.** Wood chip availability is driven by lumber mills in Eastern Canada.

Q1 2008 AbitibiBowater Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire May 8, 2008 Thursday

Wood chips are very, very tight. And so it is a question of supporting paper activity and at the same time trying to minimize the losses in the lumber business. But I think the current level of activity in our lumber business is appropriate for what we're trying to do in terms of minimizing the lumber loss and support our **paper mills.**

JOE STIVALETTI: But this is current level of operation a bit lower than your average in the first quarter?

DAVID PATERSON: I would say it is probably -- it is probably about the same. Most of the steps we took were early in the quarter. I think our costs are continuing to come down through the quarter, and will be better in the second quarter, because of some of the issues that we resolved with governments and with our unions at the lumber business.

So those benefits will flow through in the second quarter to a greater extent. But in terms of the absolute volume of production I think it would be fairly stable just on a lower cost platform.

JOHN WEAVER: So in terms of the loss in the lumber business, there is a likelihood of some improvement given the consolidation and the curtailments that Dave has indicated.

DAVID PATERSON: Volume point of view, I think, John, is pretty stable.

JOHN WEAVER: Volume, right.

JOE STIVALETTI: Right, right. Okay.

DAVID PATERSON: At admittedly low levels, but levels we're comfortable at right now given the circumstances.

JOE STIVALETTI: Uh-huh. Okay. And then on the asset sale front you basically you're saying you're targeting another $280 million for the rest of this year. To get to the $500 million because you have done $220 million and then another $250 million next year.

Have -- are you in a -- willing to give us any more sort of detail on what makes up that? Whether it is sort of high things on your list. You mentioned the mill in South Korea. Any other big pieces there that you can share with us?

JOHN WEAVER: Well, as we indicated, previously, we are looking at the mill in South Korea. There is also ongoing timber land sales both in the U.S. and now predominantly in Canada as we look forward. And we are looking at other opportunities including some of our smaller hydro assets and other opportunities.

But we feel confident that we can realize the additional $250 million. I guess somebody indicated I [mis-said] the total asset sales in the script and it should really be $750 million of total asset sales. $500 million this year and $250 million the following.

JOE STIVALETTI: And the last question I had was, when you talk about the potential conversions of a mill or mills, to coated, and I realize it is very early. But just in very -- to the extent even if it is a ballpark term, can you give us a rough idea on what it would cost to convert one of those facilities -- I mean what zip code you're talking about to convert one of those mills if you decide to move forward?

DAVID PATERSON: Well, historically, the old Bowater talked about $180 million to $200 million to convert a large scale machine from newsprint to coated. And that was our experience at Catawba, which, I think, those of you who follow our Company you know Catawba has been a real home run for us.

JOE STIVALETTI: Right.

JOHN WEAVER: And the good point Dave has raised is that we are going to convert -- we're looking for a low cost asset at the end of the day, so, the conversion is likely to be a larger machine.

JOE STIVALETTI: Okay. Thanks a lot.

DAVID PATERSON: Thank you.

OPERATOR: Thank you. The next question is from Mark Wilde from Deustche Bank. Please go ahead.

MARK WILDE, ANALYST, DEUTSCHE BANK: Hi, good morning.

DAVID PATERSON: Hi, Mark, good morning.

MARK WILDE: Just to kind of follow on on those asset sales, can you just give us a little refresher on how much land is out there in both the U.S. and Canada at this point?

Q1 2008 AbitibiBowater Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire May 8, 2008 Thursday

WILLIAM HARVEY: Mark, I will cover that. In the U.S. it is broken into free hold and also some long-term leases. We have about 30,000 acres of free hold left and about 70,000 acres of long-term leases. And in Canada we have 600,000 acres in Nova Scotia in the Mersey partnership and we have about a million acres in Quebec.

MARK WILDE: All right. And then also on the asset sales, you didn't mention Lufkin, but is that potentially in that asset sale bucket as well?

JOHN WEAVER: Well, Lufkin -- Lufkin, of course is -- we have various assets there that can be sold in pieces, or in the whole site [effect], but we still are trying to be steadfast that we're not going to create a competitor for a dollar, but all our assets here or there could be sold as we look at it. And some are being demolished. We're in the process of [demo-ing] some of the mills we closed in previous years.

MARK WILDE: Okay. And then, turning to the export market, is it possible to give us a sense, John, of where the most attractive mill nets are in the export market right now?

DAVID PATERSON: Let me take a crack at it, Mark.

MARK WILDE: Okay.

DAVID PATERSON: I think Europe right now as we sit here today, Europe is still probably the most attractive mill net market based on exchange rate. Given what our forward view is, I think that the rest of the world will catch up with Europe, probably by the end of the second quarter, or over the summer.

And so I would say that as a globally-traded commodity, newsprint is going to arbitrage to the European number pretty quick here.

MARK WILDE: Okay, and another market that Abitibi typically sold a lot into was down in the Caribbean and Latin America. I just wonder what did growth in places like Brazil right now and the fact that Norske just put a fork in that project they had down there. Whether that market is growing for you?

JOHN WEAVER: I think that just to -- in terms of both of the Latin America markets that we have all, both Abitibi and Bowater have probably been Number 1 and Number 2 ongoing, and so now we are certainly the largest supplier to many of those markets. And in Brazil, we have been the largest supplier and I think we have an opportunity to see some growth there.

The pricing there generally, follows U.S. pricing and so it is moving up, as we speak. And certainly is -- will be a favorable market as time goes on, especially with somewhat better logistics than India or other places like that.

DAVID PATERSON: Brazil is a good question, Mark, because with the Norske announcement I think Brazil will be a pretty attractive market. We were anticipating a new entry there and it is not going to happen now.

MARK WILDE: Okay. And on this coated paper issue, Dave, just from looking at the numbers you reported here in the first quarter, and then, taking into account that $60 increase, it looks to me like you might EBITDA $200 million on Catawba this year just on the coated paper side, kind of excluding the pulp mill down there?

DAVID PATERSON: Yes?

MARK WILDE: How much of that is the result of just that one machine conversion you did? How much of it would be allocated to that -- I think it was "Big Blue" or" Old Blue" machine that you did.

DAVID PATERSON: Yes, "Old Blue." I don't want to pull the mill apart but, yes, that is the biggest, fastest machine down there with the lowest cost structure. So it is a big chunk of that was that decision that was made, I guess, back in 2001, 2002, to convert. And as -- at -- it continues to be a great investment.

MARK WILDE: Okay. And then, is it possible to give us some sense in value-added, about why we don't see better performance there? It seems to me with coated paper prices up and SC moving up, with the uncoated free sheet market, doing pretty well right now, that we would see better results in that value-added segment than we are seeing right now?

DAVID PATERSON: Well, I think the challenge for us and the value-added segment, Mark, is really this Eastern Canadian issue we're referring to. We have got to get a lower energy-fiber-labor cost structure around those assets that run specialty in Eastern Canada.

I think from a revenue point of view, they are well-priced and well-accepted in the market, but we have got too high a cost structure and that's really a lot of what we're continuing to work on aggressively. If we can't get our costs down significantly then, yes, we will have to reevaluate our manufacturing strategy on those value-added grades.

Q1 2008 AbitibiBowater Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire May 8, 2008 Thursday

MARK WILDE: Okay. And then last question, Bill Harvey, is it possible for you to give us kind of a going forward view of how much maintenance expense is going to kind of ebb and flow over the next few quarters? Just taking the first quarter as a base?

WILLIAM HARVEY: When you say "maintenance" you're talking some major maintenance of --

MARK WILDE: Yes, just the annual mill outages. If you go back over the last several years, this was always a big flex factor. Sometimes it led to surprises on a quarterly basis.

WILLIAM HARVEY: Yes, and it is primarily on the pulp side. We do have a major outage of about $10 million in pulp spending and loss contribution in the first quarter and about the same amount in the third quarter. About equal in both quarters.

MARK WILDE: Okay, and is that incremental to whatever you had in the first quarter?

WILLIAM HARVEY: Yes. Yes. There was not -- there was, of course, in the winter months we had no major maintenance in the pulp mills in the first quarter.

MARK WILDE: But there is no other big maintenance event that looms, is really going to move the quarterly numbers around a lot then?

WILLIAM HARVEY: No, just those $10 million in the second quarter and $10 million in the third quarter.

MARK WILDE: Okay. Very good, I will pass it on. Thanks, guys.

OPERATOR: Thank you. Your next question is from Don Roberts from CIBC World Markets. Please go ahead.

DON ROBERTS, ANALYST, CIBC WORLD MARKETS: Thank you. John, I guess, start on the asset sales. The -- you know in the past -- there has been speculation in the investment community about the hydro assets. But this seems to be the first time you mentioned it explicitly.

And I guess I am just wondering the magnitude. You have a lot of different assets out there. Probably the biggest value are the Ontario ones. I am just wondering what kind of -- just sort of here and there, small ones or is it the bigger ones because, if it is the bigger ones could you give us a sense of how much foregone EBITDA -- how much EBITDA would we be giving away if they were sold?

JOHN WEAVER: Well, I think that -- the challenge is what -- of selling the hydro assets, of course, is the underlying cost advantages they bring. And one of the reasons for ACH Hydro in Ontario was so that we could unlock some value, but continue to realize the cost advantage.

And so I think that the sale of some of the larger assets is more challenging, however, without the selling the mills associated with them. But we also continue to look at some of the smaller assets and we think there is real value in those assets, both from a hydro advantage and from this order of green currency advantage that is in the marketplace today.

And so some of our smaller and more isolated assets have a real favorable market right now, and so we're going to be looking at those over the coming year.

DON ROBERTS: Okay. Second question, again, I guess has implications for the asset divestitures. In Quebec, we have this green paper the government has put out there. There are consultations going on.

What are the key messages and implications you see coming out of this and time lines? Is there -- are we looking at really meaningful changes, for example, in the tenure, which would again affect value on that 1 million acres and maybe the sale of the sawmills?

JOHN WEAVER: Well, I think the -- value of those lands, but I -- we don't expect significant changes in tenure. It is going to be, the green paper outlines some various ways of managing the forest in terms of tenure going forward.

But the expectation is that the timber will be sold for lumber and forest products. And so I think as long as you have that ongoing assumption it makes -- it brings some value to the sale of those lands.

DON ROBERTS: Okay. And just lastly over to Dave. Could you just comment, Dave, on the fiber cost changes on a regional basis?

DAVID PATERSON: Well, I think -- I think I have -- it is not so much regional, per se, as it is the type of fiber. Because what we're seeing is -- tree or harvest fiber from the forests is fairly stable. You have dislocation between Eastern Canada and the U.S. South, but that has been structural and it has been there a long time. But the real change in

Q1 2008 AbitibiBowater Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire May 8, 2008 Thursday

our fiber cost has been on waste paper. We saw an exceptional run-up in the cost of waste paper through the fourth quarter into the first quarter. It is leveling off now. But at very high levels.

So as we sit here today, our lowest cost furnish would be craft pulp, and our next would be TMP and waste paper in many cases is our highest cost furnish, which is a change from historical perspectives. So what we have done where we have the option and flexibilities were -- being prudent about how we use waste paper because it is so expensive and increasing our furnish mix of craft and TMP to lower our cost structure.

So that is part of the reason you saw something like newsprint where we have some of that flexibility. We didn't see a huge cost increase in newsprint, but in our mills that are heavily recycled in newsprint we took some pretty significant cost hits.

JOHN WEAVER: The other -- the other big thing that -- regionally I think that we have to point out that is in Eastern Canada, we don't have a pulp wood price. So the ability to chip, make chips, is limited. And that's what really makes Eastern Canada uncompetitive versus the U.S. South.

DAVID PATERSON: That's a great point. In the U.S. South we have a pulp wood market and then a saw log market.

DON ROBERTS: Okay, I will pass it on. Thanks very much.

DAVID PATERSON: Thanks.

OPERATOR: Thank you. The next question is from Mark Weintraub from Buckingham Research. Please go ahead.

MARK WEINTRAUB, ANALYST, BUCKINGHAM RESEARCH GROUP: Thank you, on the asset sale and EBITDA question is it possible to give us a sense of how much EBITDA was associated with the 700 -- or is associated with the $750 million of assets that you are targeting for sale?

WILLIAM HARVEY: Mark, we haven't even talked -- even explicitly stated which assets they are so we're not comfortable putting out an EBITDA number at this point.

MARK WEINTRAUB: Okay. And, secondly, can you give us a sense of how you think about prioritizing the use of cash flow going forward over the next couple of years, between further deleveraging versus shoring up the asset base versus the conversion projects, et cetera, to improve the profitability of the assets? How do you conceptualize that issue?

JOHN WEAVER: I think the Number 1 issue, target for us is the repayment of debt. And that remains that and we're going to really be focused on debt repayment. We have said that we're going to spend this year approximately $150 million to $200 million, but a more typical CapEx number is probably $300 million to $350 million.

And I think that any cost improvement or even conversion projects we would take out of that $350 million or $300 million and manage our CapEx to those targets ongoing. And, so that we -- if we had a big strategic project we would reduce capital spending in our other assets. Maybe, Dave --

DAVID PATERSON: Yes, I think to build on John's comment, I think spending at 25% of your depreciation is probably not sustainable long term. We can do it for a periods of time and we're doing it now. But -- as John said, normalized would be, say 50% of depreciation gets you to $350 million, and we certainly can fund conversions and operating the Company hat those kind of levels.

We're funding it now. We're doing a boiler -- we're building a boiler at Ft. Frances and running the Company on $150 million to $200 million. So we can certainly do conversion within that 50% or less of depreciation target.

MARK WEINTRAUB: Great. And then last thing, and I realize this may be too complicated to answer on this call, but is there a way to help us model our figure out how cash taxes will work kind of over the next year or two?

WILLIAM HARVEY: I think it -- yes, there is. From the point of view of -- on the cash tax point of view we will pay zero taxes in Canada over the next two years.

In the U.S. because of some corporate structural changes we have done we expect we will not pay significant cash taxes in the U.S. We were in a position where we were using NOLs in the U.S. and they were winding down. But through the corporate changes, et cetera, we have made as a result of the refinancing actually, we don't expect to pay any significant cash taxes.

MARK WEINTRAUB: Okay. And but -- in terms of getting provisions back, how will that work? If at all?

Q1 2008 AbitibiBowater Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire May 8, 2008 Thursday

WILLIAM HARVEY: On the -- you're speaking specifically on -- from an accounting side the valuation allowances?

MARK WEINTRAUB: Well, from a cash perspective, are you going to be -- are you going to be getting money back?

WILLIAM HARVEY: No, no, we just will not be paying money.

MARK WEINTRAUB: Okay, thank you.

WILLIAM HARVEY: And one thing there was a question Peter Ruschmeier had earlier, I had mentioned it is about $6 billion of debt and that is correct, of -- this $6 billion of debt that does include amounts drawn under the AR securitization.

When we issue the 10-Q you should look at it because it does include also the fact that some of the debt as part of the acquisition, there was a revaluation of debt. From an accounting point of view the number looks smaller, but it will be fully described in the 10-Q. With that we have time for one more question.

OPERATOR: Thank you. The last question is from Bill Hoffman from UBS. Please go ahead.

BILL HOFFMAN, ANALYST, UBS: Yes, good morning. Bill, I wonder if you could just follow-up on your earlier comments about the selling and administrative, and as well, your distribution expenses and how much of that might have been one time in nature, and as we look forward what target levels you might think you could approach?

WILLIAM HARVEY: Yes, I think on the -- I -- I will speak specifically to the selling, administration. During the first quarter there were continuing activities related to integration, et cetera, that were winding down. Those expenses, as well as some other -- what I would call, consider more one-time events were over $10 million in effect.

And our target has been to get that number per quarter to 70 or below. 70 is our first step. That doesn't include all the synergies. That just includes our first step and we believe we can get there pretty shortly. Just have to manage aggressively. On distribution I will pass that over to Dave.

DAVID PATERSON: Well, I think distribution is really a function of what is happening in energy markets. Particularly oil. I mean we're paying substantially more in terms of fuel surcharges. So the ability for us to move what we call right grade, right machine, where a lot of that is freight related.

So as we keep reordering our production planning schedule, and I would say again, March was the first month, again that all the closed assets were out of the system, we were able to reload the system. That we think as we go forward, I won't say we will lower our cost of logistics, but I think we're going to use our planning and scheduling system to mitigate logistics expense.

But at $120 -- I don't know where it is today, $124 a barrel oil, we are paying substantial energy surcharges for every truck and every ship and every rail car that goes out of one of our facilities as is the whole economy. So getting, the only way really to mitigate it in the near term is to go fewer miles with every ton you ship to get, to have any chance to mitigate it. And that's what we're trying to do. Fewer miles.

BILL HOFFMAN: All right. Part of it was rationalization of, your strategy was, obviously, rationalization of making paper in different mills for different customers. So is this more of a new run rate and we're just kind of fighting --

DAVID PATERSON: I don't think you will see our true run rate until we report our second quarter numbers because again we -- March was the first month that we could really reload our system with the closed assets out and the new business model kicking in.

So, let's wait and see where we are for the second quarter. I think you will be pleased with that.

BILL HOFFMAN: Okay. And then, just the last cash question, Bill, if you could help us. Working capital-wise you still would have been burning cash in the first quarter, and probably through April. Can you just give us some guidance on where your working capital is now and whether you're making some improvements in working capital management?

WILLIAM HARVEY: Well, I think we're making improvements on the payable side. The receivable side, though, continues to be an investment, but that relates primarily to the -- price -- to additional price of the products. So we're having an investment, but then that will continue, through the second quarter, presumably the third. What we did find were some pressures in the end in March on the -- on-- from some of our suppliers in March.

Q1 2008 AbitibiBowater Inc. Earnings Conference Call - Final FD (Fair Disclosure) Wire May 8, 2008 Thursday

In particular as we were in the middle of the refinancing where we had a lot of pressures to pay early. We, of course, resisted strongly, but there was some significant pressures there and that has reversed to some degree. It is not back to where we would like it and we do have an opportunity there, but it, we'll have to work on that through the second quarter.

JOHN WEAVER: The other thing that is we have set new inventory marks for just about every grade as we continue to push down inventories. So, it hasn't been able to offset the increase in price of the products, but we have made some, inventories are low.

BILL HOFFMAN: Great, thank you.

DAVID PATERSON: Thank you, Bill.

OPERATOR: Thank you. This concludes the question-and-answer session. I would now like to turn the meeting back over to Mr. Owens.

DUANE OWENS: Thank you for joining us on today's call. We look forward to updating you again next quarter.

OPERATOR: Thank you. The **conference** has now ended. Please disconnect your lines at this time, and we thank you for your participation.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the **conference** calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S **CONFERENCE** CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE **CONFERENCE** CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S **CONFERENCE** CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

**LOAD-DATE:** May 12, 2008