UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.  07-1912 (RMC) |
| | ) | |
| ABITIBI-CONSOLIDATED INC. and | ) | |
| BOWATER INCORPORATED, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION**

Pursuant to Section 2(e)-(f) of the Antitrust Procedures and Penalties Act (the "Tunney Act"), 15 U.S.C. § 16(e)-(f), and with the consent of the Defendants, the United States moved for entry of a proposed Final Judgment in this civil antitrust action. The Newspaper Association of America (the "Association") filed a memorandum opposing entry of the proposed Final Judgment.[1] After consideration of the parties' briefs and the full record, the Court finds that the United States has shown that the proposed Final Judgment is in the public interest and will enter it accordingly.

**I. BACKGROUND**

Abitibi-Consolidated Inc. and Bowater Incorporated were the two largest newsprint producers in North America when they announced their plan to merge. The Department of Justice, on behalf of the United States, challenged the merger alleging that it would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, but then agreed to settle the case with a consent decree, as reflected in

---

[1] By order dated June 5, 2008, the Court permitted the Association to appear as *amicus curiae*.

the proposed Final Judgment. The proposed decree required the merged firm to divest a newsprint

mill in Snowflake, Arizona. Abitibi and Bowater consummated their merger and divested the mill.

Simultaneously with filing its motion, the United States filed a Certificate of

Compliance certifying that the parties have complied with the provisions of the Tunney Act and that

the waiting periods imposed by the Tunney Act have expired.[2] Notice of the proposed Final

Judgment was published in the Federal Register on November 8, 2007. Thus, the sixty-day comment

period ended on February 7, 2008. Notice of the proposed Final Judgment was published in a local

newspaper, *The Washington Post*, starting on November 18, 2007, and ending on November 24,

2007. The United States received one comment; a twenty-two-page document with over two-

hundred pages of attachments, from the Association on January 2, 2008. The United States

responded to this comment on April 18, 2008, and published the Association's comment, its

attachments, and the response of the United States in the Federal Register on June 10, 2008.[3] *See*

---

[2] The Tunney Act prescribes a sixty-day period following publication of notice in the Federal Register that a settlement has been reached for the submission of comments. 15 U.S.C. §§ 16(b) & (d). The Tunney Act also prescribes a sixty-day waiting period following commencement of publication in a local newspaper before a proposed final judgment may be entered. *Id.* § 16(c).

[3] In its brief, the United States qualifies a statement made in the June 10, 2008, Federal Register publication:

> As an example of swings in pricing based on changes in input costs and industry capacity, the United States stated that newsprint prices were at or below the lowest level which prices reached in 2006. Response of Plaintiff United States to Public Comments on the Proposed Final Judgment, at 11-15. That statement was made based on industry information available as of the date of the filing. Since that filing, data released for the entire month of April indicate that the average newsprint prices for April 2008 were one to two percent higher than they were at the lowest point of 2006.

Pl.'s Mem. in Supp. of Final J., at 2 n.1.

15 U.S.C. § 16(d) (the United States shall file comments with the district court and publish them in

the Federal Register).

## II.  STANDARD OF REVIEW

Both sides agree that the standard of review of the proposed Final Judgment is

whether it is in the public interest.  The Tunney Act provides in relevant part:

> (1)  Before entering any consent judgment proposed by the United States
> under this section, the court shall determine that the entry of such judgment
> is in the public interest.  For the purpose of such determination, the court
> shall consider –
>
> (A) the competitive impact of such judgment, including termination of
> alleged violations, provisions for enforcement and modification, duration
> of relief sought, anticipated effects of alternative remedies actually
> considered, whether its terms are ambiguous, and any other competitive
> considerations bearing upon the adequacy of such judgment that the
> court deems necessary to a determination of whether the consent
> judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon competition in the
> relevant market or markets, upon the public generally and individuals
> alleging specific injury from the violations set forth in the complaint
> including consideration of the public benefit, if any, to be derived from
> a determination of the issues at trial.

15 U.S.C. § 16(e)(1).  The proposed Final Judgment "must be approved even if it falls short of the

remedy the court would impose on its own, as long as it falls within the range of acceptability or is

within the reaches of the public interest."  *United States v. American Tel. & Tel. Co.*, 552 F. Supp.

131, 151 (D.D.C. 1982) (quotation marks and citation omitted).  The Court "is not permitted to reject

the proposed remedies merely because the court believes other remedies are preferable."  *United*

*States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 15 (D.D.C. 2007) (citing *United States v.*

*Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C. Cir. 1995)).  "Accordingly, the relevant inquiry is

whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlement are reasonable." *Id.* at 15-16 (citing *Microsoft*, 56 F.3d at 1461); *see also United States v. AT&T Inc.*, 541 F. Supp. 2d 2, 6-7 (D.D.C. 2008) (same). "The government need not prove that the settlements will perfectly remedy the alleged antitrust harms, it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

## III.  ANALYSIS

In this case, whether the settlement is in the public interest depends on the adequacy of the divestiture of the Snowflake newsprint mill.  If there is a factual basis for concluding that the divestiture is a reasonably adequate remedy for the harm predicted in the Complaint, then the settlement should be approved.  If there is not, then the settlement should be rejected.  Thus, the starting point is identifying the harm predicted in the Complaint.

The Complaint alleges that although declining demand for newsprint over time will cause newsprint producers to curtail production and reduce capacity, the combination of Abitibi's and Bowater's large market shares will provide the merged firm with the incentive and ability to close capacity sooner than either firm otherwise would absent the merger and to raise prices and profit from the higher margins on the merged firm's remaining capacity.  Compl. ¶¶ 17-19.  As the United States explained in its Competitive Impact Statement ("CIS"), "if Defendants were allowed to merge without a divestiture, the merged firm would be able to close its capacity strategically, allowing the merged firm to raise newsprint prices and recoup its lost profits on its combined output."  CIS at 9.  The issue, then, is whether the United States has provided a factual basis for concluding that divestiture of the Snowflake newsprint mill is reasonably likely to "reduce the

capacity over which the merged firm could profit to a level at which it would not have the ability to close capacity strategically." *Id.*

The Court finds that the United States has provided such a factual basis. In support of its conclusion that divestiture of the Snowflake mill will adequately remedy the harms identified in the Complaint, the United States submitted the Declaration of Nicholas Hill, an economist at the Antitrust Division of the United States Department of Justice. *See* Pl.'s Reply in Supp. of Mot. for Final J., Ex. 1 (Decl. of Nicholas Hill ("Hill Decl.")). Mr. Hill explained that the United States analyzed the merger using an approach called the capacity closure method.[4] *Id.* ¶ 9. Inputting data obtained for all of the mills owned by the Defendants, the United States analyzed the merger using the capacity closure method. *Id.* ¶ 10. That analysis showed that the Defendants would close a number of unprofitable mills irrespective of the merger. *Id.* It also showed that the merger would give the merged company an incentive to close some profitable mills that the individual firms would not close absent the merger. *Id.* ¶ 11. Therefore, the United States evaluated whether the incentive to close profitable capacity could be eliminated through divestiture. *Id.* The United States did that by running the capacity closure method analysis many times, each time assuming that the merged company had divested a different set of mills. *Id.* That process identified all of the divestitures that removed the merged firm's incentive to close profitable capacity. *Id.* The United States selected the Snowflake mill among the mills identified because, unlike some of the other candidates, the

---

[4] Under the capacity closure method, it is assumed that a firm will raise prices by closing otherwise profitable capacity. Hill Decl. ¶ 9. A firm's incentive to close profitable capacity is measured by calculating its profit under every possible set of capacity closures that it could undertake. *Id.* A firm's profit under the most profitable set of capacity closures is then compared to its current profit. *Id.* A firm will choose to close profitable capacity only if doing so yields a greater profit than it currently earns. *Id.*

Snowflake mill was highly efficient and would remain profitable for the foreseeable future. *Id.*

Based on the results of its capacity closure method analysis, the United States concluded that

divesting the Snowflake mill would sufficiently reduce the merged firm's incentive to close capacity

strategically. *See* CIS at 7-8.

The Association disputes this conclusion. It argues that the Snowflake divestiture is

too small to deter the merged firm from closing capacity strategically. In support of its hypothesis

that the Snowflake divestiture is inadequate to remedy the harms alleged in the Complaint, the

Association points to the fact that the merged firm has reduced capacity and increased prices since

the merger and divestiture. However, the mills that the merged firm closed were unprofitable, a fact

confirmed by the United States after reviewing the merged firm's confidential profit and loss

statements at these mills.[5]  *See* Hill Decl. ¶ 25. In addition, real newsprint prices, which account for

cost inflation, are lower than they were pre-merger. *See id.* ¶ 15.

In any event, the relevant inquiry is whether the United States' conclusion about the

adequacy of the Snowflake divestiture was reasonable, not whether it was correct. *SBC Commc'ns*,

489 F. Supp. 2d at 15-17. The United States has provided a factual basis for concluding that the

Snowflake divestiture was reasonably adequate to eliminate the merged firm's incentive to close

capacity strategically. Irrespective of whether that conclusion were correct, the United States has

established an "ample foundation for [its] judgment call" and thus shown "its conclusion [was]

reasonable." *Microsoft*, 56 F.3d at 1461.

---

[5]  There is no basis for the Court to question the United States' characterization of the confidential information on which it relied. If the Court were to require the United States to disclose such confidential information to third parties for verification, companies would be less likely to cooperate with civil investigative demands, frustrating the statutory policy. *See* 15 U.S.C. § 1312.

## IV.  CONCLUSION

For the foregoing reasons the Court finds that the divestiture of the Snowflake

mill is a reasonably adequate remedy for the harm predicted in the Complaint.  Accordingly, the

Court will approve the proposed Final Judgment as being within the public interest.  The Final

Judgment accompanies this Memorandum Opinion.


Date:   November 5, 2008                   _____/s/_____
                                           ROSEMARY M. COLLYER
                                           United States District Judge